IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jacquelyn Harrelson, individually and on behalf of the statutory beneficiaries of M.J.H. and Estate of M.J.H., <br><br> Plaintiff, <br><br> v. <br><br> Clarence W. Dupnik, Sheriff of Pima County; et al., <br><br> Defendants. | No. CV-11-00411-TUC-FRZ (HCE) <br><br> **REPORT AND RECOMMENDATION** |

Pending before the Court are:  (1) the Defendants Clarence Dupnik and Pima County's (hereinafter "County Defendants") Motion for Summary Judgment (Doc. 100) (hereinafter "MSJ") and (2) Defendants Conmed Healthcare Management Inc., and Conmed Inc.'s (hereinafter "Conmed Defendants"[1]) and Defendants Steven R. Galper, M.D., Roger Bishop, M.D., Karen Yashar, R.N., and K. Richey, RN.'s (hereinafter "Individual Conmed Defendants")[2] Motion for Partial Summary Judgment (Doc. 105) (hereinafter "MPSJ"). The motions came on for oral argument on June 19, 2013.

Pursuant to the Rules of Practice of this Court, this matter was referred to

---

[1] Conmed Healthcare Management, Inc. and Conmed, Inc., are referred to in the Second Amended Complaint (Doc. 39) (hereinafter "SAC") as "the Conmed Defendants." (SAC, ¶ 11).

[2] Hereinafter, the Court will refer to the Conmed Defendants and Individual Conmed Defendants collectively as the "Conmed and Employee Defendants."

1 undersigned for a Report and Recommendation. (Doc. 10).

2      For reasons stated herein, the Magistrate Judge recommends that (1) Defendant K.

3 Richey be dismissed from this action; (2) the Pima County Defendants' MSJ be granted

4 in part and denied in part and (3) the Conmed and Employee Defendants' MPSJ be

5 granted in part and denied in part.

6 I.     **FACTUAL AND PROCEDURAL BACKGROUND**

7      This case arises from the death of M.J.H., a 17 year old juvenile remanded to the

8 custody of Defendant Dupnik in the juvenile housing unit at the Pima County Adult

9 Detention Complex (hereinafter "PCADC"). Plaintiff Jacquelyn Harrelson, (hereinafter

10 "Plaintiff") individually and on behalf of the statutory beneficiaries of M.J.H., and Estate

11 of M.J.H., filed an Amended Complaint in state court which Defendants removed to this

12 Court. (Doc. 1). Plaintiff filed a SAC naming the following Defendants: (1) Clarence W.

13 Dupnik, Sheriff of Pima County; (2) Pima County, a political subdivision of the State of

14 Arizona; (3) Conmed Healthcare Management, Inc.; (4) Conmed, Inc., doing business as

15 Conmed Healthcare Management; (5) Steven R. Galper, M.D.; (6) Roger R. Bishop,

16 M.D.; (7) Karen Yashar, R.N.; and (8) K. Richey, R.N. (Doc. 39). Plaintiff alleges five

17 counts in her SAC: Count One alleges that the Pima County Defendants committed

18 negligence and/or gross negligence for breach of duty to provide care, custody and

19 control regarding M.J.H.'s incarceration at the Pima County Jail; Count Two alleges that

20 the Conmed Defendants committed negligence and/or gross negligence; Count Three

21 alleges that all Defendants committed wrongful death pursuant to A.R.S. § 12-611, *et.*

22 *seq.*; Count Four alleges, pursuant to 42 U.S.C. § 1983, that Defendant Dupnik in his role

23 as official policy maker for the PCADC, used isolation in violation of the Eighth

24 Amendment proscription against cruel and unusual punishment and in violation of the

25 Fourteenth Amendment's guarantee of due process of law[3]; and Count Five alleges,

26

27     [3] Plaintiff has withdrawn her argument in Count Four that Prolixin was used as a

28 chemical restraint in violation of constitutional law.

- 2 -

1   pursuant to 42 U.S.C. § 1983, that Conmed and Employees were deliberately indifferent

2   to M.J.H.'s serious medical needs, in violation of the Eighth Amendment.

3          Defendant Conmed Healthcare Management has contracted with Pima County to

4   provide medical and mental health care at PCADC. (Plaintiff's Separate Statement of

5   Facts (Doc 116, pp. 40-76) (hereinafter "PSSOF") ¶9; see *also id.* at ¶¶29-30). Defendant

6   Conmed employs the following Defendants:  Dr. Bishop, who completed his residency in

7   family practice and was Conmed's Medical Director in 2010; Dr. Galper, who completed

8   a residency in neurology and psychiatry[4]; and Karen Yashar, who is an R.N. with a

9   bachelor's degree in nursing. (Conmed and Employee Defendants' Statement of Facts

10  (Doc. 106) (hereinafter "CESOF") ¶¶1-2, 4, 7, 9-10). At all relevant times, the medical

11  and mental health care of inmates housed at PCADC was provided by Conmed and its

12  employees. (County Defendants' Statement of Facts (Doc. 102) (hereinafter "CDSOF"),

13  ¶3).

14         On April 1, 2010, M.J.H. was booked into PCADC and housed in the juvenile pod

15  with instructions to keep him separate from another inmate, "C.N." (PSSOF, ¶63). On

16  April 20, 2010, C.N. assaulted M.J.H. after a corrections officer "failed to notice the

17  keep-separate order" and C.N. and M.J.H. were together in the recreation yard at the

18  same time.  (CDSOF, Declaration of Lt. Meister, ¶¶17, 20). On April 22, 2010, after

19  deciding to press charges against C.N., M.J.H. reported that he feared for his safety and

20  was afraid he would get "jumped" while in the dayroom and as a result, he was placed on

21  protective custody status, also known as Administrative Segregation or ASI ("ASI"),

22  because "PCADC policies and procedures provide that juvenile inmates are to be placed

23  on protective custody … status …where a juvenile reports threats of physical harm from

24  other inmates." (*Id.* at ¶¶ 10, 22, 23, 24; *see also* PSSOF, ¶70 & PSSOF, Exh. 1, p. IR75).

25  A juvenile on ASI participates in school, the Level Advancement Program, and receives

26  _____

27         [4] Dr. Galper is responsible for care of all the mental health patients at PCADC.
    (PSSOF,¶12). He supervises all of the mental health professionals serving PCADC.

28  (PSSOF, Ex. 13, pp. 24-25).

mail, television, dayroom, outdoor recreation, phone calls, visitation, and commissary privileges. (*Id.* at ¶¶12-13).

At intake at PCADC on April 1, 2010, M.J.H. had reported that he: had been diagnosed as bipolar and with depression a year and one-half prior while in a detention facility in California; had taken Depakote in the past for bipolar disorder; and had attempted suicide four years prior. (CESOF, Exh. 9, pp. 53, 231-234). On April 2, 2010, M.J.H. was seen by Jason Zantanos, mental health staff, who found that M.J.H. suffered from situational depression. (CESOF, ¶25). On April 7, 2010, in response to M.J.H.'s request for sleeping medication, PA Barry McMillon[5] saw M.J.H., assessed "poor sleep", and prescribed Trazadone. (CESOF, Exh. 9,pp. 51, 229). On April 21, 2010, Licensed Associate Counselor (hereinafter "LAC") Raichelle Sutton saw M.J.H., although the reason for such appointment is unclear:  the Conmed and Employee Defendants state it was for a sick call complaining of lack of sleep; Plaintiff states M.J.H. had complained about anxiety attacks, depression and insomnia. (CESOF, Exh. 9, p. 225 & Exh. 5, pp. 55-56, 58; PSSOF, Exh. 3, p.4209). LAC Sutton did not perform a full psychiatric assessment, diagnosed insomnia and referred M.J.H. to the prescriber who had previously prescribed Trazadone. (CESOF, Exh. 5, pp. 56, 58). During M.J.H.'s incarceration, he received Trazadone for either seven or ten days. (PSSOF, Exh. 13, p. 98).

On April 26, 2010, M.J.H. was seen by LAC Brent Gunderson. (CESOF, Exh. 8, pp. 6, 30, 39). LAC Gunderson testified that M.J.H. told him:

> he had been seeing demons, then the demons had gone away. He saw spots on the wall where the demons' eyes had been before….[H]e was on PC status…, he spends roughly 23 hours a day locked away.
>
> He acknowledged the stress that he feels. That's certainly something that he told me specifically. He was feeling as though he could go insane, he told

---

[5] PA McMillon, who is supervised by Dr. Galper, is the only licensed psychiatric physician's assistant at PCADC. (PSSOF, ¶16) His primary task is medication. (*Id.* at ¶18)

1
2
3

me that. He said that he feels extremely lucky if he can fall asleep before breakfast, so all of that is what he told me. And that he was sleeping very little. He was experiencing some hallucinations because of lack of sleep.

4

\* \* \*

5
6
7

Then he described a dream that he had where—the dream itself is where he had been seeing the demons….But then he said that he was still seeing spots on the walls even after the dream, after he woke up, where the demons' eyes were.

8
9
10
11
12
13
14
15
16
17
18
19
20
21

(*Id.* at pp. 39-40). According to LAC Gunderson, while M.J.H.'s statements could have indicated "some psychotic symptoms", post-traumatic stress disorder (hereinafter "PTSD"), or acute stress syndrome, he believed that stress was the cause of M.J.H's distress. (*Id.* at p. 48). M.J.H. requested a psychiatric evaluation. (CESOF, Exh. 9, p.217; PSSOF, Exh. 15, pp. 43-44). PCADC psychologist Andrew Stropko, Ph.D., agreed with LCA Gunderson's assessment, although psychosis, bipolar disorder and substance abuse were in the differential, sleep seemed to be the most important issue. (CESOF, ¶40). According to Dr. Stropko, the manner in which M.J.H. reported his dream and symptoms in terms of organization and thought process "mitigate[d] against psychosis at this point." (CESOF, Exh. 6, p. 42). Plaintiff's expert, Laura Don, a psychiatrist certified by the American Board of Psychiatry and Neurology disagrees, opining that by April 26, 2010, M.J.H.'s anxiety and depression had progressed to psychosis with visual hallucinations and paranoid delusions. (PSSOF, Exh. 3, pp. 4207, 4212).

22
23
24
25

On May 4, 2010, M.J.H.'s request to be removed from ASI status was denied. (PSSOF, Exh. 1, at p. IR81). On that same date, PA McMillon saw M.J.H. and arranged for correctional officers to observe M.J.H.'s sleep pattern for three days. (CESOF, ¶¶ 43, 44 & Exh. 9, p. 147). The observation was initiated but not completed. (CESOF, ¶45).

26
27
28

On May 6, 2010, Sergeant Ski requested "psych to see inmate as inmate is extremely agitated and has PTSD regarding an incident here [at] the jail…." (CESOF, Exh, 9, p. 215; *see also* PSSOF, Exh. 7, p. 34). Defense expert Jack Potts, M.D., testified

that on May 6, 2010 M.J.H. claimed he had been on Depakote a year ago in California, and requested to have his mood stabilized and to have sleep medication. (PSSOF, Exh. 7, p. 34) The reporting R.N. indicated that M.J.H. stated he was "feeling very agitated [and] increasingly depressed [and] isolated," (*id.*), and assessed M.J.H. with PTSD, depression, and anxiety. (*Id.* at pp. 215-16). A suicide watch was initiated. (*See id.* at p. 209) A May 7, 2010 record indicates initiation of the five-minute suicide watch, because of "unpredictable, manic-behavior, increasing anxiety." (PSSOF, Exh. 1, p. IR83). NP Hogan checked on M.J.H. on May 7 and on May 9, 2010, and diagnosed M.J.H. with adjustment disorder with anxiety, but "stabilizing" after a good night's sleep in the infirmary as of May 9, 2010. (CESOF, Exh. 9, pp. 209, 211). She changed the suicide watch from five to fifteen minutes. (*Id.* at p. 211). According to NP Hogan, her purpose in seeing M.J.H. during the five-minute suicide watch period was "[t]o evaluate him for a need for meds, as well as the suicide watch itself." (CESOF, Exh. 4, p. 67). Plaintiff disputes NP Hogan's testimony because no medication evaluation is documented in the medical record. (Plaintiff's Response to CESOF, ¶49). On May 11, 2010, LAC Gunderson found M.J.H. emotionally stable and released him from suicide watch. (CESOF, ¶¶53-55). On May 18, 2010, it was reported that M.J.H. was turning in his school work, and LAC Gunderson found M.J.H. did not present as suicidal, but rather appeared mentally and emotionally stable. (CESOF, ¶56; PSSOF, ¶81).

By May 24, 2010, LCSW Gafner noted that M.J.H. "reads Bible voraciously, fends off verbal barbs from other [inmate] who taunt him about [S]atan", and appeared "weary" and "pseudo-paranoid", but stable. (CESOF, Exh. 9, p. 197). By the evening of May 24, Zantanos, noted that M.J.H., who "reads his Bible voraciously…", reported that he had difficulty trusting other inmates and staff, and that another inmate is "being influenced by Satan and is influencing other…" inmates and correctional staff. (CESOF, Exh. 9, p. 195). Zantanos also noted that M.J.H. informed him that he was not "currently on psych meds and reports his mother does not want him on psych meds." (*Id.*). Zantanos

"aided [M.J.H.]…in coping strategies and provided emotional support…" and planned to follow up the next day. (*Id.*). At 9:45 p.m., Zantanos saw M.J.H. after correctional staff reported that M.J.H. made statements that he planned to hang himself. (*Id.* at p.196). Zantanos determined that M.J.H. was not suicidal, "but rather is desperate to be away from the perceived harassment and ridicule occurring on 1E." (*Id.*). Zantanos spoke to M.J.H. about a rehearing to move to 1F, which M.J.H. was eager to seek, but:

> it was determined by custody that…[M.J.H.] should not be attempting to choose his housing….[Inmate] state[d]…that if he has to return to 1E he will attempt to hang himself….[Inmate] is quick to decompress [with] support, though initially presents w/ tearfulness and shaking body language reporting "I can't take it anymore. I can't stay in there. This is spiritual warfare!"

(*Id.*). Zantanos determined that M.J.H. was not "psychotic but rather is experiencing a high degree of psychological distress." (*Id.*). M.J.H. was again moved to the infirmary and placed on five-minute suicide watch for ongoing support and status indications, and given access to a smock and blanket. (*Id.*; CESOF, ¶59; *see also* PSSOF, Exh. 1, p.IR 93). Defense expert, Dr. Potts, testified that he did not believe suicide watch was appropriate at this time because the record did not support the belief that M.J.H. was suicidal:  "It appears to have been the only alternative available to the mental health folks, but that's speculative." (PSSOF, Exh. 7, pp. 43-44). Dr. Potts agreed that the conditions for suicide watch are harsh. (*Id.* at p. 55).

Plaintiff's expert psychiatrist, Dr. Don, opines that brief periods of mood stabilization were documented (5/10, 5/12, and 5/18/10), however "by 5/24/10 he had deteriorated with clear psychotic and manic symptoms, including suspiciousness, hyperreligiosity (reading the Bible 'voraciously'), paranoid delusions with a belief that another inmate was influenced by Satan and that this inmate was trying to control the minds of other inmates and some officers. He was not on psychotropic medications and

reported that his mother does not want him to take psychotropic medications[6].… [Jason Zantanos, MHP, Conmed Healthcare Management]"   (PSSOF, Exh. 3, pp. 4211-12 (bracketed text in original)). Dr. Don also noted that "[a]nother therapist, also on 5/24/10, documented the paranoid delusions and noted that he had the suspiciousness of a patient who is paranoid and fearful, yet concluded that he was 'stable' and diagnosed him as being 'pseudo-paranoid.' [Administrative Segregation Screening George Gafner, LCSW]…." (PSSOF, Exh. 4, pp. 4212 (bracketed text in original)). According to Dr. Don, by May 24, M.J.H. "was floridly psychotic…." (*Id.* at p. 4212). She states that "pseudo-paranoid" diagnosed by LCSW Gafner, "is not a conventionally recognized diagnosis, but is clearly an assessment created by the evaluator to suggest malingering. Mr. Harrelson's reported symptoms, increasingly disorganized thought processes, and his agitated and distressed state, in the context of his past diagnosis with bipolar disorder, provide no basis for a diagnosis of malingering." (*Id.*).

The morning of May 25, 2010 at 6:20 a.m., M.J.H. was banging on his cell window and refused to stop. (PSSOF, Exh. 1, p. IR95). At 7:44 a.m., NP Hogan noted M.J.H. was "immersed in a delusion of Satan's influence on the juvenile pod." (CESOF, Exh 9, p. 193). She further noted:  "When I met w/ him he refused to speak, but stared with the evil eye look. After…[I] left…he began yelling, 'In the name of Jesus, stop,' etc." (*Id.*). Her assessment was that "[m]uch of his presentation seems behavioral, but it certainly smacks of early Bipolar +/or psychosis….Appears to sleep adequately, though he was yelling and banging a lot last…[night about] being put on s[uicide]/w[atch]. Unpredictable and potentially lethal thoughts. Need to keep safe." (*Id.*). She continued

---

[6] Dr. Don points out that "[t]here is no evidence to support the statement that his mother did not want him to take psychotropic medication, and this statement may have been part of his delusional belief system. There is no indication that behavioral health staff contacted his mother prior to 5/25/10 to obtain informed consent for treatment. These records indicate that Mr. Harrelson's prior requests for treatment were denied. By 5/24/10, he was floridly psychotic and could not be relied upon to make informed decisions about his treatment. His statement, therefore, should not have been relied upon regarding his mother's alleged opinion about psychotic medications." (PSSOF, Exh. 4, p. H4212).

M.J.H. on five-minute suicide watch. (*Id).* At her deposition, NP Hogan testified that on May 25th she diagnosed M.J.H. with adjustment disorder with anxiety because he was new to the adult level jail setting. (CESOF, ¶67; CESOF, Exh. 4, pp. 63).

LAC Sutton wrote on May 25, 2010 at 9:15 a.m. that M.J.H. was "throwing water out of his cell and yelling about the devil and hearing things through the wall." (CESOF, Exh. 9, p.191). M.J.H. refused to speak to her and instead threw two cups of water at the cell door. (*Id*). When staff moved M.J.H. to another cell in the infirmary, he "continued with a religious rant and struggled with officials….[M.J.H.] was then put into a restraining chair." (*Id.*). LAC Sutton agreed with NP Hogan's earlier assessment that M.J.H.'s presentation "appears to be behavioral as evidenced by…[his] snickering when he believed no one could see his face. I[nmate] has a history of being unpredictable and impulsive[7]." (*Id.*). She continued him on five-minute suicide watch. (*Id.*). At noon, LAC Sutton attempted to speak with M.J.H. again. (CESOF, Exh. 9, p. 192). He was "much calmer…" but put his arm through the food trap twice. (*Id.*). He said that "'we have no control' over him. He then began to talk to the voices telling them to leave him alone." (*Id.*). She ended the interview because M.J.H. was becoming more agitated. (*Id.*). At this point, "it was really hard to tell…" whether M.J.H's conduct was behavioral. (CESOF, Exh. 5, p. 72). At her 2012 deposition, LAC Sutton testified that she still believed her May 25, 2010 conclusion was correct:

> Because at times it was difficult to make a distinction between what was real and what wasn't. And what I mean by that is at certain points it was difficult to determine what was being driven just by typical teenage acting out, or were they symptoms of what he had been diagnosed with, bipolar disorder, rule out psychosis.

---

[7] At her deposition, MHP Sutton explained that by "behavioral", she meant that "behavior is not driven by a mental disorder." (CESOF, Ex. 5, p. 61). She ruled out bipolar disorder because M.J.H. would snicker when he thought no one was watching him and she also based her decision on information that she learned from other people observing him, such as correctional officers, staff members and other clinicians. (*Id.* at pp. 61-62).

1

2   (*Id.* at p. 62). Although some of M.J.H.'s actions on May 25 were consistent with

3   psychosis and would be difficult to sustain over time if a patient was instead malingering,

4   to LAC Sutton's knowledge, M.J.H. did not continue to decompensate but instead was

5   lucid at times. (*Id.* at p. 63).

6         On May 26, 2010, M.J.H. had a video visit with his father and other family

7   members. (PSSOF, Exh. 1, p. H1623). Mr. Harrelson testified that although M.J.H.

8   looked the same physically, "he said a lot of nonsensical things…" and Mr. Harrelson felt

9   as if M.J.H. were speaking in code and was concerned his son was having mental issues.

10   (PSSOF, Exh. 11, pp. 46-47). Upon seeing the video of the May 26th visit, defense expert

11   Dr. Potts opined that M.J.H. "was psychotic." (PSSOF, Exh. 7, pp. 10-11). Dr. Potts

12   believed that M.J.H. was exhibiting "some psychotic symptomatology prior to the

13   video…visitation…" and that M.J.H.'s "behavior as seen in the latter part of May was

14   significant enough to warrant psychiatric intervention in and of itself without the

15   history." (*Id.* at pp. 31-32). Dr. Potts did not believe that M.J.H. was malingering or

16   feigning; instead, he "believe[s] he was psychotic." (*Id.* at p. 95).

17         On May 26, 2010, M.J.H. remained on suicide watch. (CESOF, Exh. 9, p.192).

18   LAC Sutton noted that M.J.H. stood at his window, began to constantly knock on the

19   window, took off his smock, and refused food and drink. (*Id.*). She decided to follow up

20   with a prescriber. (*Id.*).

21         On May 27, 2010 LAC Sutton reported that M.J.H., who remained on suicide

22   watch: was rolling his feces in a ball and trying to push it under the cell door; smeared his

23   food on windows spelling "help" backwards so it could be read by staff; urinated out the

24   cell door; wore no clothing; refused food and drink; and did not respond to her. (CESOF,

25   Exh. 9, p. 189). Her assessment was that M.J.H. "continues to behave in a bizarre manner

26   and although it appears to be behavioral most of the time, at times it is difficult to judge."

27   (*Id.* at pp. 189-90). She noted that prescribers were attempting to get parental consent for

28

medication.[8] (*Id.* at p. 190). M..J.H. was noted to be combative, resistant to towards staff, spitting on them, and was placed in restraints. (PSSOF, Exh. 1, p. IR97).

On May 27, 2010, either a nurse or psychiatric provider asked Dr. Bishop to examine M.J.H. due to poor oral intake. (CESOF, ¶71). On May 27, 2010 Dr. Bishop diagnosed dehydration, in need of intravenous (hereinafter, "I.V.") and ordered lab tests. (*Id.* at ¶72; *see also* PSSOF, Exh. 12, pp. 47, 53). Dr. Bishop testified that he considered M.J.H.'s "situation somewhat of a medical emergency…." (PSSOF, Exh. 12, p. 53). Although he considered transporting M.J.H. to a higher level of care, he wanted to see the lab results and how M.J.H. responded to treatment. (*Id.*). If M.J.H.'s vital signs had been worse, transport would have been arranged, "[b]ut his vital signs were stable." (*Id.* at p. 54). Although Dr. Bishop ordered I.V. fluids, he did not consider medication because "I felt that was totally psych's responsibility." (*Id.* at p. 52; *see also* CESOF, ¶8 ("As a family practitioner, Dr. Bishop would not initiate anti-psychotic drugs.")). Lab reports confirmed that M.J.H. was suffering from significant dehydration. (CESOF, ¶76). Later on May 28, 2010 after M.J.H. had received I.V. fluids, Dr. Bishop noted his dehydration had improved. (PSSOF, Exh. 12, pp. 59-60).

Defense expert, Dr. Potts' "sense is … from … [May] 24th probably, certainly the 26th, 27th…[M.J.H.] was psychotic. So that is a given, It's well documented." (PSSOF, Exh. 7, pp. 22-23). According to Plaintiff's expert, Dr. Don, by May 24, 2010, M.J.H. was "floridly psychotic...." (PSSOF, Exh. 3, p. 4212).

Prior to May 28, 2010, Dr. Galper knew that a juvenile "was being moved back and forth between the infirmary and the administrative segregation area, and that mental health providers needed to provide support so he could manage better being in jail." (CESOF, ¶78). Conmed holds a "mental health meeting" every morning at PCADC and,

---

[8] It is undisputed that mental health prescribers need parental permission to prescribe medication for juvenile inmates with mental health issues. If the parent does not consent, then no medication is administered unless the patient is in acute distress. (CESOF, ¶¶84-85).

1  according to Dr. Galper, M.J.H. "was discussed intermittently at the meetings." (*Id.* at

2  ¶¶80-81). Dr. Galper also placed M.J.H. on a "hot spot list" that includes patients about

3  whom mental health professional are most concerned. (CESOF, ¶¶82, 83).

4      Upon seeing M.J.H. on May 28, Dr. Galper immediately diagnosed psychotic

5  disorder and determined that M.J.H. "acutely needed to be medicated." (*Id.* at pp. 43-45,

6  49); *see also* PSSOF, Exh. 10, pp. 68-69)

7      After seeing M.J.H. on May 28, 2010, Dr. Galper contacted Plaintiff to obtain

8  consent to administer a psychotropic medication, to M.J.H. (PSSOF, Exh 13, p. 44;

9  CESOF, Exh. 9, p. 187; PSSOF, Exh. 10, p.68). Plaintiff testified that Dr. Galper

10  identified Prolixin[9] as an anti-psychotic and described it as a "seizure drug or something."

11  (PSSOF, Exh. 10, p. 68) When she asked how her son felt about taking the medication,

12  Dr. Galper responded that M.J.H. did not want to take it. (*Id.* at pp. 68-69). When

13  Plaintiff asked Dr. Galper why M.J.H. refused to take the drug, Dr. Galper answered that

14  he did not know. (*Id.* at p. 69). Plaintiff refused consent  because she wanted to wait until

15  she met with M.J.H. to discuss the matter with him, and she also wanted to research the

16  drug. (*Id*. at pp. 68-69; CESOF, Exh. 9, p. 187). Dr. Galper informed Plaintiff that if

17  M.J.H. presented a danger to himself or others he would be medicated. (CESOF, Exh. 9,

18  p. 187). If Dr. Galper had received Plaintiff's consent to medicate, he was hopeful he

19  could use oral medication rather than Prolixin. (CESOF, ¶93). For Dr. Galper, the most

20  important consideration was keeping M.J.H. safe. (*Id.* at ¶92).[10]

21      On May 29, 2010, Nurse Condon observed M.J.H naked and hanging on the

22

23      [9] Prolixin is also known as fluphenazine. (PSSOF, Exh. 4, p. 4234).

24      [10] Dr. Galper testified that the medical notes indicate that M.J.H. "never displayed
any episodes [of a mood disorder, like bipolar disorder], until I was involved, of behavior

25  that would have qualified as mania." (PSSOF, Exh. 13, p.97). According to Plaintiff's
expert Dr. Don, "[t]he clinical information Mr. Harrelson provided suggests a diagnosis

26  of Bipolar Disorder, and the progression of his symptoms over the course of April/May
2010 strongly suggestions [sic] Bipolar Disorder with Psychosis. The treatment for this

27  condition typically includes medication management with mood stabilizing medication
and/or antipsychotic medication, with supportive psychotherapy." (PSSOF, Exh. 3, p.

28  4217).

doorway and would not get down until correctional staff arrived. (CESOF, Exh 7, pp 10, 33).

When Plaintiff went to PCADC the following Sunday, May 30, 2010, she was informed that M.J.H. refused to see her. (PSSOF, Exh 10, p.75).

On May 30, 2010, Nurse Condon noticed M.J.H's head was in the toilet and thought he was trying to commit suicide. (*Id.* at p. 35). Upon approaching, Nurse Condon found M.J.H.'s smock had been shoved into the toilet and M.J.H. was resting his head on the smock. (*Id.* at pp. 35-36). There was no water in the toilet because the smock had soaked it all up. (*Id.* at p. 36). Nurse Condon believed that M.J.H. was attempting "to make it appear like he was trying to drown himself….trying to get us all excited." (*Id.*). Later that day, M.J.H. stood on the ledge of a window, refusing to get down. (CESOF, ¶97). He also refused to talk. (*Id.*). Security removed him, and he was placed in a restraint chair due to risk of self-harm. (*Id.*).

On May 31, 2010, NP Hogan initiated a meeting with Dr. Galper to discuss medicating M.J.H. because she had concerns about what appeared to be symptoms of psychosis.[11] (CESOF, ¶¶98-99). NP Hogan and Dr. Galper determined that M.J.H. required an injection of Prolixin because he was not able to take oral medication (*Id.* at ¶100). After the injection. M.J.H. was not as psychotic, he was more sedate. (*Id.* at ¶103).

Dr. Bishop saw M.J.H. again on June 1, 2010, on his regular rounds. (*Id.* at ¶104). M.J.H. had an elevated heart rate, and Dr. Bishop was concerned about dehydration, and ordered that fluids be encouraged. (PSSOF, Exh. 12, p.68). Later, at 12:45 p.m., a correctional officer asked Nurse Condon to attend to M.J.H. who was lying on the floor with his fists clenched while he was shivering. (CESOF, ¶105). Nurse Condon notified Drs. Bishop and Galper, who both responded, and Dr. Bishop deferred to Dr. Galper's determination that M.J.H. had not suffered an epileptic seizure. (*Id.* at ¶¶106-109) A

[11] According to NP Hogan, prior to her concerns about psychosis, she had considered malingering a possibility because M.J.H. reported sleeplessness but the nurses reported that he had slept all night. (CESOF, ¶102).

neurologic examination was administered and Dr. Galper concluded that M.J.H had "volitional control" and did not need to go to a hospital for mental health reasons. (PSSOF, Exh. 13, p. 75). Dr. Galper noted that M.J.H. had an elevated heart rate, "but there's [sic]…several reasons when you look at these vital signs independently and by themselves they're not as meaningful." (*Id.* at p. 83). Dr. Galper discussed his findings with Dr. Bishop. (*Id.* at p. 87).

For his part, Dr. Bishop ordered immediate lab tests. (CESOF, ¶123). The decision whether to transfer M.J.H. to a hospital for medical reasons was Dr. Bishop's responsibility. (*See* PSSOF, Exh. 13, pp. 75-76). Inmates who have transitory seizures are routinely observed in the infirmary rather than sent to a hospital. (PSSOF, Exh. 12, p. 28). These patients are only transferred to a higher level of care if seizures re-occur, if there is a high fever, or if the patient recently suffered a head injury. (CESOF, ¶120). A decision to transfer is based on medical judgment and factors related to the patient's condition. (*Id.* at ¶121). Dr. Bishop deferred to Dr. Galper, as the prescribing physician, to advise if there was a problem related to Prolixin. (*Id.* at ¶122). Dr. Bishop was of the opinion that M.J.H. was stable, his labs would be monitored and he would be observed by the nurses in the infirmary. (PSSOF, Exh. 12, p. 78). Dr. Don stated that "[i]n the context of a dehydrated, semiconscious, and delirious individual, a suspected seizure should be treated as a medical emergency. Transfer to a higher level of care should have been undertaken immediately…." (PSSOF, Exh. 3, p. 4220).

On June 1, 2010, at 2:00 p.m., Nurse Condon noted that M.J.H's tongue was sticking out and his legs were moving as though on a bicycle. (CESOF, ¶126; *see also* PSSOF, Exh. 4, p. 4232 (M.J.H. was noted to be "posturing" and arching his back)). Lab results came back at 5:00 p.m. and Dr. Bishop directed Nurse Condon to check vitals every four hours and to notify him if M.J.H.'s heart rate increased above 160. (CESOF, ¶128). Dr. Bishop concluded that the 5 o'clock lab results were normal and, thus, dehydration was not an issue. (PSSOF, Exh. 12, pp. 79-80). He directed the nurse to

1   inform Dr. Galper that he believed the issue was psychiatric rather than medical. (*Id.* at p.

2   80). Nurse Condon informed Dr. Galper of the lab results. (CESOF, ¶131).

3           The evening of June 1, 2010, Nurse Yashar believed that M.J.H. was making

4   conscious choices when he indicated non-verbally that he wanted the Gatorade she had

5   poured for him and indicated when he had enough. (*Id.* at ¶137). When Nurse Yashar

6   checked M.J.H.'s vitals, he had a strong and steady heartbeat, and he complied with

7   Nurse Yashar's request to raise his arm so she could take his blood pressure. (*Id.* at

8   ¶¶138-139). Nurse Yashar visually observed M.J.H. throughout the night. (*Id.* at ¶¶141-

9   143). The morning of June 2, 2010, Nurse Yashar discovered M.J.H. "lying on his

10  stomach in a puddle around his chest up to his head[]", he was not breathing, and did not

11  have a pulse. (*Id.* at ¶¶144-145; *see also* CESOF, Exh. 3, pp. 143-144; *see also* CESOF,

12  Exh. 3, p.145). An Automatic External Defibrillator was brought into the room and

13  nursing staff administered CPR and basic life support until EMTs took over. (*Id.* at

14  ¶¶149-150).

15          M.J.H. was first taken to St. Mary's Hospital where "cardiac arrest, probable

16  anoxic brain injury" was noted. (PSSOF, ¶111). M.J.H. was admitted to UMC, where he

17  never regained consciousness and ultimately died on June 11, 2010 when his family

18  consented to discontinuing life support. (PSSOF, ¶111; CDSOF, ¶42). The Medical

19  Examiner indicates on M.J.H's death certificate that cause of death is "undetermined."

20  (CDSOF, Exh. D; PSSOF, Exh. 4, p. 4237).

21          Plaintiff's toxicology expert, Paul Wax, M.D., who is board certified in emergency

22  room medicine, is of the opinion that M.J.H. died as a result of "some variant of

23  [N]euroleptic [M]alignant [S]yndrome" (hereinafter "NMS") in which M.J.H. had no

24  fever, the proximate cause of which was the administration of Prolixin. (CESOF, Exh. 11,

25  p. 21; *see also* PSSOF, Exh. 4, p. 4230; *see also* PSSOF, Exh. 4, p. 4234 (NMS "is a

26  severe adverse drug reaction seen with the use of neuroleptic medications" such as

27  Prolixin)). The onset of NMS can occur anywhere from a few hours to days after

28

initiation of therapy. (PSSOF, Exh. 4, p. 4236). NMS "is characterized by muscle rigidity, hyperthermia, autonomic instability, mental status changes, and evidence of muscle injury (e.g., elevated creatine kinase levels)…the NMS diagnosis could also be made without hyperthermia." (*Id.* at pp. 4234-35 (internal quotation marks and citation omitted); *see also* PSSOF, Exh. 5, p. 4186 (signs and symptoms associated with NMS consist of fever, autonomic instability, leukocytosis, tremor, altered mental status, elevated enzymes (CPK/liver) and muscle rigidity)). Progression of NMS is typically rapid and the duration of symptoms is variable. (PSSOF, Exh. 5, pp. 4186-67). According to Dr. Wax, NMS is a recognized complication associated with Prolixin that can rapidly lead to death and requires intensive medical management in an intensive care setting, which was not available at the infirmary. (PSSOF, Exh. 4, pp. 4235-39). Thus, managing M.J.H. at the infirmary instead of transferring him to a higher level of care, failed to conform to the standard of care, which contributed to his death. (*Id.* at pp. 4238-39). Dr. Wax notes that "persistent tachycardia on June 1 with heart rate recorded at 120 and 140…" combined with abnormal motor movements, including the transient seizure, described as posturing or body contortions or tongue protrusions, and altered mental states, required that M.J.H. receive a more intensive medical evaluation than could be conducted at PCADC. (*Id.* at p. 4238).

Consistent with Dr. Wax, Plaintiff's forensic pathologist and toxicologist, Daniel Spitz, M.D., is of the opinion that M.J.H. suffered from NMS after receiving Prolixin. (PSSOF, Exh. 5, p. 4186; *id.* at pp. 4186-87 (M.J.H. died secondary to an adverse reaction to Prolixin which is best classified as NMS)). Dr. Spitz's opinion is based on factors, characteristic of NMS: (1) M.J.H. developed persistent tachycardia (up to 140 beats per minute); (2) he showed signs of rigidity with posturing and contorted body movements; (3) he had tremor involving his lower extremities; (4) he had altered mental status; (5) lab tests demonstrated elevated white blood count and elevated liver enzymes; (6) additional testing at the hospital showed elevated CPK level, elevated liver enzymes,

1    and elevated white blood count; and (7) he was found unresponsive and in
2    cardiorespiratory arrest. (*Id.*).

3          Defense expert and emergency room physician, Theodore Benzer, M.D., believes
4    M.J.H. could have suffered from NMS and the syndrome would be included in his
5    differential; however, he also believes that it is unlikely that M.J.H. suffered from NMS.
6    (PSSOF, Exh. 8 pp.27-28). Dr. Benzer was unable to determine the source of M.J.H.'s
7    elevated heart rate because there was not a complete medical evaluation in the infirmary
8    notes. (*Id.* at p. 20). Dr. Benzer believes that M.J.H. would have been better managed at
9    an ER than at the infirmary. (*Id.* at pp. 7-8).

10   **II.    DISCUSSION**

11         County Defendants move for summary judgment pursuant to Federal Rule Civil
12   Procedure 56(c), arguing that there is no genuine issue of material fact and that
13   Defendants are entitled to judgment as a matter of law on the negligence, gross
14   negligence, wrongful death and § 1983 claims because 1) neither Pima County nor
15   Sheriff Dupnik has a non-delegable duty regarding the medical and mental health care of
16   inmates at PCADC; 2) that County Defendants are relieved of liability for any negligence
17   or gross negligence through the intervening actions of the Conmed Defendants; 3) the
18   wrongful death claim as asserted is not a substantive cause of action; and 4) there is no
19   evidence in the record that the jail's policy or custom of placing inmates in protective
20   custody for their own protection amounts to deliberate indifference to the inmate's
21   constitutional right.

22         Conmed and Employee Defendants move for partial summary judgment pursuant
23   to Federal Rule Civil Procedure 56(c), arguing that there is no genuine issue of material
24   fact and that Defendants are entitled to judgment as a matter of law as to Plaintiff's §1983
25   claim because the indisputable facts in this case demonstrate that Conmed and Employee
26   Defendants did not know of and thus disregarded an excessive risk to M.J.H.'s life and
27   safety, and Plaintiff's constitutional claim against these Defendants fails as a matter of

28

1    law. Conmed and Employee Defendants also argue that Plaintiff cannot prove, by clear

2    and convincing evidence, that these defendants acted with the "evil mind" required to

3    recover exemplary damages under Arizona law.

4           A. <u>Summary Judgment Standard</u>

5           Pursuant to the Federal Rules of Civil Procedure, a party may seek summary

6    judgment where there is no genuine issue as to any material fact and that party is entitled

7    to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is appropriate

8    only when "the pleadings, depositions, answers to interrogatories, and admissions on file,

9    together with the affidavits, if any, show that there is no genuine issue as to any material

10   fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

11   P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Under summary

12   judgment practice, the moving party bears the initial responsibility of presenting the basis

13   for its motion and identifying those portions of the record, together with affidavits, which

14   it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323.

15          If the moving party meets its initial responsibility, the burden then shifts to the

16   opposing party who must demonstrate the existence of a factual dispute and that the fact

17   in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the

18   governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the

19   dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict

20   for the non-moving party. *Id*. at 250; *see  Triton Energy Corp. v. Square D. Co.*, 68 F.3d

21   1216, 1221 (9th Cir. 1995). Rule 56(c) provides that "[a] party asserting that a fact cannot

22   be or is genuinely disputed must support the assertion by: (A) citing to particular parts of

23   materials in the record . . . or (B) showing that the materials cited do not establish the

24   absence or presence of a genuine dispute, or that an adverse party cannot produce

25   admissible evidence to support the fact." An issue of fact must be genuine. *Matsushita*

26   *Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The opposing

27   party need not establish a material issue of fact conclusively in its favor; it is sufficient

28

that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). If the factual context makes the non-movant's claim implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita*, 475 U.S. at 587. The mere existence of a scintilla of evidence supporting the non-movant's position will be insufficient; there must be evidence from which a fair-minded jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 252.

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. *See* Fed. R. Civ. P. 56(c). However, the "trial court can only consider admissible evidence...." *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). The court should view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007)(citation omitted). The ultimate question is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. A party cannot defeat summary judgment by producing a "mere scintilla of evidence to support its case." *City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1369 (9th Cir. 1992).

B.     Non-Delegable Duty

The County Defendants argue that neither Pima County nor Sheriff Dupnik can be vicariously liable for the alleged medical malpractice of the Conmed defendants on any medically related claim under a non-delegable duty of care theory. The County Defendants contend that the statue charging the county sheriff with the care of inmates does not state that the county sheriff's duty to provide medical or mental health care is non-delegable, nor does it make the county sheriff liable for medical malpractice,

1    negligence or gross negligence of health care providers that treat inmates in a county jail.
2    The County Defendants also assert that any duty or obligation they might have to provide
3    medical or mental health care is satisfied through the contract with the Conmed
4    Defendants to provide these services.

5           Generally, the question of whether a duty is owed is a question of law to be
6    determined by the court. *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 354 (1985)
7    *superseded on other grounds by statute*, A.R.S. § 33-1551, *as recognized in Wringer v.*
8    *United States*, 790 F.Supp.210, 213 n.3 (D.Ariz. 1992); *Beach v. City of Phoenix*, 136
9    Ariz. 601, 604 (1983). The Supreme Court recognizes that: "An inmate must rely on
10   prison authorities to treat his medical needs; if the authorities fail to do so, those needs
11   will not be met." *Estelle v. Gamble*, 429 U.S. at 103. The Supreme Court has held that a
12   state has a constitutional obligation, under the Eighth Amendment, to provide adequate
13   medical care to those whom it has incarcerated. *Id.*, at 104. The parties do not dispute that
14   Arizona statute also imposes a duty of care upon the office of Sheriff to: "take charge of
15   and keep the county jail …and the prisoners in the county jail." A.R.S. § 11-441(A)(5).
16   The question presented is whether the duty owed to M.J.H. to provide medical and
17   mental health care may be delegated by contract such that the county is thereby relieved
18   of all liability to its detainees for such care. The County Defendants argue that the statute
19   does not state that the county sheriff has a non-delegable duty to provide medical or
20   mental health care, nor does the statute make the county sheriff liable for the negligence
21   of any medical or mental health care provider that treats inmates in a county jail.

22          When there is a non-delegable duty, the principal is vicariously liable for the
23   negligence of an independent contractor and the independent contractor is the principal's
24   agent as a matter of law. *Wiggs v. City of Phoenix*, 198 Ariz. 367, 370-71 (2000). A non-
25   delegable duty arises in special situations when a higher degree of care is prescribed by
26   law and the duty of an employer is important enough that he may not escape liability by
27   delegating the duty to an independent contractor. *Simon v. Safeway, Inc.*, 217 Ariz. 330,
28

- 20 -

338 (App.2007). For vicarious liability to exist under the non-delegable duty doctrine, a statute, regulation, contract, franchise, or charter must impose the duty upon the principal or the duty must be non-delegable under the common law. *Id*.

County Defendants argue that in other jurisdictions, courts have held that a county or sheriff cannot be vicariously liable for the medical malpractice of contracted healthcare providers working in a jail. In *Thomas v. Harris County*, 30 S.W.3d 51, 53 (2000), the Texas Court of Appeals held that the county could not be found liable under the Texas Tort Claims Act (TTCA) for the negligence of physicians employed by an independent contractor to provide medical services at the county jail. The court agreed with Plaintiff that the county has a non-delegable duty to provide adequate health care and cannot relieve itself of its responsibility to provide adequate health care to its inmates, but the court found that the county discharged that duty by entering into a contract with a reputable health care provider to provide for the medical needs of those incarcerated. *Id.* at 54. The court in *Thomas* sided with plaintiff by holding that the county's duty was non-delegable. In *Thomas*, liability was ultimately predicated on the TTCA, which waived immunity only for acts of an employee. *Id*. The court there found that, regardless of the fact that the county reserved the right to effectuate the removal of any physician, and that physicians were required to observe security procedures within the confines of the jail, the legislature had specifically refused to waive the immunity of counties only for conduct "of an employee", choosing to define the term "employee" to specifically exclude the "independent contractors." *Id*.

County Defendants also cite for support cases in other jurisdictions where the courts reasoned that a governmental entity could satisfy its responsibilities to inmates by exercising reasonable care in the selection and supervision of independent contractors, refusing to adopt a rule that would require the government actor to become a guarantor of satisfactory performance by the independent contractor's employees even though the government had no control over that performance in a given case. *Herbert v. District of*

- 21 -

*Columbia*, 716 A.2d 196 (1998) (governmental entity not liable for the negligent provision of medical services of a physician who was working in the jail pursuant to a contract absent some proof that the governmental entity was negligent in hiring that contractor); *Rivers v. State*, 159 AD.2d 788, 789 (N.Y.A.D. 1990) (rejecting the notion that the state should be a guarantor of the adequacy of medical services beyond its control because it would give prisoners greater medical malpractice rights than the rights afforded the rest of society).

By contrast, Arizona has recognized that public policy requires that in situations involving involuntary detainment or commitment a county remain "ultimately liable" for any breach of duty of care. *DeMontiney v. Desert Manor Convalescent Center, Inc.*, 144 Ariz. 6, 9 (1985). In *DeMontiney*, Yuma County had contracted with the Desert Manor Convalescent Center to provide "security rooms" to temporarily house involuntarily detained or "mental-hold" patients. 144 Ariz. at 7. A patient held in one of these security rooms committed suicide before he could be transferred to the State Hospital. *Id*. The patient's mother filed a wrongful death suit against several entities and providers, including Yuma County. *Id*. The Arizona Supreme Court found that, pursuant to Arizona statute, Yuma County had a duty to provide screening and evaluation services to involuntarily detained patients. *Id*. The court noted that while Yuma County was statutorily authorized to contract with other entities to provide such services, "the statute does not authorize the county to delegate its duty to provide proper care and treatment" and "[w]hen a county contracts for services, the contractee assists the county in fulfilling that duty; it does not relieve the county of it." *Id*. at 9. The court reasoned:

> Were the statutes to provide otherwise, a mental-hold patient harmed by a contractee would have no recourse against the county even though it is the county that is expressly responsible for the person's care and treatment and it is the county that chose the contractee who provided the actual care. … It is in the public interest that the county remain ultimately liable for any breach of that very important duty.

- 22 -

*Id*. The court in *DeMontiney* remanded the case for a determination of whether the County was negligent in its own right and whether it was negligent through the acts of its contractees. *Id.* at 9.

There is no evidence in this case that the legislature intended to permit the County or the Sheriff to delegate their duties and obligations they owed to M.J.H. As the Arizona Supreme Court expressed in *DeMontiney*, "[a]bsent clear indication by the legislature that it intended to permit the county to delegate the duty, we will not infer that it did." 144 Ariz. at 7.

County Defendants also argue that Sheriff Dupnik cannot be held liable because he is not licensed to practice medicine. The Court in *DeMontiney*, however, did not find a county's ability to provide services determinative, stating: "we do not believe the Legislature intended a system in which a county's liability to mental-hold patients is based on the county's ability, or willingness, to provide services directly." *Id*. In *DeMontiney* the County Board of Supervisors entered contracts to provide medical care because it was having difficulty in procuring medical personnel doctors directly. *Id*. at 9, n.2. Herein, similarly, there is also no evidence that the legislature intended that the County be relieved of liability to provide services for which elected public officials are personally unqualified or unable to provide nor has County Defendant presented any legal theory in support of this argument.

County Defendants state that Arizona courts have engaged in a similar analysis regarding the non-delegable duty of care theory in other types of cases involving licensed professionals, such as the State's duty to provide counsel to indigent defendants. *See e.g. State v. Hicks*, 219 Ariz. 328 (2009). The State's duty to provide counsel to indigent defendants, discharged upon the appointment of counsel, is not analogous to the County's duty to care for inmates held at the county jail. The State has an obligation to appoint competent counsel, but the State's duty ends there; further interference with counsel's representation would encroach upon both the defendant's Sixth Amendment rights and

the appointed attorney's ethical obligations. *See id.* at ¶ 12, (citing *Strickland v. Washington*, 466 U.S. 668 (1984) ("[t]he government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence") and *Polk County v. Dodson*, 454 U.S. 312, 321 (1981) (noting that an appointed attorney, even though paid by the State, has an ethical duty to exercise independent judgment on behalf of the client)). The same constitutional implications and ethical conflicts that arise when the State appoints counsel for indigent defendants do not arise when the State undertakes its duty to care for its inmates.

For the reasons stated above, the Magistrate Judge finds that County Defendants duty to provide medical and mental health care to M.J.H. is non-delegable.

C.    Negligence and/or Gross Negligence

1.    Count One: County Defendants

Plaintiff alleges that County Defendants owed M.J.H a non-delegable duty to provide care, custody, and control, and breached that duty by failing to: (1) place M.J.H in restrictive custody knowing he was predisposed to mental deterioration from restrictive custody; (2) enforce the "keep away" order; (3) provide a less restrictive custody while ensuring M.J.H's safety and security; (4) provide reasonable alternative activities to protect against the deterioration of M.J.H's pre-existing mental health condition; (5) adequately monitor the use of psychotropic drugs within the PCADC; (6) reasonably monitor M.J.H.; and (7) timely summon emergency medical care. (SAC, ¶¶ 61-62).

In order to prevail on an ordinary negligence claim, a plaintiff must prove: (1) a legal duty of the defendant to conform to a standard of conduct recognized by Arizona law for the protection of others against unreasonable risk; (2) the failure of the defendant to conform to the required standard; (3) a reasonably close causal connection between the defendant's conduct and the resulting injury to Plaintiff (proximate cause); and (4) actual loss by or damage to the plaintiff. *Ontiveros v. Borak*, 136 Ariz. 500, 504 (1983) (quoting *W. Prosser, Handbook of the Law of Torts* § 30 at 143 (4th ed.1971)); *Boyle v. City of*

1     *Phoenix*, 115 Ariz. 106, 107 (1977).

2         In order to state a claim for gross negligence, Plaintiff must allege that Pima

3 County acted or failed to act when it knew or had reason to know facts which would lead

4 a reasonable person to realize that its conduct not only created an unreasonable risk of

5 bodily harm to others but also involve a high probability that substantial harm would

6 result. *Nichols v. Baker*, 101 Ariz. 151, 153 (1966); *Walls v. Arizona Dept. of Public*

7 *Safety*, 170 Ariz. 591, 595 (App.1991). Gross negligence is different from ordinary

8 negligence "in quality and not degree." *See Kemp v. Pinal County*, 13 Ariz.App. 121, 124

9 (1970)("A person can be very negligent and still not be guilty of gross negligence.")

10         County Defendants argue that if they were negligent in placing M.J.H. in

11 protective-custody status,[12] the actions of the Conmed Defendants, *i.e.* the alleged failure

12 to diagnose and treat M.J.H.'s medical and mental health needs before and after the

13 Prolixin injection, relieves the County Defendants of liability as an intervening cause and

14 that Plaintiff has failed to produce any evidence to support their theory that the trigger for

15 M.J.H.'s mental health issues might have been due, at least in part, to the decision to

16 place M.J.H. on protective-custody status after he was assaulted by another inmate.

17         There is no dispute that M.J.H. was assaulted by another inmate after a corrections

18 officer missed the existence of a keep-separate order between M.J.H. and his assailant,

19 and that because of his fear that he would be assaulted again, corrections staff placed

20 M.J.H. on protective custody status.

21         Plaintiff asserts that County Defendant's own expert ties this event to M.J.H.'s

22 ultimate mental and physical decline that resulted in his death. When asked whether

23 M.J.H. deteriorated from a mental health standpoint following the assault, defense expert

24 Dr. Potts opined:

25        ───────────────────

26         [12] County Defendants assert that Plaintiff only speculates that the trigger for
M.J.H.'s mental health issues might have been, at least, in part due to M.J.H.'s placement

27 on protective-custody status after the assault, but have produced no evidence to support
this theory. (MSJ, citing CDSOF at ¶¶ 46-52).

28

> I think he had a period of - - clearly had some increased problems. He clearly deteriorated after the assault, but I think it was more a month later.
>
> I mean, there was a period where he appears to be doing relatively well, at least as reflected by a lack of notes and the notes saying that he was tolerating the situation, et cetera.
>
> Absolutely an assault in a jail setting can - - will increase your stress problems, thoughts, et cetera. So doesn't mean he didn't have an acute stressful period, a period of remission of stability, and then have what precipitated his death, the psychotic - - clear psychotic phenomena later.

(PSSOF, Exh. 7, p.30).

Plaintiff argues that there is no need for an expert witness to establish the claim that an officer should follow a keep-separate directive and that he is at fault if he does not because it is well within the ability of a lay juror to understand, and a triable claim of negligent failure to protect exists. The records Dr. Potts reviewed indicate that M.J.H. "was getting out of his cell one hour a day, time out of his cell, et cetra, et cetra, would— could have some bearing on the…stressors that contributed, I believe to psychotic break." (PSSOF, Exh. 7, pp. 146-47; *see also id.* at pp. 39-42) Dr. Potts testified that he believed that "lockdown was more a stressor" than M.J.H.'s insomnia and that solitary confinement contributed to M.J.H. becoming psychotic. (PSSOF, Exh. 7, pp. 40-42).

Whether proximate cause exists is a question for the jury, unless reasonable people could not differ. *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990)("The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred.")(citation omitted). An original actor may be relieved from liability for "the final result when, and only when, an intervening act of another was unforeseeable by a reasonable person in the position of the original actor and when, looking backward, after the event, the intervening act appears extraordinary." *Ontiveros,* 136 Ariz. at 506. The determination of whether an event was extraordinary requires consideration of all the facts, including those about which the defendant knew nothing at

the time of the event. Restatement (Second) Torts § 435, comment d.

The Court cannot say that the intervening actions of the Conmed Defendants in allegedly failing to properly diagnose and treat M.J.H.'s medical and mental health needs, both before and after the Prolixin injection, was an event so extraordinary that the County Defendants should be absolved of liability for their failure to protect and their decision to place and continue M.J.H. on protective custody status.

### 2.   Conmed Defendants

Conmed Defendants do not move for summary judgment on Count Two of the SAC, negligence and/or gross negligence as to Conmed Defendants. Accordingly, this Count remains.

### D.   Wrongful Death

County Defendants advise that Count Three, alleged as a wrongful death cause of action against all Defendants, is a general allegation of jurisdiction under the wrongful death statutes under Arizona law, A.R.S. § 12-611, *et seq.*, and is not a separate cause of action. Rather, it is a vehicle for bringing the negligence/gross negligence claims.

There is no common law right of action for wrongful death. A wrongful death action is an original and distinct claim for damages sustained by statutory beneficiaries and is not a derivative or continuation of claims existing in a decedent. *Halenar v. Maricopa County*, 109 Ariz. 27, 29 (1972). Accordingly, as stated in the SAC, A.R.S. § 12-611, *et seq*, entitles Plaintiff as a surviving parent, to maintain the actions alleged in the SAC, Counts One, Two, Four and Five, that the death of M.J.H. was caused by "wrongful act, neglect or default," but does not state a claim as to Count Three because it does not allege an affirmative link between the death of M.J.H. and the conduct of any particular defendant. *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

### E.   42 U.S.C. § 1983

### 1.   Defendant Dupnik

Count Four is alleged pursuant to 42 U.S.C. § 1983 against Defendant Dupnik in

his role as official policy maker for the PCADC for use of isolation in violation of the Eighth Amendment proscription against cruel and unusual punishment and in violation of the Fourteenth Amendment's guarantee of due process of law.[13] Plaintiff argues in her response to Defendants' motion that the conditions under which M.J.H. was held in the PCADC constitute cruel and unusual punishment and are directly attributable to the policies and procedures in place at the PCADC. Specifically, Plaintiff asserts that Pima County does not maintain a mental health unit for remanded juveniles, and instead has three available housing choices: (1) general population; (2) administrative segregation; and (3) suicide watch in the infirmary. As a result, when M.J.H.'s mental health deteriorated, they had no available placement other than a suicide cell where harsh conditions only exacerbated the problems M.J.H. was experiencing.

A suit against a municipal officer in his official capacity is equivalent to a suit against the municipality. *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 694 (1978). A plaintiff can establish by one of two paths that a municipality has inflicted a constitutional injury. First, a plaintiff can show that a municipality itself violated someone's rights or that it directed its employee to do so, *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1185 (9th Cir. 2002)(citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1994)); or second, a plaintiff can allege that through omissions, the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, and the municipality did not direct the employee to take the unconstitutional action, nor did the municipality have the state of mind required to prove the underlying action. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 387-89 (1989)).

To succeed under the first path, Plaintiff must show that "action pursuant to official municipal policy" caused his injury. *Monell,* 436 U.S. at 691. The elements

---

[13] Plaintiff has withdrawn her §1983 claim that Defendant Dupnik used Prolixin as a chemical restraint. (Plaintiff's Response to MSJ, p. 4, n.1).

necessary to support a § 1983 claim against a municipality are: (1) the plaintiff was deprived a constitutional right; (2) the municipality had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

Under the second path, a policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations. *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir.1992). To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, "that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right[,]" *Id*. at 1474 (quoting *Canton*, 489 U.S. at 389), and that the policy caused the violation, "in the sense that the [municipality] could have prevented the violation with an appropriate policy." *Gibson*, 290 F.3d at 1194.

"[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Crown Point Dev. Inc. v. City of Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). In this case, the due process violations asserted in Counts Four and Five are covered by a more specific constitutional provision, the Eighth Amendment, and therefore will be analyzed under that standard.

There is no factual dispute that M.J.H. was placed on ASI on April 22, 2010, after reporting a fear of harm from other inmates because "PCADC policies and procedures provide that juvenile inmates are to be placed on protective custody … status … where a juvenile reports threats of harm from other inmates." (CDSOF, Declaration of Lt. Meister, ¶10). On May 4, 2010, M.J.H. submitted an Assistance Request seeking to be removed from ASI status, stating that he "cannot stand ASI status any longer", no longer

feared for his safety, and felt that if it went on any longer he would lose his mind: "If I do not get off status, I will soon be on suicide watch I feel. Though I am not a violent person, I feel as if I'm starting to lose my mind." (PSSOF, Exh. 1, at p. IR81). Correctional staff denied M.J.H.'s request for safety reasons, and M.J.H. remained in isolation. (*Id.*).

There is no evidence in the record that the Pima County Jail's policy or custom of placing inmates in protective custody for their own protection amounted to deliberate indifference to the inmate's constitutional right. Although there is no dispute the policy of isolating inmates for their own safety exists, Plaintiff has presented no evidence that this policy or custom amounted to deliberate indifference to M.J.H.'s constitutional right.

To show deliberate indifference under the second path, Plaintiff must demonstrate that Defendants were "on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). Only then does the omission become "the functional equivalent of a decision by [the municipality] itself to violate the Constitution." *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011). Plaintiff has not alleged that Pima County or Sheriff Dupnik had actual notice of the flaw in its policies regarding the housing of juveniles with mental health needs at PCADC. The question is whether the risk of harm to a juvenile with mental health needs remanded to the juvenile detention facility at the PCADC was so "obvious" that ignoring it amounted to deliberate indifference.

Plaintiff has not introduced facts sufficient to make this showing. There is no evidence that Defendants had actual notice of a pattern of risk of harm or injury as a result of Defendants' use of isolation or administrative segregation policy in the juvenile detention pod at PCADC. The absence of any evidence of a pattern makes it far less likely that Plaintiff can prove County Defendants were "on actual or constructive notice," *Farmer*, 511 U.S. at 841, (quoting *Canton*, 489 U.S. at 396.). (internal quotation marks omitted), that its policy would lead to constitutional violations.

It is also not obvious that any omissions in Defendants' policies necessarily give rise to this situation. Plaintiff asserts that Dr. Jack Potts, Defendants' retained expert, opined that M.J.H.'s decline was the result of the housing conditions in which he was kept. He criticized County Defendant for not having alternative placement for M.J.H., rather than placing him on suicide watch when he began to deteriorate from the isolation. (*See* PSSOF ¶¶ 97, 119, 120, 122). County Defendants assert that Dr. Potts' testimony does not state or explain how being housed in the infirmary, a medical unit, is different or worse from being housed in some theoretical juvenile mental health unit, even assuming it would be practical for County Defendants to create one when the total average population of remanded juvenile inmates at the PCADC is 25 to 30 juveniles. (*See* County Defendant's Reply, p. 4). There is no evidence that the infirmary where M.J.H. was housed was a "less protective setting," that resulted in "less mental health contact or monitoring of medications" for M.J.H., or was a "less benign environment" than Dr. Potts' theoretical mental health unit. *Id*. The infirmary where M.J.H. was housed was a medical unit and was staffed with medical providers.

In the days prior to, and at the time of his cardiac event, M.J.H. was on a five-minute suicide watch in the infirmary because he had threatened to kill himself. (CDSOF, ¶¶31-32, 44). Between the April 20 assault and his cardiac event, M.J.H. was either on protective custody status in the juvenile housing pod or on a suicide watch in the infirmary but not in solitary confinement. (*Id.* at ¶¶19-27, 31, 32, 34, 37-39). While in protective custody status, M.J.H. participated in school and the level advancement system, had video visitations with family and others, was allowed phone calls, and had access to the dayroom. (*Id.* at ¶¶20-21, 27-29, 34-36). M.J.H. participated in school until May 24, when he threatened to hang himself. (*Id.* at ¶34). While on the five-minute suicide watch, M.J.H. had visitation with family members and had access to the infirmary dayroom and jail phones. (*Id.* at ¶¶32, 35-36, 44; PSSOF, ¶84). M.J.H. was seen regularly by Conmed medical and mental health professionals and interacted with corrections

officers. (CDSOF, ¶¶16, 23-26, 29-33, 37, 44-45; PSSOF, ¶¶64-65, 69, 72, 78-79, 81, 89, 91-93, 99, 109). Plaintiff has failed to demonstrate the isolation policies applied to juveniles with mental health needs remanded to the juvenile detention facility at the PCADC created a risk of harm that was so "obvious" that ignoring it amounted to deliberate indifference.

For the foregoing reasons, the Magistrate Judge recommends that the District Judge grant Defendants' MSJ as to Count Four of the SAC.

### 2. Conmed and Employee Defendants

Count Five, pursuant to 42 U.S.C. § 1983, alleges that the Conmed and Employee Defendants violated the Eighth Amendment proscription against cruel and unusual punishment through the deliberate indifference to the serious medical needs of M.J.H. Defendants argue that none of the Conmed personnel were deliberately indifferent to M.J.H's medical needs.

The government has an obligation to provide medical care for those whom it punishes by incarceration. *Estelle*, 429 U.S. at 103. Not every breach of that duty is of constitutional proportions. In order to violate the Eighth Amendment proscription against cruel and unusual punishment, there must be a "deliberate indifference to serious medical needs of prisoners." *Estelle,* 429 U.S. at 104. Mere negligence or medical malpractice does not become a constitutional violation simply because the victim is a prisoner: "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1135 (9th Cir. 1997)(*en banc*)(citing *Estelle*, 429 U.S. at 106).

An Eighth Amendment medical claim has two elements: (1) the seriousness of the prisoner's medical need; and (2) the nature of the defendant's response to that need. *Id*. A medical need is serious "if the failure to treat a prisoner's condition could result in further

significant injury or the 'unnecessary and wanton infliction of pain.' " *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities[.]" *Id*. at 1059–60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. *Farmer,* 511 U.S. at 834. Defendants have made no argument that M.J.H. did not suffer from a serious medical need, thus, the deliberate indifference analysis turns on whether Defendants acted with deliberate indifference to M.J.H.'s serious medical needs.

In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or by the way prison officials provide medical care. *Hutchinson v. United States*, 838 F.2d 390, 393–94 (9th Cir. 1988). Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105–06). *See also Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); *McGuckin*, 974 F.2d at 1059 (same). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.' " *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)( "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs."); *see also McGuckin*, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established").

Delays in providing medical care may manifest deliberate indifference. *Estelle*, 429 U.S. at 104–05. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. *See Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994); *McGuckin*, 974 F.2d at 1059; *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989); *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim. *See Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012); *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). However, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.*

In order to defeat a motion for summary judgment, a plaintiff must "produce at least some significant probative evidence tending to [show]," *T.W. Elec. Serv., Inc. v. Pacific Elec.*, 809 F.2d 626, 630 (1987), that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to plaintiff's health," *Jackson,* 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

Although Plaintiff alleges five serious medical needs to which Conmed and Employee Defendants responded with deliberate indifference, the Court analyzes Count Five for purposes of this motion as presenting allegations of two serious medical needs: an allegation that Defendants failed to respond to M.J.H.'s serious mental health needs prior to May 31, 2010, and an allegation that Defendants failed to respond to M.J.H.'s serious medical instability after receiving the Prolixin injection on May 31, 2010.

//

### a.  Conmed Defendants

Plaintiff alleges that Count Five is brought against the "Conmed defendants, defined in the SAC as Conmed Healthcare Management, Inc., and Conmed, Inc." (SAC, ¶ 11). There is no allegation of any separate wrongdoing on the part of the Conmed Defendants in Count Five. Plaintiff has simply alleged that Conmed Healthcare Management is "responsible for the acts and omissions of its employees acting within the scope and course of their employment, including health care providers and other employees providing services at the PCADC." [SAC, ¶ 10] Respondeat superior liability under 42 U.S.C. §1983 does not exist. *Monell,* 436 U.S. at  691 (1978); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Plaintiff has not alleged that Defendant Conmed Health Care formed policies or established procedures that resulted in Plaintiff's injuries. Neither is there any allegation of separate wrongdoing on the part of Conmed. Because Conmed Health Care cannot be held liable merely as an employer of individuals that injured Plaintiff, Plaintiff's Section 1983 claim for Eighth Amendment violations against the Conmed Defendants should be dismissed even if the Court believes there is sufficient basis to proceed further in this matter against the remaining named Defendants. Accordingly, the Magistrate Judge recommends that the District Judge dismiss Count Five as to the Conmed Defendants.

### b.  Karen Richey

At oral argument, Plaintiff conceded that Defendant Kathleen Richey, R.N., should be dismissed from this action.  (*See also* Doc. 115, p.1 n.1). Accordingly, the Magistrate Judge recommends that the District Judge dismiss Defendant Kathleen Richey, R.N. from this action.

### c.  Care Prior to May 31, 2010

The evidence viewed in a light most favorable to Plaintiff demonstrates a triable issue of fact as to whether Dr. Galper knew of M.J.H.'s serious medical need for a full psychiatric assessment and failed to timely provide that assessment.

Upon intake at PCADC on April 1, 2010, M.J.H. was referred for mental health evaluation. A four-page form captioned "Correctional Mental Health Services Initial Evaluation and Treatment Plan" was completed wherein M.J.H. reported that he had been diagnosed as bipolar and with depression a year and one-half prior while in a detention facility in California. (CESOF, Exh. 9, pp. 231-34). He indicated he had taken Depakote in the past for bipolar disorder. (*Id.* at p. 232). He also indicated attempting suicide using a gun to his head 4 years prior. (*Id.* at p. 233). According to LAC Sutton, the form was completed for all juvenile inmates and was considered to be a "full assessment." (*Id.* at Exh. 5, pp. 4, 20-21). M.J.H. was referred for medical evaluation and routine follow up. (*Id.* at Exh. 9, p. 234). Plaintiff argues that, despite M.J.H.'s self-reported psychiatric history, M.J.H. never underwent a *full* psychiatric assessment at PCADC. Plaintiff points to Dr. Galper's testimony that he never conducted a full psychiatric assessment of M.J.H. (PSSOF, Exh. 13, pp.33-34). Dr. Galper characterized the form completed during M.J.H.'s April 2010 intake as "an initial evaluation and treatment plan…and that was the first assessment that was done." (*Id.* at p. 34). Defense expert, Dr. Potts believes that the Conmed Defendants "did a very good assessment upon intake, because they do that for everyone. It's a triage. And then if you triage them to a psychiatrist, then they can do more…evaluations at a higher level.  But it's a triage procedure simply.  That's what it is." (PSSOF, Exh. 7, pp. 21-22). According to Dr. Potts, "a psychiatric evaluation was done frequently, psychological, psychiatric by the counselors, by the nurses, others. They were doing this." (*Id.* at p. 22).

Dr. Don, Plaintiff's expert, however, opines that M.J.H. did not receive a thorough psychiatric assessment, and therefore no diagnosis was made nor appropriate treatment plan developed. (PSSOF, Exh. 3, p. 4216) Although he was treated for insomnia, it did not address his underlying psychiatric disorder. (*Id.* at 4217). An appropriate intervention at this stage would have been a complete psychiatric evaluation, followed by a mental status examination. (*Id.* at 4216). This would result in the establishment of an assessment

(diagnosis), and an appropriate treatment plan. (*Id.*) The final step would involve re-evaluation of the treatment interventions to determine the response to treatment and appropriate adjustments to the treatment plan according to the response. (*Id.*).

Dr. Don noted that on May 1, 2010, M.J.H. was evaluated by Ky Resh, an LCSW, who noted that M.J.H. reported hearing voices, described as command hallucinations, and referred him to a psychiatrist for medication evaluation, but his diagnosis was considered to be PTSD vs. Malingering. (PSSOF, Exh. 3, p. 4211; *see also* CESOF, Exh. 9, p. 217). On May 4, 2010, M.J.H. was evaluated by a psychiatric Physician Assistant, and treated for insomnia. (PSSOF, Exh. 3, p. 4211). Plaintiff's expert again characterizes this as an incomplete psychiatric evaluation as M.J.H. was not asked about psychotic symptoms. (*Id.*). On May 7, 2010, M.J.H. was placed on a 5-minute suicide watch, which was changed to a 15-minute suicide watch on May 9, 2010, and discontinued on May 11, 2010. (CDSOF, Declaration of Lt. Meister, ¶¶ 30-32). Dr. Don notes that on May 8, 2010, M.J.H. was observed to be anxious and excited, and was exhibiting manic behavior. (PSSOF, Exh. 3, p. 4211). On May 23, 2010, M.J.H. asked to speak to "psych." (CDSOF, Declaration of Lt. Meister, ¶ 36). On May 24, 2010, M.J.H. was again placed on suicide watch. (*Id.* at ¶ 38). Between May 24, 2010 and June 2, 2010, M.J.H. was on a five minute suicide watch in the medical infirmary. (*Id.* at ¶ 44).

The evidence viewed in a light most favorable to Plaintiff suggests that despite M.J.H. being the subject "intermittently" at conferences or daily health provider meetings, and the awareness that Dr. Galper would have had that a juvenile was on suicide watch from May 7 to May 11, and then again on May 24, 2010, Dr. Galper did not involve himself directly with M.J.H.'s care until May 28, four days after M.J.H.'s second placement on suicide watch on May 24, after M.J.H.'s "anxiety and depression had progressed to psychosis with visual hallucinations and paranoid delusions." (PSSOF, Ex. 13, p. 33; *see also* PSSOF, Exh. 3, p. 4212; CESOF ¶ 80-83) Although M.J.H. was seen and treated by other health care providers, there is a triable issue of fact as to

whether Dr. Galper knew of M.J.H.'s serious medical need for a full psychiatric assessment and failed to timely provide that assessment, and, as a result failed to timely provide appropriate mental health care.

      d.   Care After May 31, 2010

The evidence viewed in a light most favorable to Plaintiff demonstrates a triable issue of fact as to whether the Individual Conmed Defendants were aware of a serious medical need: (1) that M.J.H. was suffering from a reaction to Prolixin; or alternatively (2) that M.J.H. was suffering from an unknown serious medical illness, and were Individual Conmed Defendants were deliberately indifferent to that need.

NMS is characterized by neuromuscular activity, autonomic instability, and alteration in sensorium while taking a nueroleptic drug such as Prolixin. M.J.H. exhibited signs and symptoms consistent with NMS (or a variant of NMS). Treatment would include full medical support for problems with the autonomic system. (PSSOF ¶¶ 165-66).

Dr. Galper testified that, if M.J.H. had a reaction to the Prolixin that had been administered the previous afternoon he would have expected him to have a fever, and to have been stiff and dystonic. (CESOF, ¶114). Yet, LAC Sutton's treatment notes indicate that on the date of the injection, M.J.H. was very weak, and on June 1, 2010, M.J.H. was lying in his bed unresponsive and shivering. (PSSOF, Exh. 2, H49) Faced with M.J.H.'s clinical deterioration, those charged with his care, including Dr. Galper, Dr. Bishop, and Nurse Yashar failed to take any action that would have led to transferring M.J.H. to a higher level of care. The failure to transfer M.J.H. to a higher level of care was arguably a breach of the standard of care and resulted in M.J.H. suffering cardiovascular collapse requiring resuscitation, and ultimately death. (*See* PSSOF, ¶¶108-113).

Defendants argue that both doctors considered the possibility of transporting M.J.H. to a different facility on the afternoon of June 1, and both determined that, in their medical judgment, M.J.H. would receive adequate care in the infirmary. Similarly,

Nurses Condon and Yashar believed that M.J.H. was receiving the nursing care he needed. Thus, Defendants conclude, none of the Conmed personnel were deliberately indifferent to M.J.H.'s needs because they all subjectively believed that M.H.'s condition did not warrant transfer out of the facility. Despite the confidence the Individual Conmed Defendants had in their belief that the care that M.J.H. would receive at PCADC was adequate for his medical needs, Nurse Yashar testified that although she was monitoring him from a medical standpoint on June 1, 2010, she had never been given a medical diagnosis to work from with respect to M.J.H.'s condition. (PSSOF, Exh. 6, p.116). This testimony, combined with the objectively undeniable harmful outcome, undermines Defendants' *post hoc* convictions that M.J.H. would receive the care he needed at PCADC. If Defendants were uncertain about M.J.H.'s diagnosis, evidenced by the absence of a diagnosis that explained M.J.H.'s symptoms, in the face of serious symptoms of medical instability and alterations in mental status, there is an issue of fact as to whether the decision to keep M.J.H. at PCADC demonstrated a deliberate indifference by the Individual Conmed Defendants to a serious medical need. Defendant Yashar testified that in a typical twelve hour shift she was able to meet the basic requirement for checking vital signs during her shift by checking vital signs and performing an assessment once at the beginning of the shift, and then she "like[d] to walk around and kind of eyeball everybody and just check and make sure everyone's doing good during the night." (PSSOF, Exh. 6, p. 60). During her shift, Nurse Yashar's medical care of M.J.H. consisted primarily of checking to see if M.J.H. was "breathing and moving" (PSSOF, Exh. 6, p. 133). Without a proper diagnosis, there is at a minimum a factual dispute as to whether or not the Individual Conmed Defendants' subjective belief that this level of care would be adequate demonstrated deliberate indifference to what was undeniably a serious medical need.

Furthermore, the evidence suggests that "throughout the night" before his death,

M.J.H. was lying on his stomach on the concrete floor[14], in a puddle of what the correctional officer believed was possibly liquid Gatorade[15], he appeared to be "snort[ing]" the liquid and falling asleep, and was unable to comply with correctional officers' directives to lay on his stomach. (PSSOF, Exh. 1, IR112). Medical staff had been advised early in the shift that he was doing this, and despite his apparent unresponsiveness, the corrections officers were advised by medical staff that no further action was necessary. (PSSOF, Exh. 1, IR110).   Seemingly, because his leg was moving, and he appeared to be breathing based on a *correctional officer's* observations from *outside the cell*, (*Id*., Exh. 1, IR112), M.J.H.'s very serious medical needs went unmet. The mere fact that Defendants provided M.J.H. with some form of medical treatment does not absolve them of all liability for their actions. *See Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir.2000) ("A prisoner need not prove that he was completely denied medical care.") (*en banc*); *Ortiz,* 884 F.2d at 1314. "[T]he more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." *McGuckin*, 974 F.2d at 1061.

In *Ortiz*, police found Ortiz asleep in a canal bank and arrested in him on an outstanding warrant. At the City of Imperial Jail, he fell and struck his head and was taken to the hospital where he received sutures but no x-rays. The doctor at the hospital diagnosed the cause of Ortiz's fall as alcohol withdrawal and released him to police custody two hours later. The doctor provided the sheriff with a Patient After Care Sheet that explained that problems from injuries can occur sometime later and to report to the

---

[14] M.J.H. had been lying on only concrete without a pillow since he had been placed on suicide watch on May 24.

[15] Because neither the correctional officer nor any medical provider entered the cell to actually provide care to M.J.H. until four hours after Defendant Yashar first checked his vital signs (PSSOF, Ex. 1, IR112; PSSOF Exh. 6, pp. 132, 142), it was not determined what the liquid was, although later testimony by Defendant Yashar strongly suggests that it was not Gatorade. (PSSOF, Exh. 6, pp. 143).

1    doctor or emergency room immediately if Ortiz experienced increased drowsiness or a

2    persistent headache. After Ortiz returned to his cell at the jail, he fell again and was

3    placed in the jail infirmary. Two days after the initial fall, Ortiz was found unconscious,

4    and he died ten days later in the hospital due to blunt force trauma to the head and skull

5    fractures sustained at the time of his initial fall. Ortiz's survivors brought a civil rights

6    action against his nurses and physicians at the jail alleging deliberate indifference to his

7    serious medical needs. *See Ortiz*, 884 F.2d at 1313.

8        In the *Ortiz* case the parties did not dispute that Ortiz received medical care in the

9    days following his fall. Nor did they dispute that the defendants were aware of Ortiz's

10   head injury. However, the parties did dispute the adequacy of the medical care provided

11   to Ortiz. Specifically, when Ortiz began to exhibit some of the symptoms identified on

12   the Patient After Care Sheet, the defendants did not call the emergency room or the

13   doctor from the hospital and instead called a different doctor who prescribed Ortiz

14   sedatives without examination. Sedatives are an appropriate remedy for alcohol

15   withdrawal symptoms but are not appropriate for head injuries because they can mask

16   symptoms of the injuries. At summary judgment, the district court determined that the

17   defendants' conduct could not constitute deliberate indifference to Ortiz' medical needs

18   and that they could not be found liable for his death. *See Ortiz*, 884 F.2d at 1313.

19   Reversing the district court in part, the Ninth Circuit held that Ortiz's survivors were not

20   required to demonstrate the defendants complete failure to treat Ortiz to survive summary

21   judgment. The court reiterated that "access to medical staff is meaningless unless that

22   staff is competent and can render competent care." *Ortiz*, 884 F.2d at 1314  (quoting

23   *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir.1988)), *vacated on other*

24   *grounds*, 490 U.S. 1087 (1989), *reinstated* 886 F.2d 235 (9th Cir.1989)).

25       The court explained that the defendants knew of Ortiz's head injury but

26   disregarded evidence of complications that the doctor at the hospital had alerted them to

27   previously. *Ortiz*, 884 F.2d at 1314. As a matter of law, the Ninth Circuit concluded that

28

- 41 -

it could not say that certain nurses and doctors were not deliberately indifferent to Ortiz's serious medical needs. *Id*. The court did affirm summary judgment for those defendants that did not have notice of the head injury and the possible complications. *Id*. Similarly, the Individual Conmed Defendants in this case had notice that M.J.H. had received an injection of Prolixin, and had at least constructive notice, if not actual notice, that he could be suffering from adverse side effects, including NMS, as a result. As Plaintiff's expert opined, NMS can rapidly lead to death and requires intensive medical management in an intensive care setting, which was not available at the infirmary. (PSSOF, Exh. 4, pp. 4237-38).

The evidence viewed in a light most favorable to Plaintiff demonstrates a triable issue of fact as to: (1) whether M.J.H. was suffering from a complication from the Prolixin injection, and, if so, whether Defendants disregarded evidence of the complications to which they had been specifically alerted; or (2) whether Defendants disregarded specific evidence of an unknown serious medical complication and failed to provide competent care to M.J.H. based on his medical needs. *See Ortiz*, 884 F.2d at 1314 ("access to medical staff is meaningless unless that staff is competent and can render competent care.")(citations omitted). Consequently, the Magistrate Judge recommends that Defendants' MPSJ be denied.

F.   Qualified Immunity

Qualified immunity, which shields government officials from liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects government officials "for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

By summary judgment, Defendants are only entitled to relief if the facts alleged and evidence submitted, resolved in Plaintiff's favor and viewed in the light most

favorable to him, show that their conduct did not violate a federal right; or, if it did, that the scope of that right was not clearly established in the context of the specific facts of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court has discretion to decide which of the two prongs to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009). The Ninth Circuit has previously held that "[i]f a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). Because the Magistrate Judge finds that underlying facts are disputed, a finding on the issue of qualified immunity is premature at this stage, and recommends that Defendants' motion for summary judgment as to qualified immunity be denied.

### G.   Punitive Damages

The Conmed and Employee Defendants assert that, under Arizona law, the standard for awarding punitive damages is similar to that for proving deliberate indifference under the Eighth Amendment, with the added requirement that entitlement to punitive damages must be proven by clear and convincing evidence. *Linthicum v. Nationwide Ins. Co.*, 150 Ariz. 326, 330-31 (1986).("The key is the wrongdoer's intent to injure the plaintiff or his deliberate interference with the rights of others, consciously disregarding the unjustifiably substantial risk of significant harm to them.") The Conmed and Employee Defendants assert that, as in Count Five, Plaintiff's proof falls short, and summary judgment on punitive damages is in order. The Magistrate Judge disagrees for the reasons stated above and recommends that the District Judge deny summary judgment as to the Conmed and Employee's MPSJ as to punitive damages.

## III.   RECOMMENDATION

For the reasons stated above, the Magistrate Judge RECOMMENDS that

(1)   The County Defendants' Motion for Summary Judgment (Doc. 100) be DENIED IN PART and GRANTED IN PART as follows:

a.   DENIED as to Count One

b.      GRANTED as to Count Four

(2)      the Conmed and Employee Defendants' Motion for Partial Summary Judgment (Doc. 105) be GRANTED IN PART and DENIED IN PART as follows:

a.      GRANTED as to the Conmed Defendants in Count Five.

b.      DENIED as to the remainder of the Motion for Partial Summary Judgment.

(3)      Defendant Kathleen Richey, R.N. be DISMISSED from this action.

(4)      Count Three be DISMISSED from this action.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within fourteen days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Fed.R.Civ.P. 72(b). No reply to any response shall be filed. *See id*. If objections are not timely filed, then the parties' rights to de novo review by the District Court may be deemed waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

If objections are filed the parties should use the following case number: **CV 11-0411-TUC-FRZ**.

Dated this 18th day of July, 2013.


_____
Héctor C. Estrada
United States Magistrate Judge

- 44 -