**BARBARA LAWALL**
**PIMA COUNTY ATTORNEY**
**CIVIL DIVISION**
Nancy J. Davis, SBN 017197
Deputy County Attorney
32 North Stone Avenue, Suite 2100
Tucson, Arizona 85701
Telephone: 520-740-5750
Nancy.Davis@pcao.pima.gov
*Attorney for Defendants Sheriff Dupnik and Pima County*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Jacqueline Harrelson, individually and on behalf of the statutory beneficiaries of M.J.H. and Estate of M.J.H.,

　　　　　Plaintiffs,

vs.

Clarence W. Dupnik, et al.

　　　　　Defendants.

No. **4:11-CV-00411-FRZ(BPV)**

**MOTION IN LIMINE No. 1 BY DEFENDANTS PIMA COUNTY AND SHERIFF DUPNIK RE: EXPERT WITNESS STATEMENTS BY DR. DON AND DR. POTTS**

Defendants Pima County and Sheriff Dupnik move the Court for an Order in Limine precluding Plaintiff from introducing any argument or evidence that:

- an inmate-assault and decision to place decedent MJH on protective-custody status after the assault was a proximate cause of MJH's death; and
- the lack of a separate mental-health unit for remanded juveniles at the Pima County Adult Detention Complex ("PCADC") was a proximate cause of MJH's death.

The evidence should be excluded because Plaintiff failed to properly disclose the information as required by Rules 26(a)(2) and (e)(2), Fed.R.Civ.P., and because the

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

opinion evidence, which Plaintiff intends to introduce through the use of expert witnesses does not meet the requirements of Rule 702, Fed.R.Evid.

I.  Procedural Background

Plaintiff Jacqueline Harrelson is the mother of decedent MJH.  Defendant Pima County owns the Pima County Adult Detention Complex ("PCADC").  And Defendant Sheriff Dupnik oversees the custodial operations of the PCADC.  Defendants Conmed, Inc., Dr. Steven Galper, Dr. Roger Bishop, R.N. Karen Yashar, and N.P. Julie Hogan ("the Conmed Defendants") provide mental-health and medical care to inmates incarcerated at the PCADC pursuant to a contract with Pima County.  One of those inmates was MJH.

Plaintiff's lawsuit originally alleged both federal and state-law claims against all of the Defendants arising out MJH's cardiac event and subsequent death while he was an inmate at the PCADC.  Following summary judgment, the only reaming claim against Pima County and Sheriff Dupnik is a state-law claim for wrongful death based on negligence or gross negligence.  Carlos Nunez, the inmate who assaulted MJH, is designated as a non-party at fault on that claim.  Two claims remain against the Conmed Defendants:  an Eighth Amendment claim of deliberate-indifference to serious medical needs and a state-law wrongful-death claim.

II.  Factual Background

On April 1, 2010, MJH, a 17 ½ year old male, was remanded to and booked into the custody of the PCADC to serve a sentence on felony burglary charges.  At booking, MJH noted that he suffered from bipolar disorder and had previously taken, but was not currently taking, prescription medication for his bipolar disorder.  Within a few days of being booked into the PCADC, MJH reported that he was suffering from insomnia.  Conmed contacted Plaintiff and received consent from her to treat MJH's insomnia with medication.

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

On April 20, MJH was assaulted by another juvenile inmate after a corrections officer missed the existence of an internal jail-directive ("keep-separate order") from a prior incarceration.  That order required that MJH and the other inmate were to be kept separate from one another.  MJH suffered a mild concussion and a rib fracture in the assault, was taken to a hospital for treatment, and spent a night in the medical infirmary upon his return from the hospital.

On April 22, corrections staff placed MJH on protective-custody status after MJH reported that he was afraid other inmates were going to jump him while he was in the dayroom.  The threats stemmed from MJH's decision to press charges against Nunez.

Between April 22 and May 24, MJH participated in school and the level-advancement system, a program designed to give juvenile inmates more privileges based on good behavior.  He also had dayroom time, visitation, phone access, and mail privileges.  During this same period of time, however, MJH continued to report that he had insomnia, was depressed at times, and having other stresses related to being incarcerated.  He also reported that he was having disturbing dreams, was hearing voices, and problems with his wisdom teeth.  The Conmed Defendants were notified about MJH's issues, saw MJH regularly, and attempted to treat his medical and mental-health issues.

On May 10, 12, and 18, records indicate that MJH's mental condition had improved and that he appeared stable.  Then, on May 24, MJH threatened to kill himself after being informed he was moving into a different protective-custody cell within the juvenile housing unit.  Based on MH's suicide threat, he was put on a five-minute suicide watch by Conmed and moved to a cell in the medical infirmary.

Between May 24 and May 31, MJH exhibited signs of dehydration and serious mental-health problems.  The Conmed Defendants treated the dehydration with IV fluids and attempted to diagnose the cause of MJH's mental-health issues and treat them.  On

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

1  May 28, Dr. Galper called Plaintiff, MJH's mother, for consent to treat MJH's mental-

2  health issues with oral medication.  Plaintiff was ambivalent about giving MJH the

3  mental-health medication, expressed a desire to wait and see what MJH looked like when

4  she was scheduled to come visit him in a couple of days, and declined to give her consent

5  for Dr. Galper to medicate her son.  Thereafter, MJH's mental-health condition severely

6  deteriorated.

7  　　　　By May 31, MJH was diagnosed as floridly psychotic—a mental-health

8  emergency.  Conmed personnel attempted to contact MJH's mother about medication,

9  but were unsuccessful in reaching her.  Dr. Galper then ordered that MJH be given an

10  emergency injection of Prolixin, an anti-psychotic drug.  R.N. Hogan administered the

11  injection.  Approximately 36 hours later, during the early morning hours of June 2, while

12  still on a suicide watch in the infirmary, MJH suffered a cardiac event which left him

13  with an irreversible brain injury.  The cardiac event was discovered during a five-minute

14  suicide-watch round.  MJH was transported to a hospital and placed on life-support.

15  MJH died after his family discontinued the life-support.

16  　　　　Plaintiff theorizes that MJH's cardiac event was caused by an atypical form of

17  neuroleptic malignant syndrome ("NMS").  NMS is a rare and life-threatening reaction to

18  Prolixin.  The Conmed Defendants deny that MJH's cardiac event was caused by NMS.

19  The Medical Examiner who did MJH's autopsy listed MJH's cause of death as

20  "unknown."  Pima County and Sheriff Dupnik do not know what caused MJH's death.

21  They rely on the opinion of the Medical Examiner.

22  　　　　　　　　　　　　　　**LEGAL ARGUMENT**

23  **Motion In Limine No. 1(a):  To preclude all argument or evidence that the inmate
24  assault and protective-custody status proximately caused MJH's death.**

25  　　　　As mentioned in the procedural background, the only claim remaining against

26  Pima County and Sheriff Dupnik is a claim for wrongful death grounded in negligence or

gross negligence.  One of Plaintiff's theories of liability against Pima County and Sheriff Dupnik is that an inmate-assault that occurred on April 20 and an April 22 decision to place MJH on protective-custody status after the assault proximately caused MJH's death. [1]  MJH was diagnosed as floridly psychotic on May 31, two days after his mother refused to give Conmed consent to give MJH oral mental-health medication.  MJH's cardiac event occurred on June 2, about thirty-six hours after Conmed administered the emergency Prolixin injection.  The floridly-psychotic diagnosis and cardiac event occurred six weeks after MJH's assault and placement on protective-custody status.  No expert has tied the floridly-psychotic diagnosis or the cardiac event to the assault or protective-custody status.

     In pursuing her theory, however, Plaintiff relies on statements made by two standard-of-care experts retained to offer opinions about whether the actions of Conmed Defendant Steven Galper, M.D., fell below the standard of care of a reasonable psychiatrist when he rendered treatment to MJH.  Those experts are Plaintiff's expert, Laura Don, M.D., and Conmed's expert, Jack Potts, M.D.  The experts' statements are discussed in Sections A and B below.

     A.  The Statements by Laura Don, M.D.

     Laura Don, M.D. was retained to offer an opinion on whether the actions of Defendant Steven Galper, M.D. in treating MJH fell below the standard of care of a reasonable psychiatrist and whether there was a causal connection between the medical and mental-health care treatment provided to MJH and MJH's eventual death following

---

[1]Plaintiff's second theory of wrongful-death liability is that Pima County and Sheriff Dupnik are vicariously liable for the alleged malpractice of the Conmed Defendants under a theory of non-delegable duty of care.  The assault and protective-custody status are irrelevant to that theory of liability.

BARBARA LaWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

the cardiac event.  *Exhibit A attached, Dr. Don's written opinion.*  Dr. Don opined that

the answer to both of those questions was yes.  *Id.*

Dr. Don did not offer an opinion against any corrections officer or what role any

decision by corrections staff played in MJH becoming floridly psychotic and suffering

the cardiac event.  And Dr. Don confirmed the limits of who she was expressing expert

opinions against in her deposition.

> Q:    And just so I'm clear, you're not offering any opinions that any individual corrections officer fell below the standard of care for a corrections officer, correct?
>
> A:    I didn't give an opinion in that regard.
>
> Q:    Your opinions are limited to the medical and mental healthcare that was provided?
>
> A:    Correct.

*Exhibit B attached, Excerpt of Don Deposition at p. 104, lines 1-8.*

Notwithstanding the self-proclaimed limitations on her opinions, it is anticipated

Plaintiff will attempt to use these statements to argue that Pima County and Sheriff

Dupnik should be liable for MJH's death.  This is because in rendering her opinion

against Dr. Galper, Dr. Don concluded that there was a general decline in MJH's

psychiatric condition that occurred over the course of about six weeks.  *Exhibit A at p. 4,*

*part C and p. 5, last paragraph.*  Dr. Don believes that the general decline began from the

date of the assault and that one of the potential triggers for the general decline may have

been the assault.  *Id.*  Thus, Plaintiff wants to argue that the assault and general decline

was a proximate cause of MJH's death.

But, Dr. Don's written report and deposition testimony are limited to the actions of

Dr. Galper and the other Conmed providers in treating MJH's physical and psychiatric

needs.  *See Exhibit A at p.4, part C ("Appropriate and timely treatment was not provided*

*for his psychiatric conditions . . . .") and p.14 ("A failure to treat Mr. Harrelson's*

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

*progressive symptoms directly resulted in further deterioration of his psychiatric and physical condition, and ultimately his death.") and Exhibit B at p.104, lines 1-8.*  And Dr. Don does not opine that any of those triggers caused MJH to become floridly psychotic or suffer a cardiac event.  Further, Dr. Don speculates that MJH's general psychiatric decline may have been triggered by a variety of factors.  Specifically, Dr. Don wrote that:

> the trigger for this deterioration *may be multifactorial, and was most likely due [sic] a combination of the following*:  the physical consequences of his head injury, the emotional consequences of this assault, the emotional consequences of his head injury, the emotional consequences of this assault, the emotional consequences of incarceration, the separation from any support system, and the biological course of Bipolar Disorder.

*Exhibit A at p. 11, second paragraph (emphasis added).*  Dr. Don does not know what role each of those possible triggers played.  Nor has Dr. Don offered any opinion with any degree of reasonable medical probability as to the role any one factor may or may not have played in relation to the other possible triggers.  *Exhibit A.*  Notably, Dr. Don's written  statement does not refer to the protective-custody as a possible trigger.  *Id.*  Further, Dr. Don admits that that even after the assault and placement on protective-custody, records indicated that MJH still had periods of stability as noted on May 10, 12, and 18.  *Exhibit A at p.5, last paragraph.*  This distinction is important because the mental-health issues that MJH experienced after May 24 were much different than the issues he experienced in late April and early May.  *Exhibit A; see also Exhibit C attached, Excerpt of Potts' Deposition at p.150, lines 6-10.*

        B. The Statements by Jack Potts, M.D.

        Dr. Potts was hired by the Conmed Defendants to give an opposing opinion about whether the actions of Defendant Steven Galper, M.D. fell below the standard of care of a reasonable psychiatrist.  Dr. Potts was not retained to give an opinion about the actions of Sheriff Dupnik, Pima County, or any corrections officer.  *Exhibit C at p.141, lines 12-17.*  And Dr. Potts was not retained to talk about how or why MJH suffered a cardiac event

1    and died.  Indeed, Dr. Potts testified that he has no opinion on what caused MJH's death.

2    *Exhibit C at p.111, lines 10-11 "I would defer to the pathologist."*

3         Plaintiff claims, however, that Dr. Potts ties the assault and protective-custody

4    status "to M.J.H.'s ultimate mental and physical decline that resulted in his death."

5    (Doc.#113 at p. 12, lines 1-3; Doc.#135 at p.4, lines 7-18; Doc.# 131 at p.25, line 21-

6    p.26, lines 1-9).  But Plaintiff's statement misquotes Dr. Potts' testimony.  Dr. Potts has

7    no opinion on what caused MJH's death.  *See Exhibit C at p.111, lines 10-11 ("I would*

8    *defer to the pathologist.")*.  Nor does he tie those things to MJH being diagnosed as

9    floridly psychotic or suffering a cardiac event.  *Exhibit D attached, Potts' written*

10   *opinion*.  And as with Dr. Don, Dr. Potts only discusses the custodial issues when

11   referencing possible stressors for MJH.

12        Notwithstanding this fact, during Dr. Potts' deposition, Plaintiff's counsel, over

13   objection of defense counsel, asked Dr. Potts about the stressors of being in "solitary

14   confinement" and whether he thought it contributed to MJH becoming psychotic at some

15   undefined point in time.  Over the objections of defense counsel, Dr. Potts stated that he

16   thought it did, but Dr. Potts did not indicate when or whether that caused or contributed

17   to MJH becoming floridly psychotic on May 31 or whether that caused or contributed to

18   MJH suffering a cardiac event on June 2.  *Exhibit C at p.40, line 23-p.42, line 1*.  Indeed,

19   later during his deposition, Plaintiff's counsel also asked Dr. Potts if he thought the

20   *suicide-watch conditions* "contributed to Mr. Harrelson's general mental-health decline."

21   Again, over the objection of defense counsel, Dr. Potts stated, without any qualification

22   as to date or time:

23        A:    I don't believe they helped.  I believe that his decline was precipitated more
             by the isolation, where he had previously been housed.  *But, you know, it's*
24           *all part of a gestalt as a – it's very hard to put the specific weight of one*
             *stressor on—you know, as to the—for the etiology of what was going*
25           *down.*"

26

BARBARA LaWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

1    *Exhibit C at p.56, lines 2-8 (emphasis added).* [2]

2    And when asked by Plaintiff's counsel whether street drugs may have caused or

3    contributed to MJH's psychosis, Dr. Potts testified that:

> A:  They may have contributed to it by vulnerability but did not cause it.  It clearly did not cause it. It may have been one of the things.  Remember, we talked about it.  *But these aren't simple, you know, A caused B. This is A, B, and C may cause D, E, or F.  And we have the stressors of incarceration.  We have maybe dehydration.  You know, we have a lot of—the assault, I mean, a lot, his vulnerability, a lot of things that contribute to this, past history, possibly.*

8    *Exhibit C at p.97, lines 7-20.*

9    Despite his testimony at deposition, Dr. Potts' written opinion does not contain

10   any opinions about the assault, the effect of the assault on MJH's psychiatric condition,

11   or the effect of protective-custody status on MJH.  *Exhibit D.*  And significantly, Dr.

12   Potts never tied the assault or protective-custody status to MJH becoming floridly

13   psychotic or suffering the cardiac event.  Rather, Dr. Potts testified that after May 24,

14   MJH "showed an acute decompensation that had not been evidenced prior to that time."

15   *Exhibit C at p.150, lines 6-10.*

16   <u>C.  The opinions should be excluded because they were never properly disclosed</u>

17   Plaintiff should be precluded from offering any argument or evidence based on the

18   foregoing statements by Drs. Don and Potts that the assault or protective-custody status

19   had anything to do with MJH becoming floridly psychotic or suffering a cardiac event

20   from which he later died.  The argument and evidence should be excluded for several

21   reasons.

22   First, neither expert has disclosed any written expert opinion on what role any

23   custodial issues, including the inmate assault and the protective-custody status, may have

24   played in MJH becoming floridly psychotic on May 31 or his June 2 cardiac event.  Rule

26   [2] The Merriam-Webster Dictionary defines gestalt as "something that is made of many parts."

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

1   26(a)(2), Fed.R.Civ.P., requires that all expert opinions be put in writing, with a

2   supporting factual basis, and be timely supplemented in writing.  Plaintiff bears the

3   burden of proof to show that her failure to timely and properly disclose these opinions is

4   harmless.  *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008) (the party

5   opposing exclusion of the non-disclosed evidence must "demonstrate that the failure to

6   comply with Rule 26(a) is substantially justified or harmless.").  And Rule 26(e)(2),

7   Fed.R.Civ.P., requires a party to supplement an expert's written report with additional

8   opinions, including "any information given during the expert's deposition" within "the

9   time the party's pretrial disclosures under Rule 26(a)(3) are due."  And under Rule

10   37(a)(4), Fed.R.Civ.P., "an evasive or incomplete disclosure, answer, or response must be

11   treated as a failure to disclose, answer, or respond."  Finally, Rule 37(c)(1) is a self-

12   executing mechanism for preventing the use of undisclosed evidence.  *See Yeti by Molly,*

13   *Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

14       Here, both experts' written opinions addressed the standard-of-care issues

15   involving Dr. Galper and, as to Dr. Don, what role the medical and mental-health

16   treatment provided by the Conmed Defendants played in MJH's death.  Neither Plaintiff

17   nor the Conmed Defendants have disclosed or supplemented their experts' written

18   opinions with the theory that anything about what a corrections officer did or did not do

19   had anything to do with MJH becoming floridly psychotic on May 31 or suffering a

20   cardiac event on June 2.  The deadline for Plaintiff to disclose initial and rebuttal expert

21   opinions was February 21, 2012 and May 21, 2012, respectively.  (Doc.# 22 at p.2,

22   section E).  And the Court's Order states that "**Expert witnesses will not be allowed to**

23   **testify to matters not present in their reports**."  (Doc.#22 at p.2, lines 11-12).  Plaintiff

24   has failed to comply with either of these provisions with respect to the assault and

25   protective-custody as a proximate cause of MJH's death.  *See Exhibits A and D.*

26       At best, the experts opined that MJH had mental-health issues throughout his

incarceration which the Conmed Defendants failed to appropriately treat. But, the nature of those issues changed after May 24, the date MJH threatened suicide and was put on a suicide watch in the infirmary. *Exhibit C at p.150, lines 6-10.* Plaintiff has not disclosed any evidence that MJH died because of the assault or because he was on protective-custody status. And significantly, Plaintiff has not disclosed any expert opinion against Pima County or Sheriff Dupnik that the assault or protective-custody status was a proximate cause of MJH becoming floridly psychotic six weeks later and then suffering a cardiac event from which he later died. And as previously mentioned, neither expert has made any written report regarding those issues. Indeed, both experts have testified that they were not offering any opinions against any corrections staff. *Exhibit B at p. 104, lines 1-8 and Exhibit C at p.141, lines 12-17.* Thus, their theories about whether Dr. Galper committed medical malpractice cannot be used to support Plaintiff's theory that Pima County and Sheriff Dupnik were negligent in their own right and should be liable for wrongful death based on the custodial decisions that were made. Accordingly, Plaintiff should not be allowed to bootstrap statements made in rendering an expert opinion against a treating physician into an expert opinion against the Sheriff Dupnik and Pima County based the actions of correctional officers.

Second, not only has Plaintiff failed to disclose the information under Rule 26, Fed.R.Civ.P, but she has also failed to disclose the information in response to written interrogatories submitted to her under Rule 33, Fed.R.Civ.P.

Early in the case, Pima County and Sheriff Dupnik propounded written discovery requests to Plaintiff. Plaintiff responded with vague and incomplete answers. *Exhibit E attached, Plaintiff's Responses to Dupnik's Non-Uniform Interrogatories.* For example, in response to a written interrogatory regarding Plaintiff's allegations that MJH was held in "excessively restrictive or solitary confinement," Plaintiff stated that she was not an expert and anticipated this was the subject of expert testimony. *Exhibit E at p. 2,*

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

1   *Interrogatory No. 2.*   But, Plaintiff has never disclosed any expert testimony on this point,

2   nor has she supplemented her discovery responses to include the general statements

3   expressed by Drs. Don and Potts.   And in response to an interrogatory that inquired about

4   what "reasonable alternative activities" Plaintiff claims Sheriff Dupnik should have

5   provided to MJH that were not provided while he was on protective-custody status,

6   Plaintiff stated that "discovery is ongoing," that "Plaintiff anticipates this is an area of

7   expert testimony, which will be supplemented," and that reasonable activities "include

8   age appropriate activities designed to engage MJH in positive activities."   *Exhibit E at p.*

9   *5, Interrogatory No. 7.*   But again, Plaintiff did not disclose or supplement her response

10   with an expert opinion.

11          By failing to disclose these opinions in any expert witnesses' written report and by

12   failing to provide that information in her discovery responses, Plaintiff has prejudiced

13   Sheriff Dupnik and Pima County in their defense of this case by creating a situation

14   where they are left without any expert to refute these theories.   The Scheduling Order in

15   this case provided for staggered disclosure of expert opinions.   (Doc.#22 at p. 2).   By

16   failing to disclose a custodial expert, or any medical expert, to discuss the precise role

17   that the assault and protective-custody status may have had on MJH becoming floridly

18   psychotic and suffering a cardiac event, Plaintiff has precluded Sheriff Dupnik and Pima

19   County from having its own expert on those issues. And Plaintiff's failure to provide

20   discovery answers responsive to those issues has compounded that problem.

21   Accordingly, any argument or evidence on this point should be precluded based on a

22   failure to disclose.

23          D.  The doctors' statements should be precluded under  Rule 702, Fed.R.Evid.

24          Third, Rule 702, Fed.R.Evid, requires that the expert not only be qualified to give

25   the opinion rendered by having scientific, technical or other specialized knowledge, but

26   that the proposed testimony be helpful to the jury, be based on reliable principles and

1   methods, and be based on sufficient facts and data.  Rule 702, Fed.R.Evid,; *see also*

2   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993) ("knowledge" connotes

3   more than subjective belief or unsupported speculation.").

4        Here, there has been no showing that Dr. Don is qualified to discuss correctional

5   issues such as protective-custody status at the PCADC or correctional institutions in

6   general, the impact of that status on an inmate's mental-health conditions, the actions of

7   the correctional officers with respect to MJH, or how or what impact the custody and

8   housing decisions had on MJH.  Dr. Don's CV contains a complete lack of any

9   background on jail or prison matters.  *See Exhibit F attached, Dr. Don's CV.*  And her

10  deposition testimony confirms her lack of qualifications on this issue.  *Exhibit B at p.4,*

11  *line 1—p.10 at line 19.*  If Dr. Don was qualified to discuss those issues, one would

12  expect that Plaintiff would have disclosed those opinions in her responses to the non-

13  uniform interrogatories that were propounded to her earlier in this case.   She did not.

14  *Exhibit F.*

15       While Dr. Potts does have experience inside correctional institutions, neither he

16  nor Dr. Don opined to a reasonable degree of medical probability what extent the assault

17  and protective-custody status, or any other variable, played in MJH's mental-health

18  issues, much less what role those two things may have played in MJH being diagnosed as

19  floridly psychotic on May 31 or suffering a cardiac event on June 2.  *Exhibit A at p. 11,*

20  *third full paragraph and p. 14, last paragraph; Exhibit C at p.56, lines2-8 and p.97, lines*

21  *7-20.*  Rather, the doctors refer to a number of factors that *may* have played a role in

22  MJH's mental-health issues prior to May 24, but they cannot be sure about any one

23  factor.   Nor have they opined which factors may have been more significant than others

24  or the role of any specific factor, if any, on the May 31 floridly psychotic diagnosis or the

25  June 2 cardiac event.  *Id.*  Accordingly, their opinions on this issue cannot possibly be

26  helpful to the jury within the meaning of Rule 702.

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

BARBARA LaWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

1    While the doctors speculate that the assault and protective-custody status *may*

2    *have been* stressors for MJH, neither doctor can state to any degree of medical probability

3    that they *actually were* stressors that led to the floridly-psychotic diagnosis or cardiac

4    event six weeks later.  And neither doctor can explain how or why those alleged stressors

5    may have been greater, similar, or less than any other possible stressors MJH was

6    experiencing.  Those other possible stressors include the stress of being incarcerated; of

7    being separated from family, friends, and loved ones; and a fear about succeeding on

8    probation once his sentence was over.  They also may have included the insomnia he had

9    been experiencing since being booked into the PCADC, the dehydration from unknown

10   causes that occurred after May 24, his history of illegal drug abuse prior to being booked

11   into the PCADC, his life history prior to being incarcerated, and the biological

12   progression of his pre-existing bipolar disorder which may have been unrelated to any

13   single event.  *Exhibit A at p. 11, first full paragraph.*  Dr. Potts also testified that MJH's

14   attempted but unsuccessful phone calls to his family could have had an impact on MJH's

15   mental state and could have been a stressor.  *Exhibit C at p. 147, lines 18-24.*  And lastly,

16   what role his mother's refusal to consent to oral medication on May 28 may have played.

17   The doctors' guesswork that the assault and protective-custody status may have

18   triggered mental-health issues in late April is a far cry from offering an admissible expert

19   opinion that those events had any role in MJH's death.  Indeed, both experts admit that

20   they were not retained to offer opinions on correctional issues.  *Exhibit B at p.104, lines*

21   *1-8 and Exhibit C at p.141, lines 12-17.*

22   Finally, Dr. Potts admitted in his deposition that he did not review all of the jail

23   records in this case.  *Exhibit C at p. 146, lines 8-14.*  Thus, when asked about what role

24   MJH's participation in school may have indicated with respect to MJH's mental-health

25   status, Dr. Potts was unable to give any answer.  *Exhibit C at p. 146, line 2—p. 147, line*

26

*17.*  Dr. Potts also admitted that he had not reviewed the PCADC's protective-custody policies.  *Exhibit C at p. 140, line 22—p.141, line 17.*

Dr. Potts' failure to review all of the potentially relevant records shows a complete lack of foundation for statements that the assault or protective-custody status may have played a role in MJH's eventual death.  And the statements of both Drs. Don and Potts lack the required reliability and foundation for establishing the assault and protective-custody as a cause of death.  *See e.g. Luttrell v. Novartis Pharm. Corp.*, 894 F. Supp. 2d 1324, 1338 (E.D. Wash. 2012) (An expert attempting to give a medical opinion on causation cannot be founded on "subjective beliefs or unsupported speculation."). "While absolute certainty is not what the law requires, expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1169-70 (E.D. Wash. 2009) (*quoting  Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir.1988).   And under Arizona law, "[t]o establish the causal connection between an accident and injury . . . medical testimony as to the possibility of such causal connection, without more, is insufficient." *Coca-Cola Bottling Co. v. Fitzgerald*, 3 Ariz. App. 303, 306, 413 P.2d 869, 872 (1966).  *See also Butler v. Wong*, 117 Ariz. 395, 396, 573 P.2d 86, 87 (App. 1977) (a plaintiff must do more than show that an injury might have been caused by a defendant's negligence; a plaintiff must show the injury actually was caused by negligence).

Speculation that the assault and protective-custody status "may" have been one of many known and unknown factors that "might" have played a role in triggering MJH's initial health issues issue falls short of this demanding standard.  *Exhibit C, Excerpt of Potts Deposition at p.150, lines 6-10 ( after May 24, MJH  "showed an acute decompensation that had not been evidenced prior to that time.").*  This is especially true considering that six weeks passed between the assault and the cardiac event.

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

1    Accordingly, the doctors' unsupported opinions that the inmate assault and protective-

2    custody status had anything to do with MJH becoming floridly psychotic and suffering a

3    cardiac event from which he later died should be precluded under Rule 702, Fed.R.Evid.

4    **Motion in Limine No. 1(b):  To preclude any argument or evidence that the lack of a
     separate "step-down" mental-health unit for remanded juveniles proximately**

5    **caused MJH's death.**

6            In his deposition, Dr. Potts proffered that things may have been better for MJH

7    after May 24, if the PCADC had a separate step-down housing unit for remanded

8    juveniles with mental-health issues.  *Exhibit C at p. 142, lines 1-25.*  Dr. Potts' statement

9    stems from his unsupported belief that if a separate mental-health unit for remanded

10   juveniles had existed, MJH might have been housed in that unit rather than placed on a

11   suicide watch in the infirmary.  *Id.*  Unfortunately, Dr. Potts does not explain why that

12   would be the case.  Accordingly, Dr. Potts disagreement with Conmed's decision to put

13   MJH on a suicide watch cannot serve as a basis to argue that Pima County and Sheriff

14   Dupnik are liable for wrongful death by not having that unit.  There are several reasons

15   for this.

16           First, Dr. Potts' statement that there should have been a separate mental-health

17   unit has never been disclosed in a written expert report or in response to any written

18   discovery requests.  *See also Exhibits A, C, and E attached.*  Thus, Plaintiff has not

19   complied with Rules 26 and 33, Fed.R.Civ.P.

20           Second, there is no foundation for Dr. Potts opinion under Rule 702, Fed.R.Civ.P.

21   Dr. Potts has not reviewed all of the security records in this case.  *Exhibit C at p.145,*

22   *lines 4-10; p.146, lines 8-14; and p. 148, lines 14-17.*  Dr. Potts does not know what is

23   contained in the protective-custody status policies at the PCADC.  *Exhibit C at p.140,*

24   *lines 22-25.*  And Dr. Potts does not know how many juvenile inmates are housed at the

25   PCADC or whether there was a sufficient population to create such a separate mental-

26   health unit.  *Exhibit C at p.142, lines 16-18.*  And while Dr. Potts believes he has visited

the PCADC in the past, he admits he has not there in probably 20 years.  *Exhibit C at p.141, lines 3-7.*

Third, there is no evidence that MJH would have been housed in this theoretical unit in conditions any different than those he had in the infirmary.  MJH was on a suicide watch because he verbalized a threat to kill himself.  And the Conmed staff who evaluated MJH after he made the suicide threat were the ones that decided that MJH needed to be placed on a suicide watch.  Only Conmed could remove MJH from the suicide watch.

Fourth, the same Conmed providers who are named as defendants in this case are the same providers that would have been treating MJH in the theoretical unit.

Accordingly, Dr. Potts' opinions cannot be said to be based on sufficient facts or data, or any reliable principles and methods that resulted in Dr. Potts applying to the facts of this case.  Indeed, his opinion on this topic is not based on any facts whatsoever.

Given the complete lack of a written report on this topic as required by Rule 26, Fed.R.Civ.P., and given the complete lack of facts or data to support the statement as required by Rule 702, Fed.R.Evid., there is nothing about Dr. Potts' opinion on this point that would qualify as specialized knowledge that might be helpful to the jury.  Thus, any evidence on this point should be precluded.

### CONCLUSION

Plaintiff should be precluded from offering any argument or evidence that the inmate assault and protective-custody decision were a proximate cause of MJH's death.  Six weeks passed between those events and MJH's cardiac event.  Plaintiff has not properly disclosed any expert evidence to support her theory that the assault was a proximate cause of MJH becoming floridly psychotic six weeks later.  Nor has she properly disclosed any expert evidence that the assault or protective-custody status was a proximate cause of MJH's cardiac event following the emergency Prolixin injection.

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION

1   Thus, the argument and evidence should be excluded under Rules 26(a)(2) and (e)(2),

2   Rule 33, and Rule 37, Fed.R.Civ.P.  The argument and evidence should also be excluded

3   because those statements and opinions lack the proper foundation under Rule 702,

4   Fed.R.Civ.P

5          Plaintiff should also be precluded from offering any argument or evidence that the

6   lack of a separate mental-health unit for remanded juveniles was a proximate cause of

7   MJH's death.  There is absolutely no evidence to support this theory.  And Plaintiff has

8   failed to disclose any expert opinion on this topic.  Dr. Potts' statements at deposition

9   testimony do not comply with the requirements of Rule 26, Fed.R.Civ.P.  Nor has

10  Plaintiff supplement her discovery responses with this information as required by Rule

11  33.  Further, the statements are  not based on reliable data or facts as required by Rule

12  702, Fed.R.Civ.P.

13         Accordingly, Sheriff Dupnik and Pima County respectfully request that the Court

14  issue an Order in Limine precluding Plaintiff from introducing any argument or evidence

15  on both of these points.

16         DATED December 9, 2013.

17                             BARBARA LAWALL
                               PIMA COUNTY ATTORNEY
18

19

20                             By: /s Nancy J. Davis
                               Nancy J. Davis
21                             Deputy Pima County Attorney
                               *Attorneys Pima County and Sheriff Dupnik*

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Joel B. Robbins, Esq.
Anne E. Findling, Esq.
ROBBINS & CURTIN, PLLC
301 East Bethany Home Road, Suite B-100
Phoenix, AZ 85012
*Attorneys for Plaintiff*

Timothy J. Thomason, Esq.
Denise H. Troy, Esq.
MARISCAL, WEEKS, MCINTYRE & FRIEDLANDER, PA
2901 North Central Avenue, Suite 200
Phoenix, AZ 85012
*Attorneys for Conmed Defendants*

By: <u>A.Atkins</u>

BARBARA LAWALL
PIMA COUNTY ATTORNEY
CIVIL DIVISION