*EXHIBIT A*

Laura Don, M.D.
*Diplomate in Psychiatry*
*American Board Psychiatry and Neurology*
10000 North 31st Avenue, Suite C202
Phoenix, Arizona 85051
Telephone (602) 997-6635
Facsimile (602) 997-6642

May 15, 2012

**Federal Rule 26 (a)(2)(B)**
**REPORT OF PLAINTIFF'S PSYCHIATRIC EXPERT**

**RE: Harrelson v. Pima County, et al.**

I have been retained by Anne Findling, Attorney-at-Law, 301 E. Bethany Home Rd. Suite B-100, Phoenix, AZ 85012, to offer expert opinion in the matter of Harrelson v. Pima County, et al.

I am a psychiatrist, board-certified by the American Board of Psychiatry and Neurology. I have been licensed in the state of Arizona since 1997. I am currently employed as the Behavioral Health Director of McDowell Healthcare Center, where I practice clinical psychiatry and lecture in a variety of psychiatric and HIV-related topics. I am also employed as a clinical psychiatrist with Choices Network of Arizona, providing treatment to patients with serious mental illness. Additionally, I perform forensic psychiatric services, including disability evaluations, fitness for duty evaluations, and consultation in a broad range of other civil matters. A detailed statement of my qualifications, experience, and training is attached as Appendix A. A list of my deposition and trial testimony are attached as Appendix B. My fee schedule is attached as Appendix C.

I reviewed the following material in preparation of this report:

1. Plaintiffs First Amended Complaint in this matter
2. Plaintiff's Initial Disclosure Statement and First Supplemental Disclosure Statement
3. ConMed Medical Records
4. University Physicians Healthcare Medical Records
5. Pima County Sheriff's Department Incident Report No. 100602021
6. Death Certificate
7. Medical Examiner's File
8. Photos from Medical Examiner
9. Pima County Superior Court Administrative Order
10. Note from Levi Spencer
11. Pima County Adult Detention Center Records

HARRELSON 004207

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 2

| | |
|---|---|
| 12. | Pima County Jail Records |
| 13. | LaCanada Records, 10/3/07-10/17/07 and 11/12/07-12/12/07 |
| 14. | Handy-cam Video 5/25/10 |
| 15. | Handy-cam Videos 5/27/10 |
| 16. | Pod Video 5/28/10 |
| 17. | Handy-cam Videos 1 and 2, 5/30/10 |
| 18. | Pod Video 5/30/10 |
| 19. | Pod Video 5/31/10 |
| 20. | Medication Administration Video 5/31/10 |
| 21. | Pod Video 5/3/10 1146-1220 |
| 22. | Infirmary Video 5/31/10 1600 hrs to 6/1/10 2359 hrs |
| 23. | Pod Video 6/2/10 |
| 24. | Video Visitations |
| 25. | Depositions, Roger Bishop, MD and Steven Galper, MD |

In reviewing these documents, I have been asked to address the following issues:

(A) Whether the treatment provided to Mordecai Harrelson by Pima County et al. met the standard of care.

(B) Whether a causal connection could be established between the treatment provided by Pima County et al. and the death of Mordecai Harrelson.

## CONCLUSION

Based on the information reviewed, I have determined, to a reasonable degree of medical probability, that the services provided by Pima County et al. to Mordecai Harrelson have not met the standard of care for mental health treatment. Furthermore, the evidence supports a causal relationship between the actions of Pima County et al. and Mr. Mordecai Harrelson's subsequent death.

**Summary of Findings:**

In reaching a conclusion, I was mindful of the following facts obtained from the records:

A) Multiple sources of evidence support that Mr. Harrelson had a significant pre-existing psychiatric disorder, and Pima County et al. was aware of this disorder.

Mr. Harrelson was initially arrested on 11/3/09 [Pima County Adult Detention Center Records]. On 11/3/09, he reported a history of irritability and was noted to have "possible Bipolar" Disorder with outbursts of violence or threats of violence. [Conmed Healthcare

HARRELSON 004208

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 3

Management, Facility PCADC]. Also on 11/3/09, Mr. Harrelson reported that he was previously treated with Depakote, but had not taken this medication for six weeks.

[Conmed Healthcare Management, Intake Assessment, M. Fowler, RN and C. Ryan, PA] On 11/4/09, Mr. Harrelson reported that he was previously treated with Depakote for mood lability, but this was discontinued two months ago because he did not like the way it made him feel. [Conmed Healthcare Management, Facility PCADC, J. Zontmas, MHP]

He was again incarcerated on 4/1/10 and again he reported his prior psychiatric history to the medical staff. On 4/1/10, the Intake Provider Admission Orders indicate that Mr. Harrelson reported a history of Bipolar Disorder and substance abuse. He also reported a history of violent behavior. He noted that he was previously treated with Depakote. [Conmed Healthcare Management, Intake Mental Health Assessment, 4/1/10]

In summary, these records indicated that Pima County et al. was aware of Mr. Harrelson's prior diagnosis and treatment. Lifelong conditions such as bipolar disorder require continuous monitoring and treatment to reduce the risk of recurrent episodes. Stressful experiences, such as incarceration, increase the risk of decompensation, especially without appropriate treatment.

B) Multiple sources of evidence support that Pima County et al. was aware of Mr. Harrelson's ongoing requests for assistance.

Mr. Harrelson reported that he was experiencing anxiety attacks and depression. This request was reviewed on 4/7/10 by a nurse and he was informed he will be seen by a mental health clinician "ASAP." [Conmed Healthcare Management, Health Services Request, 4/1/10]

Mr. Harrelson reported insomnia and requested treatment. He was advised that he was scheduled for a mental health appointment on 4/7/10. [Conmed Healthcare Management, Health Services Request, 4/5/10]

Mr. Harrelson requested ongoing sleeping medication, and was concerned he would be unable to sleep when it was discontinued. He was advised that he was scheduled for a mental health appointment on 4/24/10. [Conmed Healthcare Management, Health Services Request, 4/17/10]

On 4/26/10, Mr. Harrelson reported disturbing dreams and incessant insomnia. At this time, he was spending 23 hours per day in protective custody, following the recent altercation with an inmate. He reported to mental health staff that "he could go insane." He also reported that he was experiencing hallucinations because of the lack of sleep, and he was reporting dreams of demons staring at him from his cell wall. After waking, he continued to see spots on the walls where the demons were. On mental status examination, he was noted to be "intellectually bright, articulate" and "displays good

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 4

insight." He expressed his goal to remain clean and sober. Mr. Harrelson requested a
psychiatric evaluation to treat insomnia and associated hallucinations. [Mental Health
Progress Notes, Conmed Healthcare Management, Facility PCADC, 4/26/10, signature
illegible]

**In summary, these records indicate that Mr. Harrelson repeatedly requested
assistance in management of his psychiatric disorder and this treatment was not
provided. However, by the time that he received the Prolixin injection on 5/31/10, he
was floridly psychotic, in a delirious state, and was unable to make logical or
informed decisions, which included the loss of the ability to ask for assistance or
treatment.**

> C) Appropriate and timely treatment was not provided for his psychiatric
> condition. His psychiatric symptoms were dismissed without a thorough and
> objective assessment. Mr. Harrelson's psychiatric and physical condition
> deteriorated over the course of six weeks, and ultimately resulted in his death.

On 11/25/09, the records indicate that Mr. Harrelson "claimed to be suicidal then
immediately denied it. Claims cellmate attempted to sexually assault him." It was
concluded that the "suicidal statement was to get out of cell." It was further noted by
behavioral health staff that he "appears agitated and hypervigilant." [Conmed Healthcare
Management, Facility PCADC, MHP]

On 4/1/10, it was noted that he reported ruminations (obsessive thoughts) that have been
interfering with his sleep. Trazadone in Juvenile Detention had previously helped him.
He appeared calm, with a normal thought process. He was prescribed Trazadone 150mg
(to be approved by his mother). Follow-up with mental health was recommended.
[Mental Health Progress Notes, Conmed Healthcare Management, Facility PCADC]

On 4/2/10, he was diagnosed with "Situation {sic} Depression" due to being back at
PCADC. He was missing his girlfriend and processing going back to prison for the next
four months. He was also anxious about where he will live after release. He was noted to
be highly motivated to make healthy life choices and return to school. He did not exhibit
dangerousness to himself or others. [Mental Health Progress Notes, Conmed Healthcare
Management, Facility PCADC]

On 4/20/10, Mr. Harrelson was involved in a physical altercation and sustained a head
injury with loss of consciousness, as well as other skeletal and soft tissue injuries. He was
evaluated by Dr. Bishop on 4/21/10 at 08h25. Observation was recommended. He was re-
evaluated on 4/22/10, and he was considered to be stable.

On 4/26/10, Mr. Harrelson reported disturbing dreams and incessant insomnia. At this
time, he was spending 23 hours per day in protective custody, following the recent
altercation. He reported to mental health staff that "he could go insane." He also reported

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 5

that he was experiencing hallucinations because of the lack of sleep, and he was reporting dreams of demons staring at him from his cell wall. After waking, he continued to see spots on the walls where the demons were. On mental status examination, he was noted to be "intellectually bright, articulate" and "displays good insight." His goal is to remain clean and sober. Mr. Harrelson requested a psychiatric evaluation to treat insomnia and associated hallucinations. [Mental Health Progress Notes, Conmed Healthcare Management, Facility PCADC, signature illegible]

On 4/30/10, Mr. Harrelson requested an evaluation for insomnia which has been persistent for 5 days. This request was reviewed by a nurse on 5/6/10 and it was determined that he would be placed in the sleep observation program and would be seen by mental health within 7 days.

He was also evaluated by Ky Resh, LCSW on 5/1/10 at 1330, who noted that Mr. Harrelson reported "flashes of anger, intrusive thoughts, nightmares of his roommate beating him up." He reported hearing voices described as command hallucinations from demons. Mr. Harrelson stated that a pastor told him that the voices were demonic. He reported nightmares from a sexual assault. He was tearful, but was socially appropriate and his judgment was intact. He was referred to a psychiatrist for medication evaluation, but his diagnosis was considered to be PTSD vs Malingering. [Conmed Healthcare Management, Health Services Request]

A psychiatric Physician Assistant (signature illegible) evaluated Mr. Harrelson on 5/4/10, and noted that he reported insomnia. A complete psychiatric evaluation was not performed, and he was not asked about psychotic symptoms. Mr. Harrelson reported that he had responded well to the 10-day trial of Trazodone. He did not receive a psychiatric diagnosis. His treatment plan was limited to a recommendation for a sleep observation study.

On 5/6/10, a Sergeant had requested an evaluation of Mr. Harrelson as he was observed to be "extremely agitated and has PTSD regarding an incident in the jail." During this interview with the nurse, Mr. Harrelson reported that he was feeling very agitated and increasingly depressed and isolated. He felt that his cellmate wanted to rape him. He reported that he was not sleeping because he is afraid of dreaming, and reported that he felt isolated because inmates think he is a snitch. He appeared alert and oriented, but anxious and agitated with hand wringing and twisting, and rubbing of his hands on his head and legs. He denied suicidal thoughts but admitted to hearing voices. His behavior was appropriate. He was diagnosed with PTSD, depression and anxiety, and was placed on 5 minute suicide watch, although he did not endorse suicidal thoughts. [Mental Health Nurse (Signature illegible), Conmed Healthcare Management]

By 5/8/10, he was observed to be anxious and excited, and was exhibiting manic behavior. Psychotropic medication was not offered at this time. A brief period of stabilization of his mood was documented (5/10, 5/12, and 5/18/10). However, by

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 6

5/24/10 he had deteriorated with clear psychotic and manic symptoms, including
suspiciousness, hyperreligiosity (reading the Bible "voraciously"), paranoid delusions
with a belief that another inmate was influenced by Satan and that this inmate was trying
to control the minds of other inmates and some officers. He was not on psychotropic
medications and reported that his mother does not want him to take psychotropic
medications. [Jason Zantanos, MHP, Conmed Healthcare Management] Another
therapist, also on 5/24/10, documented the paranoid delusions, and noted that he had the
suspiciousness of a patient who is paranoid and fearful, yet concluded that he was
"stable" and diagnosed him as being "pseudo-paranoid." [Administrative Segregation
Screening, George Gafner, LCSW]

**By 4/26/10, Mr. Harrelson's anxiety and depression had progressed to psychosis
with visual hallucinations and paranoid delusions. There is no evidence to support
the statement that his mother did not want him to take psychotropic medication,
and this statement may have been part of his delusional belief system. There is no
indication that behavioral health staff contacted his mother prior to 5/24/10 to
obtain informed consent for treatment. These records indicate that Mr. Harrelson's
prior requests for treatment were denied. By 5/24/10, he was floridly psychotic and
could not be relied upon to make informed decisions about his treatment. His
statement, therefore, should not have been relied upon regarding his mother's
alleged opinion about psychotic medications. Furthermore, despite his obvious
psychosis and increasingly disorganized thought processes, he was diagnosed as
being "pseudo-paranoid." This is not a conventionally recognized diagnosis, but is
clearly an assessment created by the evaluator to suggest malingering. Mr.
Harrelson's reported symptoms, increasingly disorganized thought processes, and
his agitated and distressed state, in the context of his past diagnosis with bipolar
disorder, provide no basis for a diagnosis of malingering.**

Mr. Harrelson was evaluated by J. Hogan, PMHNP on 5/25/10, and he was observed to
be immersed in his delusional belief system, and he was no longer able to engage in a
coherent conversation. Despite the progressively worsening psychosis, Ms. Hogan
opines, "much of his presentation seems behavioral, but it certainly smacks of early
Bipolar and/or psychosis." She noted diagnoses of Psychosis vs Bipolar disorder, but did
not address treatment options. Soon after this evaluation, he was seen by another
therapist, Rachelle Sutton, MC, when he was throwing water out of his cell and yelling
about the devil and hearing things through the wall. She also concluded that his
"presentation appears to be behavioral as evidenced by IM snickering when he believed
no one could see his face." He was observed to be increasingly agitated. Ms. Sutton
continued to question whether his behavior was volition, as she noted in the progress note
of 5/27/10, although by this stage he was rolling his feces in a ball, smearing his food on
the window, urinating out the cell door, standing in the nude, not communicating verbally
and refusing to eat or drink. She wrote, "IM continues to behave in a bizarre manner and
although it appears to be behavioral most of the time, at times it is difficult to judge." Ms.
Sutton also made the first documentation that Mr. Harrelson's mother was being

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 7

contacted. She noted on 5/27/10 at 10h20, "Prescribers are attempting to get parental
consent for meds." His mother was not contacted, however, until Dr. Galper called her on
5/28/10 at 11h00. Although a copy of a court-order, or a request for court-ordered
medication, was not included in the medical records, Ms. Sutton notes on 5/28/10 at
10h40 that a court order was received allowing medication administration.

His refusal to eat or drink, while clearly not volitional but rather due to severe psychosis,
led to acute dehydration and a compromised renal functioning. His BUN was elevated on
5/27/10 to 33.6, which if left untreated would result in renal failure and death. Despite the
flagrant psychosis and dehydrated state he was in, Ms. Sutton noted on 5/27/10 that the
"CO reports that his behavior was perfectly normal during recent visit." This is in direct
contradiction to the videotape of the visit of 5/23/10, which clearly depicts Mr. Harrelson
responding to internal stimuli (voices in his head) and his agitation as a result of paranoid
delusions.

This severe psychosis, inability to communicate verbally, inability to sleep, and inability
to monitor his basic needs, such as the need for food or water, continued from 5/27/10
through 5/31/10. In his disorganized state, and possibly due to the auditory hallucinations
commanding him to harm himself, he placed his head in the toilet water on 5/30/10. Ky
Resh, LCSW opined that putting a blanket in the toilet to make it look like he was
submerging his head required organization and self-control." Additionally he was noted
to have odd posturing of his body. On 5/31/10, Rachelle Sutton, MC noted that he was
not speaking, and acknowledged her "doubt if he understood."

**In a different context, placing the blanket in a toilet bowl may be interpreted as
"requiring organization and self-control." However, this action was conducted by
an individual who was unable to communicate verbally, was unable to maintain his
basic hydration and nutritional needs, was preoccupied by psychotic symptoms, was
contorting his body with odd posturing, and was clearly unable to understand the
consequences of his actions. In a psychotic state, individuals may behave in a
manner which is illogical and/or irrational. Often, their actions are in response to
command hallucinations (responding to instructions from their auditory
hallucinations) or in response to delusions (false beliefs that at the time seem real).**

There is no documentation of an evaluation by Dr. Galper. On 5/31/10 at 15h46, J.
Hogan, PMHNP noted that Mr. Harrelson was observed to be lying nude on the floor,
making a hissing noise, and unable to communicate. She concluded that he has
"deteriorated and is floridly psychotic." She noted "COT" (referring to court-ordered
treatment) and ordered Prolixin 5mg IM now (the Prolixin was administered at 16h05).

Dr. Galper contacted Mr. Harrelson's mother on 05/31/10 at 16h30, and informed her that
the Prolixin had been administered. He explained that her son's behavior was thought to
be due to multiple causes ("street drugs, behavioral and possible underlying psychosis").

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 8

Dr Galper's assessment of Mr. Harrelson, as described to his mother on 5/31/10, reflects an inaccurate assessment of the cause of his psychosis. He diagnosed the cause of this condition as "street drugs, behavioral, and possible psychosis." Typically, the most prominent causes of a condition are listed first, and in this case he is suggesting that street drugs and behavioral causes (malingering and manipulating) are the most prominent causes of his psychosis and delirium with an underlying psychiatric disorder listed third, as a "possible" factor. In light of his florid psychosis and progression to delirium (with dehydration, confusion, disorientation and a catatonic state (near mutism with abnormal posturing), he is clearly not malingering (intentionally acting more ill than he really is). Furthermore, Mr. Harrelson had been incarcerated for two months by 5/31/10. His symptoms progressed during this period (without exposure to street drugs) from anxiety, insomnia and depression to psychosis with hallucinations and paranoid delusions, to delirium with catatonia and dehydration. There are no street drugs which cause a progression of symptoms over 8 weeks without continued drug exposure. There is no indication that Dr. Galper reviewed the records or conducted a thorough psychiatric examination of Mr. Harrelson, therefore his conclusion was unfounded. Without providing accurate information to Mrs. Harrelson, she could not make an informed decision regarding treatment options.

In depositions, Roger Bishop, MD, internist, noted that he did not perform a complete history and physical examination of Mr. Harrelson, and did not communicate with Steven Galper, MD regarding their patient's condition. He limited his treatment of Mr. Harrelson to management of the dehydration, and assumed that this dehydration was due to his psychiatric disorder. He acknowledged that because he did not witness seizure activity, he assumed no seizure had occurred. He assumed that Mr. Harrelson's presentation was baseline for this patient, when in fact the delirium was of recent onset, and had not been evaluated or treated. Steven Galper, MD, psychiatrist, similarly acknowledged in deposition that he did not perform a full psychiatric assessment of Mr. Harrelson. Although he stated in his deposition that an inmate who self-identifies as requesting psychiatric evaluation for medication management will be evaluated for this, he acknowledged that Mr. Harrelson was first seen by him on 5/28/10. He acknowledged that he did not write a progress note, and in lieu of this documented his telephone call with the patient's mother. He could not describe the nature of his evaluation of Mr. Harrelson but acknowledged that he did not spend a long time with him. He stated that he deferred to Dr. Bishop with regards to whether or not the patient was delirious, and needed medical transfer. Dr. Galper stated that he did not perform a suicide risk assessment because the patient was on suicide watch. He also stated that there was no indication of mania, although the medical records document severe insomnia and hyper-religious preoccupation which are strongly suggestive of mania.

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 9

    D) <u>Inappropriate emergency interventions were provided to Mr. Harrelson which</u>
       <u>reduced the likelihood of a meaningful recovery from this condition.</u>

Within 12 hours after receiving the Prolixin injection, Mr. Harrelson began to exhibit fluctuations in autonomic regulation with his pulse and blood pressure fluctuating and his respiratory rate increasing to 24 breaths per minute. At 12h45 on 6/1/10, he was observed by security to be having a possible seizure. Dr. Galper was called but the first note he wrote following this event was at 1400. He did not witness the seizure activity. At 14h00, he documented that Mr. Harrelson was moving all his extremities, withdraws to noxious stimuli, blinks on confrontation, facial muscles grimace on exposure to ammonia, and he was protecting is airway. He was also observed to have an intermittent tremor of the left leg, rather than a generalized tremor. Based on these findings, he opined that the episode was a "non-epileptiform spell" and he declined to administer Ativan or treat him for a seizure disorder. He also observed that Mr. Harrelson was posturing (exhibiting abnormal rigidity). He ordered vital signs every four hours.

**The criteria that Dr. Galper used to distinguish "non-epileptiform spells" from seizure activity are not based on neurologically valid criteria. Furthermore, Dr. Galper observed Mr. Harrelson in the postictal state (after the tonic-clonic component of the seizure was completed). He therefore could not dismiss the possibility that a seizure previously occurred.**

The rigidity and abnormal posturing, as seen with catatonic states, continued over the next several hours, as did his persistent inability to ingest adequate quantities of food and liquids to maintain his basic needs. He was observed to be making swirling motions in the air with his arms in a ritualistic fashion, and this may have been catatonic movements or seizure activity. Both represent serious medical conditions. Approximately 12 hours after the first seizure was observed by the security personnel, Mr. Harrelson was found to be unresponsive, without a pulse or respirations.

In statements to Detective Navarro on 6/2/10 and statements of Supervisor Mattes and other corrections personnel in the Corrections Bureau Incident Reports of 6/2/10, it was noted that Officer Aleman and Nurse Yasher observed Mr. Harrelson lying on the floor face down in Gatorade. After turning him over, the nurse did not check for vital signs. The officer asked the nurse to leave the cell and return with a towel to wipe the mucus off his face. After she returned with this towel and they wiped his face, the nurse determined that he was not breathing and did not have a pulse. The nurse asked the officer to call for medical assistance, and the officer left to call for medical assistance, and he returned with an Automated External Defibrillator. He was then told by the nurse to bring an ammonia inhalant. He returned without this as he could not find it, and he was given further instructions by the nurse where to find it. He then returned with the inhalant. Before CPR was initiated, it was determined that Mr. Harrelson was unresponsive to sternal rub and ammonia inhalant. Furthermore, these statements indicate that CPR was initiated only after being advised by the AED to do so. The Pima County Sheriff's Department,

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 10

Corrections Bureau Incident Reports indicate that the medical assistance call went over the radio at 0109 and '911' was called at 01h13.

**The American Heart Association guidelines for CPR advise to check for respiration and pulse for 5-10 seconds then start CPR. In a two-person rescue, one individual begins chest compressions and establishes an airway, followed by ventilations, while the second rescuer activates the emergency response system and obtains and attaches an AED. Guidelines do not include delays in initiating CPR to check for response to a sternal rub or ammonia inhalation. These are assessments of malingering. Furthermore, the guidelines do not suggest that chest compressions are only initiated after awaiting instruction from an AED. Establishing oxygen flow to the brain is of paramount importance and should not be delayed, especially in the case of a two-person rescue, when one rescuer can leave to call 911 and obtain the AED while CPR continues uninterrupted.**

The Autopsy Report of 9/2/10 indicates that Mr. Harrelson was diagnosed with cerebral edema and bronchopneumonia. While CPR was able to re-initiate cardiac activity, as a result of prolonged anoxia he did not regain brain function.

## PSYCHIATRIC OPINION

Mr. Harrelson presented as moderately anxious on 4/1/10. His primary symptom at that time was insomnia. He received a limited psychiatric assessment by behavioral health staff. At this time, he was noted to be calm, with normal thought processes (no evidence of psychosis or disorganized thought processes). He clearly expressed a request for psychiatric evaluation and treatment during this initial period of his incarceration, and he had openly reported his prior diagnosis with bipolar disorder, and the prior treatment interventions.

An appropriate intervention at this stage would have been a complete psychiatric evaluation, which should include a thorough evaluation of current psychiatric symptoms, past psychiatric history, history of prior psychiatric treatment, a medical history, a substance abuse history, a social history, and a family history. This is followed by a mental status examination which includes documentation of cognitive functioning, speech, mood, affect (how emotions are expressed), thought content (the presence of psychosis, suicidal thoughts, violent thoughts) and thought processes (the pattern and flow of thoughts). Following a complete psychiatric evaluation, an assessment (diagnosis) is established and an appropriate treatment plan is developed. The final step should involve re-evaluation of the treatment interventions to determine the response to treatment and appropriate adjustments to the treatment plan according to the response.

Mr. Harrelson did not receive a thorough psychiatric assessment, and therefore no diagnosis was made nor appropriate treatment plan developed. He was briefly treated with Trazadone, which temporarily managed his insomnia, but did not address his

HARRELSON 004216

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 11

underlying psychiatric disorder. The clinical information Mr. Harrelson provided suggests a diagnosis of Bipolar Disorder, and the progression of his symptoms over the course of April/May 2010 strongly suggestions Bipolar Disorder with Psychosis. The treatment for this condition typically includes medication management with mood stabilizing medication and/or antipsychotic medication, with supportive psychotherapy.

Mr. Harrelson's psychiatric condition deteriorated over the course of six weeks, beginning after his head injury sustained in an altercation on 4/20/10. The trigger for this deterioration may be multifactorial, and was most likely due a combination of the following: the physical consequences of his head injury, the emotional consequences of this assault, the emotional consequences of incarceration, the separation from any support system, and the biological course of Bipolar Disorder. By 4/26/10, he was exhibiting psychotic symptoms, and expressed to mental health staff that he was experiencing visual hallucinations. Despite the psychotic symptoms that he was reporting, he was initially "intellectually bright, articulate" and "display(ed) good insight." His thought processes and behavior had not yet become disorganized. Despite the clear evidence of psychosis reported on 5/1/10 to Ky Resh, LCSW, this therapist did not make the diagnosis of a psychotic disorder, but instead considered a diagnosis of posttraumatic stress disorder vs. malingering. There was no evidence of symptom exaggeration, symptom fabrication or a motivation for secondary gain, and no basis in this patient to consider malingering and disregard the psychotic symptoms.

Mr. Harrelson became increasingly agitated, distressed, and anxious over the course of the next few weeks. While he was intermittently seen by mental health nurses and therapists, they failed to perform a complete psychiatric assessment and develop a treatment plan, despite his deterioration. On 5/6/10 and 5/8/10 he was observed to be "manic" and "extremely agitated" and continued to report auditory hallucinations. A further decline occurred between 5/8/10 and 5/24/10 when his behavior deteriorated from being cooperative and appropriate to being floridly psychotic and preoccupied with his delusions.

By 5/8/10, he was observed to be anxious and excited, and was exhibiting manic behavior. Psychotropic medication was not offered at this time. By 5/24/10 he had deteriorated with clear psychotic and manic symptoms, including suspiciousness, hyperreligiosity (reading the Bible "voraciously") and paranoid delusions. While Mr. Harrelson reported to Jason Zantanos, MHP that he was not on medication because his mother did not provide consent, in light of his florid psychosis it would be prudent to verify this with his mother. There is no documentation indicating that his mother was contacted prior to 5/24/10 to obtain informed consent. Furthermore, with progressive psychosis of this nature, court-ordered treatment should be considered, and there is also no documentation that this occurred.

This prevalent pattern of disregard of prolonged and severe psychosis was seen not only in the notes of Ky Resh, LCSW, but also in the notes of George Gafner, LCSW, on

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 12

5/24/10, J. Hogan, PMHNP on 5/25/10, and Rachelle Sutton, MC on 5/25/10. Mr. Gafner diagnosed "pseudo-psychosis." This diagnosis is not found in the DSM-IV-TR, but implies falsification or malingered symptoms. Similarly, Mr. Harrelson's rapidly declining mental status, with increasing agitation, preoccupation with delusions, and inability to communicate in a coherent manner was diagnosed by J. Hogan, PMHNP and Rachelle Sutton, MC as "behavioral," implying that this behavior was in his voluntary control. The videotape of 5/25/10 clearly identifies his agitation and his inability to comprehend both his own behavior and the behavior of others. He was unable, rather than unwilling, to communicate appropriately.

Mr. Harrelson was evaluated by J. Hogan, PMHNP on 5/25/10, and he was observed to be immersed in his delusional belief system, and he was no longer able to engage in a coherent conversation. Despite the progressively worsening psychosis, Ms. Hogan opines, "much of his presentation seems behavioral, but it certainly smacks of early Bipolar and/or psychosis." She noted diagnoses of Psychosis vs Bipolar disorder, but did not address treatment options. Soon after this evaluation, he was seen by another therapist, Rachelle Sutton, MC, when he was throwing water out of his cell and yelling about the devil and hearing things through the wall. She also concluded that his "presentation appears to be behavioral as evidenced by IM snickering when he believed no one could see his face." He was observed to be increasingly agitated. Ms. Sutton continued to question whether his behavior was volition, as she noted in the progress note of 5/27/10, although by this stage he was rolling his feces in a ball, smearing his food on the window, urinating out the cell door, standing in the nude, not communicating verbally and refusing to eat or drink. She wrote, "IM continues to behave in a bizarre manner and although it appears to be behavioral most of the time, at times it is difficult to judge."

In the context of a patient who appears catatonic, with abnormal posturing and no verbalization, it is clear that he was not able to organize his thoughts in a rational manner. Despite the fact that Mr. Harrelson was not able to utilize rational and deductive reasoning skills at this time, and he made no requests of the medical staff or of the officers (as in the case of malingering for secondary gain), Ky Resh, LCSW opined that when he placed his head in the toilet on 5/30/10 with a blanket, this required "organization and self-control."

In a different context, placing a blanket in a toilet bowl may be interpreted as "requiring organization and self-control." However, this action was conducted by an individual who was unable to communicate verbally, was unable to maintain his basic hydration and nutritional needs, was preoccupied by psychotic symptoms, was contorting his body with odd posturing, and was clearly unable to understand the consequences of his actions. In a psychotic state, individuals may behave in a manner which is illogical and/or irrational. Often, their actions are in response to command hallucinations (responding to instructions from their auditory hallucinations) or in response to delusions (false beliefs that at the time seem real).

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 13

Rachelle Sutton, MC also made the first documentation that Mr. Harrelson's mother was being contacted, as noted on 5/27/10 at 10h20, "Prescribers are attempting to get parental consent for meds." She was not contacted, however, until Dr. Galper called her on 5/28/10 at 11h00. Although a copy of a court-order, or a request for court-ordered medication, was not included in the medical records, Ms. Sutton notes on 5/28/10 at 10h40 that a court order was received allowing involuntary medication administration.

Obtaining a court-order for treatment requires the diagnosis of a serious mental illness and the opinion that failure to treat this condition will result in additional harm to the patient, and furthermore the patient is unable to make an informed decision to refuse medication. If a court order for treatment was requested by Dr. Galper, then this is in direct contrast to his statement to Mrs. Harrelson regarding the cause of her son's condition. He stated that her son's condition was due to multiple causes, one of which is "possibly underlying psychosis." However, he listed street drugs and "behavioral" as more likely causes. Mr. Harrelson had been incarcerated since 4/1/10, and developed progressively worsening mania, depression, anxiety, psychosis and delirium over the next 60 days. There are no illicit drugs which would cause a delayed onset of symptoms followed by progressive worsening without ongoing exposure to the drug. Furthermore, as previously noted, Mr. Harrelson had been exhibiting persistent and worsening psychosis with the more recent onset of delirium (with acute confusion, disorientation, and the inability to communicate or maintain his basic bodily functions) and this does not resemble malingering (or "behavioral" causes) due to the nature and consistency of his presentation.

Neuroleptic Malignant Syndrome (NMS) is a medical emergency which is triggered by the use of neuroleptic medications. The mortality rate is currently 10-20% overall, including those who receive treatment for this condition. Mr. Harrelson may have been at higher risk for developing NMS because he was a young male, he received a high potency neuroleptic (such as Prolixin), it was administered intramuscularly, and he was catatonic, agitated, and dehydrated prior to receiving this medication. [Medical Clinics North America, 1993, 77:185; Journal American Academy of Child and Adolescent Psychiatry, 1999, 38:187; British Journal of Psychiatry, 1992, 161:254, Biological Psychiatry, 1998, 44:748]. Over the course of 1-3 days, symptoms typically develop and may include combinations of the following symptoms: Mental Status Change, Muscular Rigidity, Hypertheramia and Autonomic Instability. The diagnosis is made by recognition of the symptoms and measuring the serum creatinine kinase level, which is typically elevated. Treatment involves immediate cessation of the triggering drug and advanced treatment in an ICU.

Mr. Harrelson exhibited mental status changes (he was lying on the floor for extensive periods without moving or responding), he exhibited muscular rigidity with abnormal posturing, and he exhibited autonomic instability with increased pulse rate, blood pressure and respiratory rate. A creatinine kinase level was not ordered. Furthermore, he was observed to have seizure-type activity by corrections personnel at 12h45 on 6/1/10.

HARRELSON 004219

Re: Harrelson v. Pima County
Laura Don, M.D.
May 15, 2012
Page 14

However, Dr. Galper made a determination that this was a "non-epileptiform spell" based on Mr. Harrelson's presentation one hour after the event. Dr. Galper determined that because his patient responded to pain and ammonia inhalant, and retained a blink response, he did not previously have a seizure. None of these measures are currently standard of care to assess a patient post-ictally (after a seizure-type event). Obtaining a description of the seizure from the observers and obtaining a video/EEG is the standard practice to determine the nature of a seizure-type activity. Based on review of the videotapes of Mr. Harrelson in the days before his death, it is apparent that he did not exhibit the insight, judgment, awareness of his surroundings, or the capacity for planning that is required to fabricate a seizure episode. In the context of a dehydrated, semi-conscious, and delirious individual, a suspected seizure should be treated as a medical emergency. Transfer to a higher level of care should have been undertaken immediately to monitor and treat this patient.

This pattern of doubting the legitimacy of Mr. Harrelson's symptoms (i.e. assuming malingering) continued even when it was determined that he did not have a pulse or respirations. Effective CPR was delayed while a sternal rub was performed (this was done to determine if he would respond to pain) and an ammonia inhalant was retrieved (another technique used to arouse a response in someone who is malingering unconsciousness). Effective CPR was also delayed by waiting for the AED to instruct the rescuer to initiate CPR. Chest compressions should be initiated immediately while the second rescuer applies the AED pads to the chest, to avoid a delay in oxygenating the brain. Additionally, the records indicate that advanced EMS was only called at 0113, 4 minutes after determining that Mr. Harrelson was not breathing. Initiating the emergency response system in a two-person rescue should not be delayed.

A failure to treat Mr. Harrelson's progressive symptoms directly resulted in further deterioration of his psychiatric and physical condition, and ultimately his death.

Respectfully submitted,

Laura Don, MD

HARRELSON 004220