1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT
7               FOR THE DISTRICT OF ARIZONA
8
9   Jacquelyn Harrelson,                    No. CV-11-00411-TUC-FRZ (BPV)
10                    Plaintiff,             **REPORT AND**
                                             **RECOMMENDATION**
11  v.
12  Clarence W Dupnik, et al.,
13                    Defendants.
14
15          Pending before the Court are motions in limine filed by Plaintiff (Docs. 151 –

16  155), Defendants Pima County and Clarence W. Dupnik (the "County Defendants")

17  (Docs. 143-144), and Defendants Steven Galper, Roger Bishop, Karen Yasher, (the
18
    "Individual Conmed Defendants") and Conmed Healthcare Management, Inc., and
19
20  Conmed Inc.'s ("Conmed")(collectively "the Conmed Defendants") (Docs. 146-149).

21          On August 27, 2013, the District Court adopted the report and recommendation
22
    submitted by Magistrate Judge Estrada, and referred the matter back to the magistrate
23
24  judge for a report and recommendation as to motions in limine. (Doc. 137.) *See* Rule

25  72(b), Fed.R.Civ.P *and* 28 U.S.C. §636(b). On November 19, 2013, the referral was
26
    reassigned to Magistrate Judge Velasco. (Doc. 140.)
27
28          Magistrate Judge Velasco heard argument on the pending motions on February 27,

2014. The Magistrate Judge's reported findings and recommendations are as follows:

## I.  BACKGROUND

The factual background of this case was thoroughly summarized in Magistrate Judge Estrada's report and recommendation on the County and Conmed Defendants' motions for summary judgment. *See* Report and Recommendation, (Doc. 131), dated July 18, 2013. Because the report and recommendation contained a detailed factual discussion, the facts of the case will not be reproduced here, except to the extent they are necessary for and relevant to a determination of the pending motions.

In brief, Plaintiff Jacqueline Harrelson is the mother of decedent M.J.H. Defendant Pima County owns the Pima County Adult Detention Complex ("PCADC"). And Defendant Sheriff Dupnik oversees the custodial operations of the PCADC. The Conmed Defendants provide mental-health and medical care to inmates incarcerated at the PCADC pursuant to a contract with Pima County. One of those inmates was M.J.H.

Plaintiff's lawsuit originally alleged both federal and state-law claims against all of the Defendants arising out M.J.H.'s cardiac event and subsequent death while he was an inmate at the PCADC. Plaintiff alleges M.J.H. died because of medical malpractice committed by the Conmed Defendants. Specifically, Plaintiff theorizes that M.J.H. suffered a cardiac event after developing an atypical reaction to the emergency administration of an antipsychotic drug, Prolixin. Following summary judgment, the only remaining claim against the County Defendants is a state-law claim for wrongful death based on negligence or gross negligence. C.N., an inmate who assaulted M.J.H., is

designated as a non-party at fault on that claim. Two claims remain against the Conmed Defendants: an Eighth Amendment claim of deliberate-indifference to serious medical needs and a state-law wrongful-death claim.

**II.    MOTIONS IN LIMINE**

> A.    <u>County Defendants.</u>

> *1.    Expert Witness Statements by Dr. Don and Dr. Potts (Doc. 144, 168.)*

The County Defendants move the Court to preclude Plaintiff from introducing any argument or evidence that 1) an inmate-assault and decision to place decedent M.J.H. on protective-custody status after the assault was a proximate cause of M.J.H.'s death; and 2) the lack of a separate mental-health unit for remanded juveniles at the PCADC was a proximate cause of M.J.H.'s death.

Defendants argue that the evidence should be excluded because Plaintiff failed to properly disclose the information as required by Rules 26(a)(2) and (e)(2), and Rule 33, Fed.R.Civ.P., and because the opinion evidence, which Plaintiff  intends to introduce through the use of expert witnesses does not meet the foundational requirements of Rule 702, Fed.R.Evid.

On April 20, M.J.H. was assaulted by another juvenile inmate after a corrections officer missed the existence of an internal jail-directive ("keep-separate order") that required that M.J.H. and another inmate, C.N., were to be kept separate from one another. C.N. assaulted M.J.H. when they were left together. M.J.H. suffered a mild concussion and a rib fracture in the assault, was taken to a hospital for treatment, and spent a night in

1  the medical infirmary upon his return from the hospital.

2        On April 22, 2010 corrections staff placed M.J.H. on protective-custody status

3  after M.J.H. reported that he was afraid other inmates were going to jump him while he

4  was in the dayroom. The threats stemmed from M.J.H.'s decision to press charges against

5  C.N.

6        One of Plaintiff's theories of liability against the County Defendants is that an

7  inmate-assault that occurred on April 20 and the April 22 decision to place M.J.H. on

8  protective-custody status after the assault proximately caused M.J.H.'s death. *See*

9  (Amended Complaint, Doc. 39, at ¶¶ 60-63).

10        The Magistrate Judge issued a report and recommendation, adopted by the Court,

11  finding that "whether proximate cause exists is a question for the jury" and the Court

12  "cannot say that the intervening actions of the Conmed Defendants in allegedly failing to

13  properly diagnose and treat M.J.H.'s medical and mental health needs, both before and

14  after the Prolixin injection, was an event so extraordinary that the County Defendants

15  should be absolved of liability for their failure to protect and their decision to place and

16  continue M.J.H. on protective custody status." (Doc. 131, at 26-27.)

17        Defendant argues that Plaintiff has not disclosed any expert evidence to support

18  her theory that the assault was a proximate cause of M.J.H. becoming floridly psychotic

19  six weeks later. Plaintiff's expert, Dr. Don, opined in her written report that there was a

20  general decline in M.J.H.'s psychiatric condition that occurred over the course of about

21  six weeks, beginning after his head injury from the assault, and ultimately resulting in

22  M.J.H.'s death. (Doc. 144, Ex. A at pp.4, 11.) County Defendants argue that Dr. Don's

1
2
3
4
5
6
7
8

written report is limited, by her own testimony as to the scope of her opinion during depositions, to the actions of Dr. Galper and the other Conmed providers in treating M.J.H.'s physical and psychiatric needs. Further, Defendants maintain that Dr. Don speculated as to a variety of factors that may have contributed to M.J.H.'s general decline, and also admits that even after the assault and placement in protective-custody, records indicate that M.J.H. still had periods of stability as noted on May 10, 12, and 18.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Similarly, Dr. Potts was hired by the Conmed Defendants for purposes of opining about whether the actions of Dr. Galper fell below the standard of care. Dr. Potts' written opinion does not contain any opinions about the assault, the effect of the assault on M.J.H.'s psychiatric condition, or the effect of protective-custody status on M.J.H. The foundation for Dr. Pott's opinion, regarding Dr. Galper's care of M.J.H., is based on medical records from May 28, 2010 to June 1, 2010. (Doc. 144, Ex. D at 2.) Plaintiff claims, however, based on Dr. Pott's deposition, that Dr. Potts ties the assault and protective-custody status "to M.J.H.'s ultimate mental and physical decline that resulted in his death." Despite this claim, Dr. Potts testified that he has no opinion on what caused M.J.H.'s death. Dr. Potts did not tie the assault and protective custody status to M.J.H. being diagnosed as floridly psychotic or suffering a cardiac event, but discusses the custodial issues as being a "possible stressor" for M.J.H. Over the objection of defense counsel, Plaintiff's counsel asked Dr. Potts at his deposition about the stressors of being in solitary confinement and whether he thought it contributed to M.J.H. becoming psychotic at some point in time. Dr. Potts stated that he thought it did.

28

Defendants submit that neither expert disclosed any written report on what role

any custodial issues, including the assault and placement on protective-custody status, may have played in M.J.H. becoming floridly psychotic on May 31, 2010, or his June 2, 2010 cardiac event. Federal Rules of Civil Procedure, and the Court's Order (Doc. 22), prohibits testimony from expert witnesses on matters not present in their reports.

Defendants also argue that Plaintiff failed to disclose the information in response to written interrogatories, and that Plaintiff has never disclosed any expert testimony regarding excessively restrictive or solitary confinement or reasonable alternative activities, nor has she supplemented her discovery responses to include the general statements expressed by Dr. Don and Dr. Potts. By failing to disclose a custodial expert, or any medical expert, to discuss the precise role that the assault and protective-custody status may have had on M.J.H. becoming floridly psychotic and suffering a cardiac event, Defendants assert that Plaintiff has precluded the County Defendants from having their own expert on those issues.

Defendants also argue that the doctors' statements should also be precluded under Rule 702, Fed.R.Evid. While Dr. Potts does have experience inside correctional institutions, Dr. Don has no background on jail or prison matters, and neither he nor Dr. Potts opined to a reasonable degree of medical probability what extent the assault and protective-custody status, or any other variable, played in M.J.H.'s mental-health issues, much less what role those two things may have played in M.J.H. being diagnosed as floridly psychotic on May 31 or suffering a cardiac event on June 2.

Finally, Defendants argue that Plaintiff should be precluded from offering any argument or evidence that the lack of a separate mental-health unit for remanded

juveniles was a proximate cause of M.J.H.'s death because there is absolutely no evidence to support this theory. Defendants maintain that Plaintiff has failed to disclose any expert opinion on this topic, that Dr. Potts' statements at deposition testimony do not comply with the requirements of Rule 26, Fed.R.Civ.P., and Plaintiff has not supplemented her discovery responses with this information as required by Rule 33.

Under Rule 26(a)(2)(B), a party using an expert witness must disclose a report containing, *inter alia*, "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2)(B). The purpose of the rule is to eliminate "unfair surprise to the opposing party." *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir.1995). But it "does not limit an expert's testimony simply to reading his report.... The rule contemplates that the expert will supplement, elaborate upon, [and] explain and subject himself to cross-examination upon his report" in his oral testimony. *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006). Under Rule 37(c)(1), if a party fails to disclose the information required by Rule 26(a), its expert may not testify as to that information—"unless such failure is harmless." Fed.R.Civ.P. 37(c)(1). The requirement of a detailed report serves several functions. It helps the opposing party to meaningfully depose the expert; it helps the opposing party to determine its own expert needs; and it prevents the expert from "lying in wait" with new, last-minute opinions.

Dr. Potts' report contains no basis for his opinion obtained at deposition about the stressors of being in solitary confinement and whether he thought it contributed to M.J.H. becoming psychotic at some point in time. Dr. Potts' report is limited to his opinion

based on the very narrow window of time concerning M.J.H.'s treatment by Dr. Galper from Dr. Galper's first contact with M.J.H. on May 28, 2010, to the time M.J.H. was found unresponsive in his cell on June 1, 2010. Counsel cannot expand the scope of Dr. Potts' testimony by cross-examining him in areas outside the scope of the report during deposition. Admission of testimony from Dr. Potts concerning the care and custodial treatment of M.J.H. outside this time period discussed in his report would run afoul of Rules 26 and 37. Such transgression is not harmless, *see* Fed.R.Civ.P. 37(c)(1), because this testimony goes to much more than merely supplementing, elaborating upon, and explaining his report. Thus, defense counsel lacked adequate notice to prepare a rebuttal report or to prepare for or closely examine Dr. Potts' testimony on this subject at depositions. Accordingly, the Magistrate Judge recommends that the Court grant Defendants' motion in part by limiting the scope of Dr. Potts' testimony based on the opinion and foundational basis for that opinion disclosed in his report and preclude any testimony outside this scope.

Dr. Don, on the other hand, expressed an opinion regarding factors she considered to be contributing factors in the deterioration of M.J.H.'s psychiatric and physical condition, elaborating on these topics in her discussion to include the physical assault of M.J.H. and the time he spent in protective custody. Defendants were not prejudiced, nor should they have been unfairly surprised, when Dr. Don was asked to elaborate on these topics during her deposition. Dr. Don, a board-certified psychiatrist, reviewed extensive records and opined on M.J.H.'s psychiatric disorder over a time period that covered the time from his arrest on November 3, 2009 through to the autopsy performed on M.J.H.

following his death. Dr. Don's opinion is not any less authoritative because she opines that the trigger for M.J.H.'s deterioration might be "multifactorial," though this would clearly be a topic for cross-examination by Defendants. Accordingly, the Magistrate Judge recommends that the Court deny the motion as to Dr. Don in part, to allow testimony from Dr. Don concerning her opinion that the physical and emotional consequences of the assault and head injury, and protective custody status, as a causal factors in the deterioration of M.J.H.'s psychiatric condition but grant the motion as to any testimony regarding standard of care of the County Defendants.

As there is no foundation or opinion expressed in the reports from either doctor concerning the issue of whether a lack of a separate mental-health unit for remanded juveniles at the PCADC was a proximate cause of M.J.H.'s death, the Magistrate Judge recommends that the Court preclude expert testimony on this subject from either Dr. Don or Dr. Potts pursuant to Rules 26(a)(2) and (e)(2), and Rule 33, Fed.R.Civ.P. To clarify, however, this should not preclude testimony regarding either doctors' opinion regarding the circumstances and suitability of the level of medical care that M.J.H. was provided while he was in protective custody or in the infirmary.

> 2. *Special Damages – Medical Bills and Emergency Transport Bills already Paid by Defendants or Not Otherwise Chargeable to Plaintiff (Docs. 143, 169.)*

The County Defendants move the Court for an order precluding Plaintiff from introducing any argument or evidence about special damages (medical bills and an emergency-transport bill) that have already been paid by Pima County or written off by

the provider. Defendants argue that the evidence should be excluded because it is not relevant under Rule 401, Fed.R.Evid., nor is it a recoverable measure of damages.

At issue, specifically, are disclosures Plaintiff has made listing as Special Damages the bills incurred during the emergency transport and hospital treatment of M.J.H., totaling $159,799.64, and consisting of bills from the Tucson Fire Department ("TFD"), St. Mary's Hospital ("St. Mary's"), and UMC. Defendants assert that Pima County denied the bill submitted by the TFD as untimely, and TFD wrote the balance off. Defendants also assert that, similarly, St. Mary's also wrote its balance off and that Pima County settled the UMC bill. Defendant maintains that Plaintiff paid no sums on the bills, and is not legally obligated to do so.

Plaintiff acknowledged in the hearing on Defendants' motion that as to the State wrongful death claim, medical bills that were incurred by the decedent would not normally be an element of damages in the wrongful death. Plaintiff directed her arguments to the §1983 claim brought on behalf of the estate of M.J.H.

Plaintiff opposes the motion based on the "collateral source" rule under Arizona tort law, and because of the relevancy of the medical bills to the issue of liability.  Under the collateral source rule, "total or partial compensation for an injury which the injured party receives from a collateral source wholly independent of the wrongdoer does not operate to reduce the damages recoverable from the wrongdoer." *Hall v. Olague*, 119 Ariz. 73, 73 (App. 1978). Although the collateral source rule "favors the victim of the wrong rather than the wrongdoer" it "is an attempt to resolve a basic conflict between the two guiding principles of tort law, namely, (1) the limitation of compensation to the

injured party to the amount necessary to make him whole and (2) the avoidance of a windfall to the tortfeasor if a choice must be made between him and the injured party." *Lopez v. Safeway Stores, Inc., 212 Ariz. 198, 207 (App. 2006).* (citations omitted). Furthermore, in light of "Arizona's broad application of the collateral source rule," *Lopez* 129 P.3d at 496, the Magistrate Judge finds that the write-offs are a collateral source because they are not actually paid by Defendants.

The Magistrate Judge recommends denying the motion as to the medical bills and emergency transport bills that were paid from a collateral source, including those which have been written off. To the extent Defendants allege that some of the payments come directly from Defendant Pima County, and are thus not a collateral source, the Magistrate Judge acknowledges that this may be the basis for granting Defendants' motion, but does not have enough information to decide at this time, and recommends deferring the ruling at this time. *See Lopez*, 129 P.3d at 493 (" '[t]he law does not differentiate between the nature of the benefits, so long as they did not come from the defendant.' ")(quoting Restatement (Second) of Torts § 920A cmt. b.) (noting that benefits conferred by plaintiff's own insurance arrangements or by a third party gift are recoverable). To the extent Plaintiff argues that the documents are admissible as evidence of liability regardless of their source, the Magistrate Judge recommends reserving ruling on this issue until trial.

B.    <u>Conmed Defendants</u>

1.    *Motion to limit plaintiff's standard of care testimony to testimony regarding Dr. Galper (Docs. 146, 172.)*

- 11 -

Conmed Defendants move to limit the testimony of Plaintiff's expert, psychiatrist Dr. Laura Don, to testimony regarding the standard of care that applies to Dr. Galper. Conmed Defendants further move to prohibit all standard of care testimony from Dr. Wax.

In the year prior to June 2010, Dr. Don worked as a clinical psychiatrist who provided care to HIV patients. Dr. Don does not currently practice general medicine and is not a nurse.

"Arizona law requires a plaintiff who asserts a medical negligence claim against a health care professional to prove that the health care professional failed to comply with the applicable standard of care." *Awsienko v. Cohen*, 227 Ariz. 256, ¶ 8 (App. 2011), citing A.R.S. § 12–563. Arizona law further provides that in medical malpractice cases, an expert cannot testify unless the expert is "a specialist who is board certified in that specialty or claimed specialty" of the professional against whom the expert will testify, and, during the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to the active clinical practice of the same health profession as the defendant, in the same specialty or claimed specialty. A.R.S. §§ 12-2604(A)(1), (A)(2)(a). If the defendant is a general practitioner, the expert must have devoted a majority of their time in the year preceding the occurrence giving rise to the lawsuit to active clinical practice as a general practitioner. A.R.S. § 12-2604(A)(3). Defendants assert that these requirements are substantive Arizona law. *See* (Doc. 146, at 3) citing *Seisinger v. Siebel*, 220 Ariz. 85, 95 (2009) and *Kaufman v. Jesser*, 884 F.Supp.2d 943, 953 (D. Ariz. 2012); *see also Liebsack v. United States*,731, F.3d 850

1    (9th Cir. 2013)(Federal Rule of Evidence 601 mandates that district court first apply any

2    state witness competency requirement and then determinate if the testimony is otherwise

3

4    admissible under federal evidentiary rules and controlling law.).

5         The intent of § 12-2604 is that "in a medical malpractice action, only physicians

6    with comparable training and experience may provide expert testimony regarding

7    whether the treating physician provided appropriate care." *Baker v. University Physicians*

8

9    *Healthcare*, 231 Ariz. 379, 383 ¶ 9 (2013). In applying this statute, the Arizona Supreme

10   Court directs trial courts to:

11

12        … initially determine if the care or treatment at issue involves the identified
         specialty, which may include recognized subspecialties. If it does, testifying
13        experts must share the same specialty as the treating physician. The trial
         court then must determine if the treating physician is board certified within
14        that specialty. If so, any testifying expert must also be board certified in
         that specialty.
15

16

17   *Id*. at 386, ¶ 27.

18         A "specialty" is construed for purposes of § 12-2604 as referring to "a limited area

19   of medicine in which a physician is or may become board certified." *Id*. at 378, ¶ 21.

20
     Only if the care or treatment involved a medical specialty will expertise in that specialty
21
     be relevant to the standard of care in a particular case. *Id*. at 384, ¶ 12. If a specialty or
22
     subspecialty is involved, the testifying physician must share the same specialty as the
23

24   treating physician, "even if physicians in other specialties might also have competently

25   provided the treatment" in question. *Id*. at 387, ¶ 31. "The statute does not require a

26
     testifying expert to have identical certifications to the treating physician (*e.g.*, when the
27

28   treating physician has multiple certifications), but only that the expert be certified in the

specialty at issue in the particular case." *Id*. at 387, ¶ 28. Requiring a testifying expert to match each specialty of a party would be "unmanageable and absurd," *Lo v. Lee*, 231 Ariz. 531 (App. 2012). *See also Aswienko*, 227 Ariz. at 260, ¶ 17, n.3 (indicating that a similar statute has been interpreted in another state "to require plaintiff's expert witness to specialize in the defendant's most relevant standard of practice, *i.e.*, the specialty or subspecialty the defendant engaged in during the course of the alleged malpractice.") citing *Woodard v. Custer*, 476 Mich. 545 (2006).

The Conmed Defendants argue that, because Dr. Don's expertise is limited to psychiatry, she cannot be permitted to testify regarding the standard of care for Dr. Bishop, Nurse Yashar, or any other Conmed employee, including physician assistants, nurse practitioners, and mental health professionals other than Dr. Galper. She also cannot be permitted to testify regarding Dr. Galper's diagnosis of M.J.H. on the afternoon of June 1, 2010, when Dr. Galper was acting as a neurologist, not a psychiatrist, in assessing whether M.J.H. had a seizure.

Plaintiff first objects to Defendants' use of the procedural vehicle of a motion in limine to assert a substantive, potentially dispositive motion. Plaintiff argues that because Defendants chose not to raise this substantive issue during the Court's resolution of dispositive motions, Defendants should be deemed to have waived any objections to Plaintiff's experts. The authority Plaintiff cites in support of this argument generally supports the proposition that motions in limine are not to be used to assert substantive, potentially dispositive motions. As a practical matter, granting this motion would be dispositive as to claims which, under Arizona law, require expert testimony to prove the

1
2
3
4
5
6
7
8
9
10
11
12
13

licensed professional's standard of care or liability for the claim. Additionally, the Magistrate Judge finds that a review of this Court's cases determined since enactment of A.R.S. § 12-2604 suggests that it is also the practice of this Court to consider such motions in conjunction with the Court's resolution of dispositive motions, *see e.g. Mann v. United States*, 2012 WL 273690 (resolving substantive objections to expert testimony under A.R.S. § 2604 as matter for summary judgment). Plaintiff, however, cites no specific authority that holds that motions in limine are an inappropriate vehicle to raise objections to an expert's qualifications under state substantive law. Nonetheless, as this motion is a substantive motion, dispositive of Plaintiff's claims, the Magistrate Judge recommends denying the motion as untimely filed.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Alternatively, considering the merits of Defendants' motion, regarding testimony used to establish the standard of care during the time period Dr. Galper testified he was "acting as a neurologist," the Court considers initially if the care or treatment at issue involves the identified specialty. *Baker*, 231 Ariz. at 386, ¶ 27. Based on the evidence before the Court, specifically the opinion from Dr. Don that the criteria that Dr. Galper used in evaluating the possible seizure activity was not "based on neurologically valid criteria" the Magistrate Judge determines that this care or treatment involves an identified specialty, specifically neurology. Because Dr. Galper was not board certified as a neurologist at the time of treatment, it is not necessary for Dr. Don to be board certified in neurology. *See id.*; A.R.S. § 12-2604. The Magistrate Judge recommends a finding that Dr. Don, a board certified psychiatrist with additional training in neurological evaluations and treatment, is qualified to testify as to Dr. Galper's treatment of M.J.H. during the

entire time he was in Dr. Galper's care.

The Plaintiff did not address, in her written objection, the Defendant's motion to preclude Dr. Don's testimony regarding the standard of care for Dr. Bishop, Nurse Yashar, or any other Conmed employee, including physician assistants, nurse practitioners, and mental health professionals other than Dr. Galper.

To the extent Plaintiff can establish that Dr. Don is qualified to testify as to the care provided by members of the "health profession" and has the expertise to truly assist the fact-finder on issues of standard of care and proximate causation, the Magistrate Judge recommends that she be allowed to do so. Under *Baker*, however, this is a highly fact specific inquiry, and requires the Court to first determine if the care or treatment provided to M.J.H. involved any identified specialty. *See Liebsack*, 731 F.3d. at 858 (Board certified family practice physician not qualified under similar, but not identical, Alaska law to testify to nurses breach of the standard of care for psychiatric treatment of a patient with lithium toxicity symptoms when the district court's ruling addressed not just the nurse's failure to "follow-up" on lab tests ordered, but also discussed nurses conduct, including the failure to contact physician and to order lithium tests more frequently.) At this time, the Court lacks the factual basis necessary to make such a determination as to the health care providers in this case other than Dr. Galper. For this reason, the Magistrate Judge recommends granting Defendants' motion at this time as to Dr. Don in regards to health professionals other than Dr. Galper, but grant Plaintiff leave to move to qualify Dr. Don, under § 12-2604, if a factual basis for the qualification is demonstrated at trial.

1      Next, Plaintiff asserts that Dr. Wax, a clinical professor of surgery and emergency

2   medicine and medical toxicology, and service provider in the emergency department of

3   the Arizona Heart Hospital, will testify as to the standard of care of "a reasonably prudent

4   medical provider providing gatekeeping services" and that there is no specialty involved

5   in being a provider at the PCADC nor is there a specialty required for the medical

6   director. Under *Baker*, however, whether or not there is a specialty involved in being a

7   provider or medical director at PCADC is not the relevant inquiry. What is relevant is

8   whether the care or treatment at issue involves an identified specialty.

9      Defendants argue that because none of the Individual Defendants, or any other

10   employee of Conmed is a toxicologist, and because Dr. Wax is not a psychiatrist, a

11   family medicine provider, a nurse or a mental health professional, Dr. Wax is not

12   qualified to testify as to the standard of care of any Conmed Employee, or Conmed itself.

13      To the extent Defendants are arguing that Dr. Wax (and for that matter, Dr. Don)

14   cannot testify against certain Defendants because he is overqualified, this position was

15   rejected by the Arizona Court of Appeals in *Cornerstone Hosp. of Southeast Arizona,*

16   *L.L.C. v. Marner ex rel. County of Pima*, 231 Ariz. 67, 79 (App. 2012). Applying a

17   "common-sense interpretation" and rejecting the idea that a registered nurse ("RN") is

18   not qualified to provide expert opinion on the standard of care for professions that require

19   more limited skills than are required of an RN on the ground that the RN is overqualified,

20   the appellate court concluded that nursing is a "health profession" for purposes of

21   2604(A)(2), and that RNs, LPNs, and CNAs are subcategories of that profession.

22   *Cornerstone Hosp.* 231 Ariz. at 79. The appellate court found that this conclusion did not

thwart the legislative purpose behind § 12-2604 of ensuring that physicians or nurses, testifying as experts, have sufficient expertise to truly assist the fact-finder on issues of standard of care and proximate causation." *Cornerstone Hosp.*, 231 Ariz. at 78 (quoting *Lo*, 230 Ariz. 457.) Thus, to the extent Plaintiff can establish that Dr. Wax is qualified to testify as to the care provided by members of the "health profession" and has the expertise to truly assist the fact-finder on issues of standard of care and proximate causation, he may do so. Under *Baker*, however, this requires the Court to first determine if the care or treatment provided to M.J.H. involved any identified specialty. At this time, the Court lacks the factual basis for making this determination. For this reason, the Magistrate Judge recommends granting Defendants' motion at this time as to Dr. Wax in regards to Dr. Bishop or health professionals other than Dr. Galper, but grant Plaintiff leave to move to qualify Dr. Wax, under § 12-2604, if a factual basis for the qualification is demonstrated at trial.

> ### 2. *Motion to limit testimony regarding the cause of M.J.H.'s death (Doc. 147, 170.)*

The Pima County Medical Examiner did not determine the cause of M.J.H.'s death. Plaintiff claims that the death was a result of a reaction to an anti-psychotic drug administered to M.J.H., which caused neuroleptic malignant syndrome ("NMS"), a rare, but sometimes fatal, side effect of the drug. Plaintiff has identified three experts who will testify and will address NMS: Dr. Don, a psychiatrist, Dr. Wax, an emergency medicine physician and toxicologist, and Dr. Daniel Spitz, a forensic pathologist. *See* (Doc. 147, Ex. 1). Both Dr. Wax and Dr. Spitz have opined that M.J.H. developed NMS as a result

of the Prolixin injection on May 31, 2010, and that the NMS was the cause of M.J.H.'s death. *See* Wax Report, (Doc. 147, Ex. 2), at pp. 2 and 9; Spitz Report, (*Id.*, Ex. 3) at p. 3-4. The Conmed Defendants move to limit Plaintiff to one expert who may testify regarding the issue of whether M.J.H. developed NMS, and whether NMS was the cause of Plaintiff's death, as this testimony is needlessly cumulative, and therefore, highly prejudicial to the Conmed Defendants.

Under Rule 702(a), Federal Rules of Evidence, expert testimony is admissible to "help the trier of fact to understand the evidence or to determine a fact in issue." Even so, it may be excluded under Rule 403, Fed.R.Evid., if the probative value of the evidence is substantially outweighed by a danger of "needlessly presenting cumulative evidence." Rule 403's cumulative evidence provision does not prohibit the introduction of cumulative evidence; rather, it merely permits courts to exclude cumulative evidence when it has little incremental value. *See* Fed.R.Evid. 403 ("evidence may be excluded if its probative value is substantially outweighed ... by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

Plaintiff contends that the term NMS is likely to be used by all of the testifying medical experts, however, Plaintiff anticipates that only Dr. Spitz will opine on the cause of M.J.H.'s death. Plaintiff further anticipates that Dr. Don will testify regarding the use and the potential risks of anti-psychotic medication, including NMS and the role of a psychiatrist in recognizing and managing NMS, while Dr. Wax is expected to testify about the diagnosis and proper course of treatment for NMS. Dr. Wax will also testify regarding the care and treatment provided to M.J.H. in the final days before his collapse.

It is not apparent to the undersigned that this testimony is needlessly cumulative. Although there appears to be some potential for overlap between Dr. Don and Dr. Wax's anticipated testimony, considering the requirements imposed by A.R.S. §12-2604, discussed above, the Court cannot say it is *needlessly* cumulative. Dr. Don testifies as an expert concerning the alleged breach of care of Dr. Galper. Dr. Wax testifies as an emergency care provider, directly relevant to the alleged breach of care of Dr. Bishop, and possibly other individual defendants as to the proper management of NMS. Accordingly, because no needlessly cumulative testimony is anticipated at this time, the Magistrate Judge recommends that the District Court deny Defendants' motion. Because testimony may in fact be elicited at trial that is "needlessly cumulative," the Magistrate Judge further recommends that the motion be denied without prejudice at this time.

3.      *Motion to exclude video tapes of M.J.H. in infirmary (Docs. 148, 157.)*

The Conmed Defendants move to exclude the introduction of video tapes of M.H.J. while he was in the infirmary, other than those to which they have stipulated. Prior to M.J.H.'s transportation to the hospital, M.J.H. had been on a five-minute suicide watch in the PCADC infirmary. He was constantly videotaped while in the infirmary. Defendants argue that the videos are "disturbing" in that they show the harsh condition under which M.J.H. lived, without clothes and housed in a cell with no bed or bedding, are more prejudicial than probative, especially as to the Conmed Defendants, and should be excluded pursuant to Rule 403, Fed.R.Evid. The Conmed Defendants argue that they had no control over where and how an inmate is housed, and that these videotapes are

likely to elicit sympathy from a jury, and attribute some of the fault for these conditions to the Conmed Defendants. Additionally, a jury would be prone to include the consideration of these videotapes in the determination of whether the Individual Defendants were deliberately indifferent to the needs of M.J.H., even though the Individual Defendants had no control over these living arrangements.

Plaintiff explains that there are three separate types of video relevant to this case: (1) surveillance videos created by a stationary security camera; (2) a recording of the last video visit between M.J.H. and his family; and (3) a video recording from a portable camera placed in front of M.J.H.'s cell for the specific purpose of recording his activities.

Defendants raise no objection to the video recording of M.J.H.'s last video visit with his family or to the video recording of the administration of the drug. There being no objection to the video recording of M.J.H.'s video visit with his family, the undersigned does not address this recording here. Defendants clarified at the hearing that they seek to preclude video from the surveillance cameras, which document the entry and exit of individuals from M.J.H.'s cells and the portable camera placed in front of M.J.H.'s cell. Plaintiff opined that they would seek to present at trial approximately one hour of video.

Defendants contend that the videotapes are especially prejudicial because M.J.H. can be seen naked, in a cell, without so much as a mattress; conditions which are likely to elicit sympathy in the jury and which the jurors will attribute to the Conmed Defendants even though the Conmed Defendants had no control over the conditions. As Plaintiff contends, this video is relevant and probative on several issues in this case including the conditions under which M.J.H. was kept, M.J.H.'s mental and medical condition at the

time of his collapse, the treatment (or lack thereof) provided by the Conmed Defendants, and the reasonableness of the Conmed Defendants' decision to keep M.J.H. at PCADC, rather than transfer him to a higher level of care. Accordingly, the Magistrate Judge recommends that the District Court find that the danger of prejudice does not outweigh the highly probative value of the evidence, and deny Defendants' motion.

Plaintiff clarified at the hearing that they propose to present any video that documents any interactions between M.J.H. and medical providers or his custodians, in addition to any video that shows his mental status to the extent Defendants argue that he was not mentally ill. Plaintiff clarified that they intend to present approximately one hour, non-consecutive, of video in relation to Dr. Don's deposition, that would be "fairly short" and to present the video visit with his family in relation to Dr. Potts deposition, and in addition any video relevant to the impeachment comparing the medical records to the actions of Conmed. Defendants contend that additional time will be necessary to show video that demonstrates M.J.H.'s behavior when he was calm. Accordingly, the Magistrate Judge recommends that the trial court exercise its sound discretion in imposing reasonable time limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence.

4.      *Motion to preclude evidence of the Medical Board's investigation of Dr. Bishop and the Advisory Letter it issued (Doc. 149, 171.)*

The Conmed Defendants seek to exclude evidence of the Arizona Medical Board's (the "Board") investigation and issuance of an advisory letter ("Advisory Letter"), arising from a complaint against Defendant Bishop filed by M.J.H.'s family.

After M.J.H.'s death, his family filed two complaints, with the board; one filed against Dr. Bishop, the second against Dr. Galper. The investigation by the board was confined to a review of the medical records, and Bishop and Galper's written responses to the complaints. The complaint against Dr. Galper was dismissed. The complaint against Dr. Bishop resulted in the Advisory Letter being placed in his file. Because the Advisory Letter does not constitute a disciplinary action, Dr. Bishop had no further right of review of the Board's action. The Conmed Defendants seek to exclude the Advisory Letter, as hearsay evidence, because it is not sufficiently trustworthy to be admissible under Rule 803(8), Fed.R.Evid., as a public record, and, even it if were, it is more prejudicial than probative under Rule 403, Fed.R.Evid., and should be excluded.

The Conmed Defendants argue that the Advisory Letter, based on the opinion of one medical consultant who never spoke to Dr. Bishop, nor anyone else involved in the care of M.J.H. while incarcerated, was issued under circumstances indicating a lack of trustworthiness. The Conmed Defendants assert that because the medical consultant who provided the conclusions underlying the Advisory Letter would not be permitted to testify, because she was not a fact witness and would not qualify as an expert, then the document should not be admitted.

The Conmed Defendants further argue that because the conclusions in the Advisory Letter are not a finding that Dr. Bishop breached the standard of care, rather, as the letter explains, the Board had insufficient evidence to support such a conclusion, or the violation of the Board's standards was minor or technical, allowing a jury to consider it would be highly prejudicial, as a jury is likely to give the findings great weight.

Finally, the Conmed Defendants argue that, if the Advisory Letter is admitted as sufficiently trustworthy and probative, then they should be allowed to introduce evidence that the Complaint against Dr. Galper was dismissed as equally trustworthy and probative.

Plaintiff agrees that the advisory letter is not admissible in her case in chief to prove liability and agrees not to comment on it in opening statement. Plaintiff asserts, however, that she can envision circumstances in which the letter may become admissible during trial, and that the Court should reserve decision on this issue. Because these circumstances are not now before the Court, the Magistrate Judge recommends denying the motion as moot, relying on Plaintiff's stipulation not to move to use the letter in her case in chief, but grant Defendants leave to reurge the motion during trial if Plaintiff seeks to introduce the letter.

    C.    <u>Plaintiffs</u>

        1.    *Nature and Circumstances of Sentenced Crime (Docs. 151, 158, 162.); Prior Bad Acts or Evidence of Juvenile Record (Docs. 153, 159.)*

Plaintiff moves to preclude Defendants from identifying the crime for which M.J.H. was convicted or the circumstance surrounding the crime itself, the arrest, or victim information. (Doc 151) citing Rules 402, 403, 404(b), Fed.R.Evid. M.J.H. pled guilty to second degree burglary and was sentenced to four months in the Pima County Adult Detention Center. Plaintiff seeks to exclude all references to the conviction by live witnesses, in deposition transcripts, expert reports and jail and medical records.

Additionally, Plaintiff also seeks to preclude any argument based on the nature or circumstances of his crime, including "examples" of the types of convictions that might result in a juvenile being remanded to county custody.

Plaintiff argues that the Sheriff's duties to M.J.H. and other individuals in his custody is not dependent on the particular crime for which an individual is charged or convicted, and the circumstances of the arrest, charge and conviction are not relevant to that duty.

In written opposition, the County concedes, and Defendant Conmed does not assert, that the evidence is relevant to liability, nonetheless, they oppose the motion, arguing that this evidence is highly relevant to the damages Plaintiff seeks. Defendants argue that the evidence will show that M.J.H. broke into a home for the purpose of stealing Adderall, and was videotaped breaking into the home. The County Defendants assert this evidence is admissible under Rules 401, 402, 403, 602, 701, and 801, Fed.R.Evid.

Plaintiff also moves in limine to preclude Defendants from introducing evidence that M.J.H. had a history of contact with the juvenile justice system. (Doc. 153) citing Rules 402, 403, 404(b), and 609(d), Fed.R.Evid. Plaintiff seeks to exclude all references by live witnesses, in deposition transcripts, expert reports, and jail and medical records to prior bad acts or juvenile history. Plaintiff also seeks to preclude any argument based on the nature or circumstances of any prior acts that involved the juvenile justice system.

Plaintiff argues that, under Arizona statute, A.R.S. § 8-207, the evidence of M.J.H.'s contacts with the juvenile justice system are inadmissible. Although Defendants

did not respond to Plaintiff's assertion that the evidence is protected under this statute, a review of state case law reveals that the law is not contravened by the use of M.J.H.'s juvenile record in this case. Under the statute, an order of the juvenile court shall not be deemed a conviction of a crime, and the disposition of a juvenile in the juvenile court may not be used against the juvenile in any case or proceeding other than a criminal or juvenile case. A.R.S. §8-207. The Arizona Supreme Court has held that this prohibition does not forbid the use of information for any purpose, rather, only when used as evidence against the juvenile. *See Parsons v. Smithey*, 109 Ariz. 49, 51 (1973)(discussing A.R.S. former § 8-228, now A.R.S. § 8-207). Use of the evidence in this case would not be "against" M.J.H., thus A.R.S. § 8-207 does not apply.

Plaintiff also argues that even if the nature of the conviction is relevant to Plaintiff's damages, the evidence is unfairly prejudicial. To be admissible, evidence must be relevant under Fed.R.Evid. 402 and its probative value must not be substantially outweighed by the danger of unfair prejudice under Rule 403, Fed.R.Evid. Plaintiff argues that the prejudice from admitting evidence of prior bad acts or evidence of juvenile referrals is allowing the jury to use the impermissible reasoning that it is the parents' fault their child was incarcerated.

Rule 404(b) dictates that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. Defendant Conmed asserts that under the Arizona wrongful death statute, A.R.S. §12-613, the character of the decedent is admissible on the issue of damages, and is also relevant to Plaintiff's damage claim under 42 U.S.C. § 1983, where

Plaintiff seeks damages for loss of life. In the context of a wrongful death claim, the trier of fact is asked to "give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover." A.R.S. § 12–613. The jury is charged with subjectively valuing the plaintiff's damages and awarding the amount it deems "fair and just." *Walsh v. Advanced Cardiac Specialists Chartered*, 229 Ariz. 193, 196 (2012) citing *Hernandez v. State*, 128 Ariz. 30, 32 (App. 1980). "Wrongful death damages are statutorily limited to injuries "resulting from the death," §12-613, which may include the decedent's prospective earning capacity; the loss of companionship, comfort and guidance caused by the death; and the survivor's emotional suffering," *id.*, "decedent's character in this regard in relationship to the surviving parties is a matter in issue." *Kemp v. Pinal County*, 8 Ariz.App. 41, 45 (App. 1968).

The County Defendants assert that Plaintiff's wrongful-death claim requires that Plaintiff show how she and the other beneficiaries have been deprived of the love, companionship, and society of M.J.H.. At deposition, Plaintiff, M.J.H.'s father, and M.J.H.'s half-brother all testified that they had a close and loving relationship with M.J.H., that M.J.H. was a good kid and son, and that M.J.H. was determined to turn his life around. The County Defendants maintain, however, that the fact that M.J.H. had a criminal history, including a felony conviction, had been in jail more than once, and had abused alcohol and a variety of prescription and illegal drugs in the years prior to his death, including stealing drugs and other property, is evidence that goes to the nature and extent of Plaintiff's relationship with her son. The Conmed Defendants assert that from

the age of 13, following his parents' divorce in 2005, M.J.H. had extensive contact with the juvenile justice system arising from charges of theft, burglary, drug use, domestic violence, and violation of probation. M.J.H.'s father had M.J.H. arrested for theft and for a probation violation. The domestic violence charges were reported by M.J.H.'s mother, the Plaintiff in this case. During this time M.J.H. was also in and out of juvenile detention and drug rehabilitation programs. Defendant asserts that this evidence, specifically the negative effect that drug abuse has on a parent/child relationship, is relevant for a determination of damages. From the evidence cited above, Defendants maintain that the jury could infer what type of relationship M.J.H. had and would continue to have with his parents.

In *Braillard v. Maricopa County*, the Arizona Court of Appeals affirmed a trial court's ruling precluding a defendant's discovery of information on the decedent's computer that would demonstrate illicit activities on the internet, including credit card fraud and selling stolen properties. 224 Ariz. 481, 496 (App. 2010). The appellate court found that, because the plaintiff was seeking damages only for loss of consortium, the evidence was not relevant to the jury's determination of damages for Plaintiff's asserted loss of companionship, guidance, and comfort, because "any connection between any such activities and the quality of [plaintiff and decedent's] relationship is facially tenuous and, in the absence of any evidence, completely speculative." *Id*. There is, in this case however, unlike *Braillard*, evidence that M.J.H.'s criminal behavior negatively

influenced the quality of M.J.H.'s relationship with his family.[1] Restricted to the issue of damages, evidence of M.J.H.'s juvenile criminal history is relevant to the nature and degree of emotional comfort and companionship that Plaintiff had received from her son. *See Gates v. Rivera*, 993 F.2d 697, 700 (9th Cir. 1993) (stating in § 1983 wrongful death case brought by mother that "[r]estricted to the issue of damages, the questions as to [decedent son's] use of drugs were proper, and the district court had discretion to admit them as probative and not unduly prejudicial ."). The Magistrate Judge recommends denying the motion to preclude evidence of M.J.H.'s prior bad acts or juvenile record as evidence regarding the parent's relationship with M.J.H. for purposes of a determination of damages only.

The Magistrate Judge finds that additionally, as to the nature and circumstances of Plaintiff's crime for which he was sentenced to PCADC, the prejudicial impact of this evidence is minimized because the jury will be aware from other evidence that M.J.H. was detained at the PCADC, and will likely infer that such detention was as a result of the criminal charges or the criminal conviction of M.J.H. The Magistrate Judge therefore finds this evidence relevant to damages, and not unfairly prejudicial, and recommends denying Plaintiff's motion to preclude evidence of the circumstances and nature of crime for which M.J.H. was sentenced but limiting this evidence only for purposes of a determination of Plaintiff's damages.

The Magistrate Judge further recommends bifurcating the trial as to damages to

---

[1] Plaintiff conceded at oral argument that she is not seeking any damages for loss of earning capacity or lost wages.

minimize any prejudicial effect this evidence would have on the juries determination of liability.

To the extent the evidence of the circumstances of M.J.H.'s conviction is admissible as relevant to damages, then Plaintiff should be allowed to testify regarding the fact that she believes M.J.H. was "set up" to commit the crime. The County Defendants argue that Plaintiff should not be allowed to testify regarding these facts because regardless of what Plaintiff believes occurred, the simple truth of the matter is that M.J.H. committed a burglary and pled guilty to it. Additionally, the County Defendants assert that Plaintiff's belief about a set-up is based entirely on hearsay, speculation, and conjecture, and that Plaintiff does not have first-hand knowledge of the crime or alleged set-up. Because the evidence of M.J.H.'s conviction is relevant to damages only so far as it bears on the relationship between M.J.H. and his family, the family members should be allowed to testify regarding their understanding of the circumstances and nature surrounding the conviction as it affected them and their relationship with M.J.H. Thus, the Magistrate Judge further recommends that, to the extent the evidence is admissible as relevant to damages, then Plaintiff should be allowed to testify regarding the fact that she believes M.J.H. was "set up" to commit the crime, and a limiting instruction regarding the purpose of this evidence be given.

Finally, the Defendants suggested during the course of the hearing that evidence regarding M.J.H.'s criminal background, behavior, wrongdoing, whether it was formally adjudicated or not is all relevant in this case, and the injury cannot be neatly separated from the damages because M.J.H. suffered from bipolar disorder, and a lot of what was

going on with M.J.H. prior to being incarcerated had to do with his mental disorder which includes, and the experts will testify, the criminal misconduct and wrongdoing in which he engaged.  For this reason, the County opposes bifurcation of the trial. Because the Defendants did not argue in their written response to Plaintiff's motion that any of this evidence was relevant to the issue of liability, there is an insufficient factual basis for the Magistrate Judge to make a recommendation as to the relevancy and admissibility of this evidence regarding liability.

> 2.   *Limitations on Testimony of Richard Trepeta, M.D. (Docs. 154, 160.)*

Defendants have disclosed the following opinion of Richard Trepeta, M.D.:

> It should be noted that at the time of autopsy, [M.J.H.] was also found to have cardiomegaly with thinning of the left ventricular. I believe that it is these cardiac abnormalities, possibly due to either [M.J.H's] admitted substance abuse and/or history of pharmacologic treatment for his mental disorders that resulted in a cardiac arrhythmia followed by anoxic brain damage. Without these pre-existing conditions [M.J.H.] would not have sustained a cardiac arrest and subsequent death. It could not have been known by his medical providers that these conditions existed at the time of his incarceration. I hold these opinions to a reasonable degree of medical probability.

(Doc. 154, Ex. 1.) Plaintiff moves to preclude Dr. Trepeta from offering opinions outside of his expertise that were not disclosed, and/or are without a factual basis in the record, specifically any opinions regarding : 1) alleged drug use by M.J.H.; 2) the probability that M.J.H. suffered an adverse consequence from the injection of anti-psychotic medication at PCADC; 3) whether M.J.H. was "faking" symptoms; 4) the medical management of M.J.H. at PCADC; 5) the medical management of Neuroleptic Malignant Syndrome; and

6) the suitability of the infirmary for managing M.J.H.'s medical or mental health condition.

During hearing on this issue, Plaintiff moved to preclude the opinions of Dr. Trepeta that were not disclosed in his report. The Conmed Defendants stated that the opinions at issue were elicited during the deposition in response to questions asked by Plaintiff, and agreed that they did not intend to elicit testimony from Dr. Trepeta that exceeds the opinions disclosed in his report.

Accordingly, the Magistrate Judge recommends denying this motion as moot.

### 3.       *Comparative Fault (Docs. 150, 165.)*

Plaintiff moves to preclude any assertion of contributory negligence on the part of M.J.H. for the assault that resulted when officers failed to keep C.N. separate from M.J.H., specifically any evidence or suggestion that M.J.H. was contributorily negligent or comparatively at fault for: 1) reporting that C.N. had attempted to sexually assault M.J.H.; 2) not reminding correctional officers about the keep separate order; and 3) requesting that C.N. be prosecuted for the assault.

Plaintiff asserts that the Pima County Defendants have not, and cannot, establish any legal duty that M.J.H. breached. He cannot be faulted for reporting an attempted sexual assault or requesting prosecution of C.N. Defendants do not intend to argue that M.J.H. was contributorily negligent or comparatively at fault for reporting C.N. or for M.J.H.'s decision to press charges. Thus, the Magistrate Judge recommends denying the motion as moot as to any evidence or suggestion that M.J.H. was contributorily or comparatively at fault for reporting C.N. had attempted to sexually assault him or for

1    requesting that C.N. be prosecuted for the assault.

2          Plaintiff asserts that Defendants cannot show that 17-year-old M.J.H. was in a

3    position to dictate security practices to corrections officers, let alone a legal duty to do so.

4    Without that evidence, there can be no comparative fault or contributory negligence.

5          The Pima County Defendants argue that every person is under a duty to act with

6    reasonable care, thus, contrary to Plaintiff's claim, M.J.H. had a duty to act with

7

8    reasonable care on the date he was assaulted, and because he attended class together with

9    C.N. just before the assault, M.J.H. breached that duty by not telling anyone that it was a

10   mistake to let both him and CN out at the same time.

11

12         In Arizona, if a jury applies the defense of contributory negligence in its verdict,

13   "the full damages shall be reduced in proportion to the relative degree of the claimant's

14   fault which is a proximate cause of the injury or death, if any." A.R.S. § 12–2505 (2003).

15

16   The Arizona Constitution, however, leaves the issue solely within the jury's discretion.

17   Ariz. Const. art. 18, § 5. ("[C]ontributory negligence ... shall, in all cases whatsoever, be

18   a question of fact and shall, at all times, be left to the jury."). In a negligence action such

19

20   as this, the jury not only has "the right to determine the facts, but to apply or not, as the

21   jury sees fit, the law of contributory negligence as a defense." *Gunnell v. Ariz. Pub. Serv.*

22   *Co.*, 202 Ariz. 388, 394, ¶ 23, (2002) quoting *Heimke v. Munoz*, 106 Ariz. 26, 28, (1970)

23

24   ( overruled on other grounds by *Jurek v. Jurek*, 124 Ariz. 596, 606 P.2d 812 (1980)).

25

26         A directed verdict cannot be granted if any evidence shows or tends to show the

27   plaintiff is guilty of contributory negligence. *Flashberg v. Krebs*, 8 Ariz.App. 254, 445

28   P.2d 456 (1968). **On the other hand, the issue of contributory negligence should not**

**go to the jury if there is not sufficient evidence from which reasonable men might conclude that the plaintiff was negligent**. *Mitchell v. Colquette*, 93 Ariz. 211 (1963); *Citizens Utilities Co. v. Firemen's Ins. Co.*, 73 Ariz. 299 (1952); *Motors Ins. Corp. v. Rhoton*, 72 Ariz. 416 (1951); *Humphrey v. Atchison T. & S.F. Ry. Co.*, 50 Ariz. 167 (1937). Additionally, although it is seldom appropriate to take the question of negligence from the jury, *Wilson v. City of Tucson*, 8 Ariz.App. 398 (1968), a directed verdict is proper where the evidence is such that no reasonable person could find the existence of essential elements of actionable negligence. *Shafer v. Monte Mansfield Motors*, 91 Ariz. 331, 372 P.2d 333 (1962).

The Magistrate Judge recommends that the District Court deny the motion as moot as to any evidence or suggestion that M.J.H. was contributorily or comparatively at fault for reporting C.N. had attempted to sexually assault him or for requesting that C.N. be prosecuted for the assault. The Magistrate Judge further recommends that the District Court deny the motion regarding M.J.H.'s duty to act reasonably and notify the correctional officers of the keep separate order with leave to argue for a directed verdict on this issue if the evidence is such that no reasonable person could find the existence of essential elements of actionable negligence.

4.    *Expert Testimony on Deliberate Indifference (Doc. 152, 160.)*

Plaintiff moves to preclude Defendants' experts from testifying regarding whether any individual Conmed expert was deliberately indifferent to M.J.H.'s serous medical needs, arguing that this determination involves a subjective component not the proper subject for expert opinion.

Conmed Defendants assert that this motion is too vague to be granted. Plaintiff points to no evidence in the record where any experts opine as to any individual defendant's subjective belief. Proper opinion testimony would include opinion as to whether Defendants met the standard of care, and by this, the jury may infer that the individual Conmed Defendants subjectively believed they were doing the right thing.

Both parties agreed during hearing that if neither side's experts broached the subject, then neither would they.

Based on this agreement, and because there is no evidence that Defendants' experts intend to opine on this subject, the Magistrate Judge recommends that the motion be denied with leave to reurge if Defendants opinion testimony broaches any area reserved as a matter of law to the jury or court for decision.

### 5.   *Comparative Fault; Consent for Treatment (Docs. 155, 161,167.)*

Plaintiff moves to preclude Defendants from introducing evidence or arguing that Plaintiff was comparatively at fault for failing to consent to the medical or mental health treatment of M.J.H. while he was in custody.

Shortly after Plaintiff's admission, Plaintiff consented to the treatment of M.J.H.'s sleeping problems with the medication Trazodone. After treatment was started, Plaintiff tried to contact medical staff to talk about the Trazodone, but nobody returned her call. Two months later, on May 28, Plaintiff received a phone call from Dr. Steven Galper, who told Plaintiff that he wanted to treat M.J.H. with an anti-psychotic drug. Plaintiff asked for additional information and said she wanted to visit with M.J.H. before consenting to the medication. Records indicate that she was "ambivalent" about the

medication, but had not refused consent. Plaintiff tried to see her son on Sunday, but was told that M.J.H. refused the visit. The following day Plaintiff was told that M.J.H. had been medicated.

Notations in the medical records suggested that Plaintiff would not consent to medications. Plaintiff submits there was no factual basis for this suggestion.[2] Defendants argue that it is relevant to liability of the Defendants charged with deliberate indifference, because even if there was no factual basis for asserting that Plaintiff would not consent, the individual Defendants believed that Plaintiff would not give consent to treatment, and were operating under this belief throughout their treatment of M.J.H. The Magistrate Judge finds that this evidence is both relevant and admissible on this issue.

After Plaintiff consented to treatment with Trazodone, she was not contacted again until Dr. Galper's call on May 28. Plaintiff argues that there is no factual basis for asserting that Plaintiff withheld consent for treatment prior to May 28, and the result of the May 28 conversation with Dr. Galper was not a refusal, but a request for additional information. Plaintiff contends that Defendants should therefore be precluded from arguing that Plaintiff was comparatively at fault in her son's death. The County Defendants argue that Plaintiff's failure to consent to Conmed giving M.J.H. medication on May 28, 2010 explains why M.J.H. received the Prolixin injection on May 31. Further,

---

[2] While Plaintiff argues there is no factual basis in the record supporting the notation that Plaintiff would not consent for M.J.H. to take psychotropic medications, the record actually demonstrates the basis for this belief was M.J.H.'s statements that his mother did not want him to take psychotropic medication. Although as Dr. Don pointed out, this may have been part of his delusional belief system. Regardless, as a juvenile, particularly a "floridly psychotic" juvenile, only Plaintiff's actual consent or lack of consent could be determinative.

it is anticipated that Dr. Galper will testify that the medication he was going to give M.J.H. on May 28, 2010 was not Prolixin and that the originally intended medication did not carry the same risks. Thus, Plaintiff's failure to consent explains why Conmed gave M.J.H. the Prolixin.

The County Defendants further argue that the jury should be allowed to decide what weight to give Plaintiff's explanation of her decision-making process to the jury. It is anticipated that M.J.H.'s father and half-brother will testify that in fact, Plaintiff did not approve of the taking of any mental-health medications. Defendant's expert Dr. Kern opines that "there was a potential that had he received treatment sooner, perhaps this event could have been avoided. … [T]he fact that there was a delay might have affected the outcome."

The Conmed Defendants position is that M.J.H. had unknown cardiac issues that caused his death. In the days prior to his death, M.J.H. had not been eating or drinking properly due to his psychosis. Dehydration and an electrolyte imbalance could have caused the cardiac problems M.J.H. suffered. Consequently, it is Conmed's position that if Dr. Galper had been able to medicate M.J.H. on Friday, May 28, 2010, his mental health would have improved, and his physical health would not have been further endangered. In addition, the emergency injection of Prolixin would not have been necessary. The Conmed Defendants argue that Plaintiff is asking the Court to dismiss an affirmative defense, something that should be accomplished in a motion for summary judgment, not a motion in limine. Furthermore, the evidence comes in to demonstrate why Dr. Galper delayed medicating M.J.H. until Monday, May 31, 2010.

1
2
3
4
5

    The Magistrate Judge finds that this evidence is both relevant and admissible on this issue and recommends that the District Court find that Plaintiff's arguments in support of exclusion of this evidence go to the weight, not admissibility, of the evidence and deny the motion.

6
7
8
9
10
11
12
13

    Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within fourteen days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Fed.R.Civ.P. 72(b). No reply to any response shall be filed. See id. If objections are filed the parties should use the following case number: CV 11-411-TUC-FRZ.

14
15
16

    If objections are not timely filed, then the parties' right to de novo review by the District Court may be deemed waived.

17

    Dated this 12th day of March, 2014.

18
19
20
21
22
23
24
25
26
27
28

_____
Bernardo P. Velasco
United States Magistrate Judge